DAVID B. GOLUBCHIK (SBN 185520)
KRIKOR J. MESHEFEJIAN (SBN 255030)
LEVENE, NEALE, BENDER, YOO & GOLUBCHIK L.L.P.
2818 La Cienega Avenue
Los Angeles, California 90034
Telephone:  (310) 229-1234; Facsimile:  (310) 229-1244
Email: DBG@LNBYG.COM; KJM@LNBYG.COM

Attorneys for Chapter 11 Debtor
and Debtor in Possession

# UNITED STATES BANKRUPTCY COURT
## CENTRAL DISTRICT OF CALIFORNIA
## SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re:<br><br>NOBILITY MANAGEMENT, LLC, a California limited liability company,<br><br>Debtor and Debtor in Possession. | Case No. 1:23-bk-10657-MB<br>Chapter 11 Case<br><br>[Subchapter V Election]<br><br>**DEBTOR'S NOTICE OF MOTION AND (I) MOTION FOR AUTHORITY APPROVING MODIFICATION OF LEASE UNDER § 363 AND (II) ASSUMING LEASE AS MODIFIED**<br><br>Hearing:<br>Date:  September 6, 2023<br>Time:  1:30 p.m.<br>Place:  Courtroom 303<br>          21041 Burbank Boulevard<br>          Woodland Hills, CA 91367<br>(VIA ZOOM GOV) |

**PLEASE TAKE NOTICE** that on September 6, 2023 in Courtroom 303 located at 21041 Burbank Boulevard, Woodland Hills, CA 91367, the Court will hold a hearing to consider this motion (the "Motion") pursuant to 11 U.S.C. §§ 363, 365,  and Fed. R. Bankr. P. 6004, filed by Nobility Management, LLC, the debtor and debtor in possession in the above-referenced Chapter 11 bankruptcy case (the "Debtor"), for entry of an order approving the Amendment and New Lease[1] (collectively, the "Lease Modification") between the Debtor and Calmur, LLC (the

---

[1] The Amendment and New Lease are defined below in the Motion and Memorandum of

1

"Landlord") concerning real property located at 26025 Mureau Road, Suite 110, Calabasas, California 91302 (the "Property"), and entry of an order authorizing the Debtor to assume the New Lease as modified. The complete bases for the Motion are set forth in the Motion and Memorandum of Points and Authorities and Declaration of Mark Rabinovich attached hereto. In summary, the Debtor believes that there is a sound business justification to enter into the Lease Modification because it allows the Debtor to operate at the same building in a smaller, less expensive space. Accordingly, the Debtor has negotiated the terms of, and now seeks authority to enter into the Lease Modification, which provides for the Debtor to lease office space at 26025 Mureau Road, Suite 210, Calabasas, California 91302 on a monthly basis, beginning on August 1, 2023, with monthly payments totaling $11,941, which is less than half of what the Debtor would otherwise be required to pay under the original lease.

**PLEASE TAKE FURTHER NOTICE** that, pursuant to L.B.R. 9013-1(f) any opposition to the Motion must be filed with the Clerk of the United States Bankruptcy Court and served upon the United States Trustee as well as counsel for the Debtor at the address located in the upper left-hand corner of the first page of this Notice and Motion by no later than fourteen (14) days before the hearing on this Motion.

**PLEASE TAKE FURTHER NOTICE THAT** that due to the COVID-19 pandemic, the Court will conduct the hearing remotely, using ZoomGov audio and video technology. Hearing participants and members of the public may participate in and/or observe the hearing using ZoomGov, free of charge.

Individuals may connect by ZoomGov audio and video using a personal computer (equipped with camera, microphone and speaker), or a handheld mobile device with an integrated camera, microphone and speaker (such as an iPhone, iPad, Android phone or Android tablet). The connection can be initiated by entering the "Meeting URL" into a web browser on any of these devices, provided the device is connected to the Internet. Individuals connecting in this manner will be prompted for the Meeting ID and Password shown below.

Points and Authorities attached hereto.

Individuals also may connect to the hearing by telephone only, using the telephone number provided below. Individuals connecting in this manner also will be prompted for the Meeting ID and Password.

Neither a Zoom nor a ZoomGov account is necessary to participate in or observe the hearing, and no pre-registration is required.

The audio portion of the hearing will be recorded electronically by the Court and constitute its official record.

All persons are strictly prohibited from making any other recording of court proceedings, whether by video, audio, "screenshot," or otherwise. Violation of this prohibition may result in the imposition of monetary and non-monetary sanctions.

The following is the unique ZoomGov connection information for the above-referenced hearing:

**URL**: https://cacb.zoomgov.com/j/1610312437

**ZoomGov meeting number:** 161 031 2437

**Password:** 534912

**Telephone conference lines:** 1 (669) 254 5252 or 1 (646) 828 7666

More information on using ZoomGov to participate in this hearing is available on the Court's website at the following web address:

https://www.cacb.uscourts.gov/news/zoom-video-hearing-guide-and-training-participants

**PLEASE TAKE FURTHER NOTICE** that the failure to file and serve a timely response to this Motion may be deemed by the Court to be consent to the granting of the relief requested in this Motion.

///

///

///

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

1.    granting the Motion in its entirety;

2.    approving the Lease Modification;

3.    authorizing the Debtor to enter into the Lease Modification and to take all actions necessary to consummate the Lease Modification;

4.    authorizing the Debtor to assume the New Lease as modified; and

5.    granting such other and further relief as the Court deems just and proper.

Dated: August 7, 2023                                    NOBILITY MANAGEMENT, LLC;

                                              By:    */s/ David B. Golubchik*
                                                   DAVID B. GOLUBCHIK
                                                   KRIKOR MESHEFEJIAN
                                                   LEVENE, NEALE, BENDER,
                                                   YOO & GOLUBCHIK L.L.P.
                                                   Counsel for Chapter 11 Debtor and Debtor-in-Possession

## MEMORANDUM OF POINTS AND AUTHORITIES[2]

### I.

### STATEMENT OF FACTS

**A.    Background.**

1.    On May 15, 2023 ("Petition Date"), the Debtor filed a Voluntary Petition for relief under Subchapter V of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtor continues to manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.    The Debtor is a medical billing and management services company that, on the Petition Date, provided digital marketing, administrative, and billing services to various affiliated outpatient clinics.

3.    The Debtor is a California limited liability company with its principal place of business located at the Property.

4.    The Debtor has been at the Property since May 1, 2021. Prior to that, the Debtor was located at 26500 W. Agoura Road, Suite 201, Calabasas, CA 91302.

5.    Prior to the Petition Date, the Debtor leased approximately 11,009 square feet of space, which consists of a single open-space unit with dedicated restrooms and an employee dining area. The Debtor leases the Property from Landlord pursuant to a Modified Gross Lease (the "Lease").[3]

6.    The Lease grants the Debtor one 5-year extension option, provided that the Debtor is not in default. The option contemplates a fair market value adjustment to the rent.

7.    The Lease is subject to a limited personal guarantee by Yury Gampel. The guarantee is capped at $200,000.00.

8.    Currently, monthly rent under the Lease is $28,475.62. Base rent under the Lease automatically increases by approximately 3% per annum. An additional charge is possible if

---

[2] All capitalized terms herein have the same meanings as in the preceding Notice of Motion and Motion.

[3] The Lease is attached as **Exhibit 1** to the annexed Declaration of Mark Rabinovich (the "Rabinovich Declaration").

common area expenses exceed base-level expenses in 2021 (a standard "modified gross lease" provision).

9. The impetus of the filing of this bankruptcy case was the Landlord's issuance of a three-day notice to pay rent or quit on May 12, 2023. Since March of 2023, the Debtor experienced a severe cash flow shortfall as a result of suspension of Medicare payments to some of the clinics for which the Debtor performs billing services.  As a result, both in April and in May of 2023, the Debtor did not have sufficient cash to meet two large expenditures which accrue in the beginning of the month: the payroll for the last 15 days of the prior month payable on the 6th day of the month and the rent payable by the 5th day of the month.

10. Prior to the Petition Date, the Debtor attempted to negotiate modifications to the Lease but was unable to reach an agreement.

11. Post-petition, after extensive negotiations with the Landlord, the parties entered into a Lease Modification.  Under the first step of the Lease Modification, the parties amended the Lease (the "Amendment").[4]

12. The Amendment modifies the Lease from 5 years to 2 years and three months. Thus, the Lease now expires on July 31, 2023.

13. The Amendment provides that, effective August 1, 2023, the Debtor shall relocate from unit 110 of the Property to unit 210 or any other space in the building below 4,900 rentable sq. feet.

14. Under the second step of the Lease Modification, and subject to this Court's approval, the parties will enter a new lease (the "New Lease")[5] for unit 210, which provides for a reduced monthly payment of $11,941 per month until the end of its term on July 31, 2024.

15. The Lease Modification allows the Debtor to continue its existing operations at a reduced rent at a smaller space.  Under the current Lease, the amount of space that the Debtor occupies—11,009—is too large for the Debtor's existing operations.

---

[4] The Amendment is attached as **Exhibit 2** to the Rabinovich Declaration.

[5] The New Lease is attached as **Exhibit 3** to the Rabinovich Declaration.

16.    The Debtor believes, in the exercise of its sound business judgment, that the terms of the Amendment and New Lease are fair and reasonable and that approval of the Lease Modification and assumption of the New Lease as modified is in the best interest of the Debtor's estate. The Property is the Debtor's principal place of business and the Debtor will incur substantial expenses if it is forced to move to another location

## II.

## DISCUSSION

### A.  Authority To Modify Lease Under 11 U.S.C. § 363(b)(1)

Section 363 of the Bankruptcy Code provides that court approval is generally required for actions that are "other than in the ordinary course of business." 11 U.S.C. § 363(b)(1).   In analyzing a Debtor's request for the approval to take an action that is outside of the ordinary course of business, courts generally apply a "business judgment standard." In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983) (As a general matter, "a judge determining a Section 363(b) application [should] find from the evidence presented before him at the hearing a good business reason to grant such an application."); In re 240 N. Brand Partners, Ltd., 200 B.R. 653, 659 (B.A.P. 9th Cir. 1996).

Here, the Amendment specifically requires court approval from the Court to become effective.  The Debtor submits that approval of the Amendment and the New Lease represents an exercise of the Debtor's sound business judgment and there is a compelling business reason to enter into the Lease Modification.  The Lease Modification, which was obtained after substantial negotiations, allows the Debtor to remain in its present location (albeit in a smaller space, at reduced rent) without having to incur burdensome moving expenses.  The reduction in monthly payments from $28,475.62 to $11,941 saves the Debtor thousands of dollars per month. As mentioned above, the filing of this bankruptcy was predicated on the Landlord's issuance of a three-day notice to pay rent or quit on May 12, 2023.  Since the Petition Date, the Debtor has worked tirelessly to resolve the rent issue with its Landlord.  As a result of their negotiations, the Debtor and Landlord have reached an agreement that will allow the Debtor to move forward with

its bankruptcy case. Moreover, the reduced expenses will improve the Debtor's cashflow to aid in its reorganization efforts, for the benefit of all creditors.

### B. Authority To Assume Lease under 11 U.S.C. § 365

11 U.S.C. § 365(a) authorizes a debtor in possession, "subject to the Court's approval, ... [to] assume or reject any executory contract or unexpired lease of the debtor." A debtor in possession may assume or reject executory contracts for the benefit of the estate. In re Klein Sleep Products, Inc., 78 F.3d 18, 25 (2d Cir. 1996); In re Central Fla. Metal Fabrication, Inc., 190 B.R. 119, 124 (Bankr. N.D. Fla. 1995); In re Gucci, 193 B.R. 411, 415 (S.D.N.Y. 1996).

In reviewing a debtor's decision to assume or reject an executory contract or unexpired lease, a bankruptcy court should apply the "business judgment test" to determine whether to approve the assumption or rejection. Agarwal v. Pomona Valley Med. Group, Inc. (In re Pomona Valley Med. Group, Inc.), 476 F.2d 665, 670 (9th Cir. 2007)

The Debtor believes that its decision to assume the Lease reflects a sound exercise of the Debtor's business judgment and is in the best interests of the Debtor's estate. The Debtor and its Landlord have negotiated a modification to the lease that will allow the Debtor to operate profitably by cutting its monthly rent from $28,475.62 to $11,941. The Property is also the Debtor's principal place of business and the Debtor will incur substantial expenses if it is forced to move to another location. Thus, the Debtor's business decision to assume the New Lease is sound.

///
///
///

## III.

## <u>CONCLUSION</u>

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order:

1.  granting the Motion in its entirety;

2.  approving the Lease Modification;

3.  authorizing the Debtor to enter into the Lease Modification and to take all actions necessary to consummate the Lease Modification;

4.  authorizing the Debtor to assume the New Lease as modified; and granting such other and further relief as the Court deems just and proper.

Dated: August 7, 2023                              NOBILITY MANAGEMENT, LLC;

                                        By:     */s/ David B. Golubchik*
                                                DAVID B. GOLUBCHIK
                                                KRIKOR MESHEFEJIAN
                                                LEVENE, NEALE, BENDER,
                                                YOO & GOLUBCHIK L.L.P.
                                                Counsel for Chapter 11 Debtor and Debtor-
                                                in-Possession

**DECLARATION OF MARK RABINOVICH**

I, Mark Rabinovich, hereby declare under penalty of perjury as follows:

1. Except where otherwise stated, I have personal knowledge of the facts set forth below and, if called to testify, would and could competently testify thereto.

2. I am the Manager of Nobility Management, LLC, the debtor and debtor in possession herein (the "Debtor" or "Nobility"). I am also an attorney authorized to practice law in the State of California.

3. On May 15, 2023, the Debtor filed a Voluntary Petition for relief under Subchapter V of 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code"). The Debtor continues to manage its financial affairs and operate its bankruptcy estate as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

4. The Debtor is a medical billing and management services company that, upon commencement of this case, provided digital marketing, administrative, and billing services to various affiliated outpatient clinics.

5. The Debtor is a California limited liability company with its principal place of business located at the Property.

6. The Debtor has been at the Property since May 1, 2021. Prior to that, the Debtor was located at 26500 W. Agoura Road, Suite 201, Calabasas, CA 91302.

7. The Debtor leases approximately 11,009 square feet of space, which consists of a single open-space unit with dedicated restrooms and an employee dining area. The Debtor leases the Property from Landlord pursuant to a Modified Gross Lease (the "Lease").[6]

8. The Lease grants the Debtor one 5-year extension option, provided that the Debtor is not in default. The option contemplates a fair market value adjustment to the rent.

9. The Lease is subject to a limited personal guarantee by Yury Gampel. The guarantee is capped at $200,000.00.

---

[6] A true and correct copy of the Lease is attached as **Exhibit 1**.

10. Currently, monthly rent under the Lease is $28,475.62. Base rent under the Lease automatically increases by approximately 3% per annum. An additional charge is possible if common area expenses exceed base-level expenses in 2021 (a standard "modified gross lease" provision).

11. The impetus of the filing of this bankruptcy case was the Landlord's issuance of a three-day notice to pay rent or quit on May 12, 2023. Since March of 2023, the Debtor experienced a severe cash flow shortfall as a result of suspension of Medicare payments to some of the clinics for which the Debtor performs billing services. As a result, both in April and in May of 2023, the Debtor did not have sufficient cash to meet two large expenditures which accrue in the beginning of the month: the payroll for the last 15 days of the prior month payable on the 6th day of the month and the rent payable by the 5th day of the month.

12. Prior to the Petition Date, the Debtor attempted to negotiate modifications to the Lease but was unable to reach an agreement.

13. Post-petition, after extensive negotiations with the Landlord, the parties entered into a Lease Modification. Under the first step of the Lease Modification, the parties amended the Lease (the "Amendment").[7]

14. The Amendment modifies the Lease from 5 years to 2 years and three months. Thus, the Lease now expires on July 31, 2023.

15. The Amendment provides that, effective August 1, 2023, the Debtor shall relocate from unit 110 of the Property to unit 210 or any other space in the building below 4,900 rentable sq. feet.

16. Under the second step of the Lease Modification, and subject to this Court's approval, the parties will enter a new lease (the "New Lease")[8] for unit 210, which provides for a reduced monthly payment of $11,941 per month until the end of its term on July 31, 2024.

---

[7] A true and correct copy of the Amendment is attached as **Exhibit 2**.

[8] A true and correct copy of the New Lease is attached as **Exhibit 3**.

17.     The Lease Modification allows the Debtor to continue its existing operations at a reduced rent at a smaller space.  Under the current Lease, the amount of space that the Debtor occupies—11,009—is too large for the Debtor's existing operations.

18.     The Debtor believes, in the exercise of its sound business judgment, that the terms of the Amendment and New Lease are fair and reasonable and that the approval of the Lease Modification and assumption of the New Lease as modified is in the best interest of the Debtor's estate.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 7th day of August, 2023, at Aventura, Florida.

_____
MARK RABINOVICH

# Exhibit 1

# AIRCRE

## STANDARD MULTI-TENANT OFFICE LEASE - GROSS

1. **Basic Provisions ("Basic Provisions").**

    1.1 **Parties.** This Lease ("**Lease**"), dated for reference purposes only _October 13, 2020_ , is made by and between _Calmur, LLC_ ("**Lessor**") and _Nobility Management, LLC a California limited liability company_ ("**Lessee**"), (collectively the "**Parties**", or individually a "**Party**").

    1.2(a) **Premises:** That certain Portion of the Project (as defined below), commonly known as (street address, suite, city, state): _26025 Mureau Rd., Suite 110, Calabasas, CA 91302_ ("**Premises**"). The Premises are located in the County of _Los Angeles_ , and consist of approximately _11,670_ rentable square feet and approximately _11,009_ useable square feet. In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to the Common Areas (as defined in Paragraph 2.7 below) as hereinafter specified, but shall not have any rights to the roof, the exterior walls, the area above the dropped ceilings, or the utility raceways of the building containing the Premises ("**Building**") or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "**Project**." The Project consists of approximately _45,304_ rentable square feet. (See also Paragraph 2)

    1.2(b) **Parking:** _47_ unreserved and _zero_ reserved vehicle parking spaces at a monthly cost of _zero_ per unreserved space and _zero_ per reserved space. (See Paragraph 2.6)

    1.3 **Term:** _5_ years and _3_ months ("**Original Term**") commencing _February 1, 2021_ ("**Commencement Date**") and ending _April 30, 2026_ ("**Expiration Date**"). (See also Paragraph 3)

    1.4 **Early Possession:** If the Premises are available Lessee may have non-exclusive possession of the Premises commencing _so long as tenant does not interfere with landlord's improvements, Tenant shall have 15 days of early occupancy_ ("**Early Possession Date**"). (See also Paragraphs 3.2 and 3.3)

    1.5 **Base Rent:** _$26,841.00_ per month ("**Base Rent**"), payable on the _first_ day of each month commencing _March 1, 2021_ . (See also Paragraph 4)

    ☑ If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted. See Paragraph _57_ .

    1.6 **Lessee's Share of Operating Expense Increase**: _twenty five point eight_ percent ( _25.8_ %) ("**Lessee's Share**"). In the event that that size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to reflect such modification.

    1.7 **Base Rent and Other Monies Paid Upon Execution:**
    (a) **Base Rent:** _$26,841.00_ for the period _February 1, 2021 - February 28, 2021_ .
    (b) **Security Deposit:** _$62,232.15_ ("**Security Deposit**"). (See also Paragraph 5)
    (c) **Parking:** _NA_ for the period _____ .
    (d) **Other:** _NA_ for _____ .
    (e) **Total Due Upon Execution of this Lease:** _$89,073.15_ .

    1.8 **Agreed Use:** _general office_ . (See also Paragraph 6)

    1.9 **Base Year; Insuring Party**. The Base Year is _2021_ . Lessor is the "**Insuring Party**". (See also Paragraphs 4.2 and 8)

    1.10 **Real Estate Brokers.** (See also Paragraph 15 and 25)

    (a) **Representation**: The following real estate brokers (the "**Brokers**") and brokerage relationships exist in this transaction (check applicable boxes): None.

    ☐ _____ represents Lessor exclusively ("**Lessor's Broker**");
    ☐ _____ represents Lessee exclusively ("**Lessee's Broker**"); or
    ☑ _Pacific Partners Commercial, Inc._ represents both Lessor and Lessee ("**Dual Agency**").

    (b) **Payment to Brokers**. Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement ~~(or if there is no such agreement, the sum of _____ or _____ % of the total Base Rent)~~ for the brokerage services rendered by the Brokers.

    1.11 **Guarantor.** A portion of ~~T~~the obligations of the Lessee under this Lease are to be guaranteed by _Yury Gampel_ ("**Guarantor**"). (See also Paragraph 37 and attached guaranty)

    1.12 **Business Hours for the Building**: _8_ a.m. to _6_ p.m., Mondays through Fridays (except Building Holidays) and _9_ a.m. to _1_ p.m. on Saturdays (except Building Holidays). "**Building Holidays**" shall mean the dates of

INITIALS

INITIALS

© 2017 AIR CRE. All Rights Reserved.

OFG-21.10, Revised 11-01-2017

observation of New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day, and
_____ .

    1.13    **Lessor Supplied Services**. Notwithstanding the provisions of Paragraph 11.1, Lessor is NOT obligated to provide the following within the Premises:

☑ Janitorial services
☐ Electricity
☑ Other (specify): _HVAC service after Business Hours for the Building per paragraph 1.12._

    1.14    **Attachments**. Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs _51_ through _56_ ;
☑ a ~~plot~~ space plan depicting the Premises;
☑ a current set of the Rules and Regulations;
☐ a Work Letter;
☐ a janitorial schedule;
☑ other (specify): _Option To Extend, Rent Adjustments, Arbitration Agreement, Guaranty of Lease, First Addendum to Lease Guaranty, Rules and Regulations, Exhibit "A" – Final Space Plan_ .

**2.  Premises.**

    2.1  **Letting**. Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease. While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different. **NOTE: Lessee is advised to verify the actual size prior to executing this Lease.**

    2.2  **Condition**. Lessor shall deliver the Premises to Lessee in a clean condition on the Commencement Date or the Early Possession Date, whichever first occurs ("**Start Date**"), and warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("**HVAC**"), and all other items which the Lessor is obligated to construct pursuant to the Work Letter attached hereto, if any, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law. Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

    2.3  **Compliance**. Lessor warrants that to the best of its knowledge the improvements on the Premises and the Common Areas comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("**Applicable Requirements**") that were in effect at the time that each improvement, or portion thereof, was constructed. Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 49), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee. **NOTE: Lessee is responsible for determining whether or not the zoning and other Applicable Requirements are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.** If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same. If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Premises ("**Capital Expenditure**"), Lessor and Lessee shall allocate the cost of such work as follows:

    (a)  Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent. If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter. Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

    (b)  If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as,

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises. Lessee shall pay Interest on the balance but may prepay its obligation at any time. If, however, such Capital Expenditure is required during the last 2 years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure. If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid. If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c)  Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements. If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense. Lessee shall not have any right to terminate this Lease.

2.4  **Acknowledgements**. Lessee acknowledges that: (a) it has been given an opportunity to inspect and measure the Premises, (b) Lessee has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental  aspects, and compliance with Applicable Requirements), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease. In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5  **Lessee as Prior Owner/Occupant**. The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date, Lessee was the owner or occupant of the Premises. In such event, Lessee shall be responsible for any necessary corrective work.

2.6  **Vehicle Parking**. So long as Lessee is not in default, and subject to the Rules and Regulations attached hereto, and as established by Lessor from time to time, Lessee shall be entitled to rent and use the number of parking spaces specified in Paragraph 1.2(b) at the rental rate applicable from time to time for monthly parking as set by Lessor and/or its licensee.

(a)  If Lessee commits, permits or allows any of the prohibited activities described in the Lease or the rules then in effect, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

(b)  The monthly rent per parking space specified in Paragraph 1.2(b) is subject to change upon 30 days prior written notice to Lessee. The rent for the parking is payable one month in advance prior to the first day of each calendar month.

2.7  **Common Areas - Definition**. The term "**Common Areas**" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the  Premises that are provided and designated by the Lessor from time to time for the general nonexclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including, but not limited to, common entrances, lobbies, corridors, stairwells, public restrooms, elevators, parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

2.8  **Common Areas - Lessee's Rights**. Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project. Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas. Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time. In the event that any unauthorized storage shall occur, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9  **Common Areas - Rules and Regulations**. Lessor or such other person(s) as Lessor may appoint shall have the exclusive

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

control and management of the Common Areas and shall have the right, from time to time, to adopt, modify, amend and enforce reasonable rules and regulations ("**Rules and Regulations**") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees. The Lessee agrees to abide by and conform to all such Rules and Regulations, and shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessor shall not be responsible to Lessee for the noncompliance with said Rules and Regulations by other tenants of the Project.

2.10    **Common Areas - Changes**. Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)  To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of the lobbies, windows, stairways, air shafts, elevators, escalators, restrooms, driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

(b)  To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c)  To designate other land outside the boundaries of the Project to be a part of the Common Areas;

(d)  To add additional buildings and improvements to the Common Areas;

(e)  To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and

(f)  To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

3.  **Term.**

3.1  **Term**. The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2  **Early Possession**. Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date. Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises. If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession. All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of the Operating Expense Increase) shall be in effect during such period. Any such Early Possession shall not affect the Expiration Date.

3.3  **Delay In Possession**. Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date. If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date. Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee. If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder. If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate. If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4  **Lessee Compliance**. Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5). Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance. Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

4.  **Rent.**

4.1  **Rent Defined**. All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("**Rent**").

4.2  **Operating Expense Increase**. Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share of the amount by which all Operating Expenses for each Comparison Year exceeds the amount of all Operating Expenses for the Base Year, such excess being hereinafter referred to as the "**Operating Expense Increase**", in accordance with the following provisions:

(a)  "**Base Year**" is as specified in Paragraph 1.9.

(b)  "**Comparison Year**" is defined as each calendar year during the term of this Lease subsequent to the Base Year; provided, however, Lessee shall have no obligation to pay a share of the Operating Expense Increase applicable to the first 12 months of the Lease Term (other than such as are mandated by a governmental authority, as to which government mandated expenses

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

INITIALS

OFG-21.10, Revised 11-01-2017

Lessee shall pay Lessee's Share, notwithstanding they occur during the first twelve (12) months). Lessee's Share of the Operating Expense Increase for the first and last Comparison Years of the Lease Term shall be prorated according to that portion of such Comparison Year as to which Lessee is responsible for a share of such increase.

(c)    The following costs relating to the ownership and operation of the Project, calculated as if the Project was at least 95% occupied,  are defined as "**Operating Expenses**":

(i)    Costs relating to the operation, repair, and maintenance in neat, clean, safe, good order and condition, but not the replacement (see subparagraph (g)), of the following:

(aa) The Common Areas, including their surfaces, coverings, decorative items, carpets, drapes and window coverings, and including parking areas, loading and unloading areas, trash areas, roadways, sidewalks, walkways, stairways, parkways, driveways, landscaped areas, striping, bumpers, irrigation systems, Common Area lighting facilities, building exteriors and roofs, fences and gates;

(bb) All heating, air conditioning, plumbing, electrical systems, life safety equipment, communication systems and other equipment used in common by, or for the benefit of, tenants or occupants of the Project, including elevators and escalators, tenant directories, fire detection systems including sprinkler system maintenance and repair.

(cc) All other areas and improvements that are within the exterior boundaries of the Project but outside of the Premises and/or any other space occupied by a tenant.

(ii)    The cost of trash disposal, janitorial and security services, pest control services, and the costs of any environmental inspections;

(iii)    The cost of any other service to be provided by Lessor that is elsewhere in this Lease stated to be an "Operating Expense";

(iv)    The cost of the premiums for the insurance policies maintained by Lessor pursuant to paragraph 8 and any deductible portion of an insured loss concerning the Building or the Common Areas;

(v)    The amount of the Real Property Taxes payable by Lessor pursuant to paragraph 10;

(vi)    The cost of water, sewer, gas, electricity, and other publicly mandated services not separately metered;

(vii)    Labor, salaries, and applicable fringe benefits and costs, materials, supplies and tools, used in maintaining and/or cleaning the Project and accounting and management fees attributable to the operation of the Project;

(viii)      The cost of any capital improvement to the Building or the Project not covered under the provisions of Paragraph 2.3 provided; however, that Lessor shall allocate the cost of any such capital improvement over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such Capital Expenditure in any given month;

(ix)    The cost to replace equipment or improvements that have a useful life for accounting purposes of 5 years or less.

(x)    Reserves set aside for maintenance, repair and/or replacement of Common Area improvements and equipment.

(d)    Any item of Operating Expense that is specifically attributable to the Premises, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Premises, Building, or other building. However, any such item that is not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

(e)    The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(c) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

(f)    Lessee's Share of Operating Expense Increase is payable monthly on the same day as the Base Rent is due hereunder. The amount of such payments shall be based on Lessor's estimate of the Operating Expense Expenses.  Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses for the preceding year.  If Lessee's payments during such Year exceed Lessee's Share, Lessee shall credit the amount of such over-payment against Lessee's future payments.  If Lessee's payments during such Year were less than Lessee's Share, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of said statement.  Lessor and Lessee shall forthwith adjust between them by cash payment any balance determined to exist with respect to that portion of the last Comparison Year for which Lessee is responsible as to Operating Expense Increases, notwithstanding that the Lease term may have terminated before the end of such Comparison Year.

(g)    Operating Expenses shall not include the costs of replacement for equipment or capital components such as the roof, foundations, exterior walls or a Common Area capital improvement, such as the parking lot paving, elevators, fences that have a useful life for accounting purposes of 5 years or more.

(h)    Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or by insurance proceeds.

4.3  **Payment**.  Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States on or before the day on which it is due, without offset or deduction (except as specifically permitted in this Lease).  All monetary amounts shall be

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

rounded to the nearest whole dollar.  In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease.  Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month.  Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to time designate in writing.  Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating.  In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check.  Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

**5.    Security Deposit.**  Lessee shall deposit with Lessor upon  execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease.  If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof.  If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease.  If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent.  Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof.  If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition.  Lessor shall not be required to keep the Security Deposit separate from its general accounts.  Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor.  Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied.  No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.  THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.

**6.    Use.**

6.1  **Use**.  Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose.  Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties.  Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles.  Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements of the Building, will not adversely affect the mechanical, electrical, HVAC, and other systems of the Building, and/or will not affect the exterior appearance of the Building.  If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.

6.2  **Hazardous Substances**.

(a)    **Reportable Uses Require Consent**.  The term "**Hazardous Substance**" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory.  Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, byproducts or fractions thereof.  Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements.  "**Reportable Use**" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties.  Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use such as ordinary office supplies (copier toner, liquid

© 2017 AIR CRE.  All Rights Reserved.                                                        OFG-21.10, Revised 11-01-2017

paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor. In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b) **Duty to Inform Lessor**. If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c) **Lessee Remediation**. Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d) **Lessee Indemnification**. Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project not caused or contributed to by Lessee). Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease. No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e) **Lessor Indemnification**. Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees. Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f) **Investigations and Remediations**. Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g) **Lessor Termination Option**. If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice. In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment. In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available. If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3 **Lessee's Compliance with Applicable Requirements**. Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any

INITIALS

© 2017 AIR CRE. All Rights Reserved.

INITIALS

OFG-21.10, Revised 11-01-2017

applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date.  Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor, and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.  Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4  **Inspection; Compliance**.  Lessor and Lessor's "**Lender**" (as defined in Paragraph 30) and consultants authorized by Lessor shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times, after reasonable notice, for the purpose of inspecting and/or testing the condition of the Premises and/or for verifying compliance by Lessee with this Lease.  The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see Paragraph 9.1e) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority.  In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.  In addition, Lessee shall provide copies of all relevant material safety data sheets (**MSDS**) to Lessor within 10 days of the receipt of written request therefor.  Lessee acknowledges that any failure on its part to allow such inspections or testing will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, should the Lessee fail to allow such inspections and/or testing in a timely fashion the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for the remainder to the Lease.  The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to allow such inspection and/or testing.  Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to such failure nor prevent the exercise of any of the other rights and remedies granted hereunder.

7.    **Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

7.1  **Lessee's Obligations**.  Notwithstanding Lessor's obligation to keep the Premises in good condition and repair, Lessee shall be responsible for payment of the cost thereof to Lessor as additional rent for that portion of the cost of any maintenance and repair of the Premises, or any equipment (wherever located) that serves only Lessee or the Premises, to the extent such cost is attributable to abuse or misuse.  In addition, Lessee rather than the Lessor shall be responsible for the cost of painting, repairing or replacing wall coverings, and to repair or replace any similar improvements within the Premises.  Lessor may, at its option, upon reasonable notice, elect to have Lessee perform any particular such maintenance or repairs the cost of which is otherwise Lessee's responsibility hereunder."

7.2  **Lessor's Obligations**.  Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, fire alarm and/or smoke detection systems, fire hydrants, and the Common Areas.

7.3  **Utility Installations; Trade Fixtures; Alterations**.

(a)  **Definitions**.  The term "**Utility Installations**" refers to all floor and window coverings, air lines, vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, and plumbing in or on the Premises.  The term "**Trade Fixtures**" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises.  The term "**Alterations**" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion.  "**Lessee Owned Alterations and/or Utility Installations**" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)  **Consent**.  Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent.  Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof, ceilings, floors or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and the cumulative cost thereof during this Lease as extended does not exceed $2000.  Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor.  Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor.  Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans.  Consent shall be deemed

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                                    OFG-21.10, Revised 11-01-2017

conditioned upon Lessee's: (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner. Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials. Lessee shall promptly upon completion furnish Lessor with as-built plans and specifications. For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c) **Liens; Bonds**. Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein. Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility. If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof. If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same. If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4 **Ownership; Removal; Surrender; and Restoration**.

(a) **Ownership**. Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises. Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations. Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b) **Removal**. By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease. Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c) **Surrender; Restoration**. Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted. "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice. Notwithstanding the foregoing, if the Lessee occupies the Premises for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear. Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee. Lessee shall also remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) to the level specified in Applicable Requirements. Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee. Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire. The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

8. **Insurance; Indemnity.**

8.1 **Insurance Premiums**. The cost of the premiums for the insurance policies maintained by Lessor pursuant to paragraph 8 are included as Operating Expenses (see paragraph 4.2 (c)(iv)). Said costs shall include increases in the premiums resulting from additional coverage related to requirements of the holder of a mortgage or deed of trust covering the Premises, Building and/or Project, increased valuation of the Premises, Building and/or Project, and/or a general premium rate increase. Said costs shall not, however, include any premium increases resulting from the nature of the occupancy of any other tenant of the Building. If the Project was not insured for the entirety of the Base Year, then the base premium shall be the lowest annual premium reasonably obtainable for the required insurance as of the Start Date, assuming the most nominal use possible of the Building and/or Project. In no event, however, shall Lessee be responsible for any portion of the premium cost attributable to liability insurance coverage in excess of $2,000,000 procured under Paragraph 8.2(b).

8.2 **Liability Insurance**.

(a) **Carried by Lessee**. Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto. Such insurance

© 2017 AIR CRE. All Rights Reserved.

OFG-21.10, Revised 11-01-2017

shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000.  Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement and coverage shall also be extended to include damage caused by heat, smoke or fumes from a hostile fire.  The policy shall not contain any intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease.  The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder.  Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b)  **Carried by Lessor**.  Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee.  Lessee shall not be named as an additional insured therein.

8.3  **Property Insurance - Building, Improvements and Rental Value**.

(a)  **Building and Improvements**.  Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Building and/or Project.  The amount of such insurance shall be equal to the full insurable replacement cost of the Building and/or Project, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof.  Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor.  If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss.  Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located.  If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence.

(b)  **Rental Value**.  Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance").  Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c)  **Adjacent Premises**.  Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

(d)  **Lessee's Improvements**.  Since Lessor is the Insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations unless the item in question has become the property of Lessor under the terms of this Lease.

8.4  **Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance**.

(a)  **Property Damage**.  Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations.  Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence.  The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

(b)  **Worker's Compensation Insurance**.  Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements.  Such policy shall include a 'Waiver of Subrogation' endorsement.  Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

(c)  **Business Interruption**.  Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(d)  **No Representation of Adequate Coverage**.  Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5  **Insurance Policies**.  Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender.  Lessee shall not do or permit to be done anything which invalidates the required insurance policies.  Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance.  No such policy shall be cancelable or subject to modification except after 10 days prior written notice to Lessor.  Lessee shall, at least 30 days prior to the expiration of such policies,

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may increase his liability insurance coverage and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand. Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less. If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure and maintain the same.

8.6 **Waiver of Subrogation**. Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein. The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto. The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

8.7 **Indemnity**. Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, a Breach of the Lease by Lessee and/or the use and/or occupancy of the Premises and/or Project by Lessee and/or by Lessee's employees, contractors or invitees. If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense. Lessor need not have first paid any such claim in order to be defended or indemnified.

8.8 **Exemption of Lessor and its Agents from Liability**. Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom. Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

8.9 **Failure to Provide Insurance**. Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater. The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

9. **Damage or Destruction.**
　9.1 **Definitions**.
　　(a) "**Premises Partial Damage**" shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.
　　(b) "**Premises Total Destruction**" shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 month's Base Rent. Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.
　　(c) "**Insured Loss**" shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.
　　(d) "**Replacement Cost**" shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the

INITIALS

Page 11 of 25
Last Edited: 10/13/2020 9:04 PM

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e)  "**Hazardous Substance Condition**" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires restoration.

9.2  **Partial Damage - Insured Loss**. If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $5,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose. Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs. In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor. If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect. If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to: (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter. Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction. Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3  **Partial Damage - Uninsured Loss**. If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either: (i) repair such damage as soon as reasonably possible at Lessor's expense (subject to reimbursement pursuant to Paragraph 4.2), in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage. Such termination shall be effective 60 days following the date of such notice. In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor. Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment. In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available. If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4  **Total Destruction**. Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction. If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5  **Damage Near End of Term**. If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage. Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires. If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect. If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6  **Abatement of Rent; Lessee's Remedies**.

(a)  **Abatement**. In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance. All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

herein.

(b) **Remedies**. If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice. If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice. If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect. "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7   **Termination; Advance Payments**. Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor. Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

## 10. Real Property Taxes.

10.1   **Definitions**. As used herein, the term "**Real Property Taxes**" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address. "**Real Property Taxes**" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2   **Payment of Taxes**. Except as otherwise provided in Paragraph 10.3, Lessor shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3   **Additional Improvements**. Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other lessees or by Lessor for the exclusive enjoyment of such other lessees. Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of Alterations, Trade Fixtures or Utility Installations placed upon the Premises by Lessee or at Lessee's request or by reason of any alterations or improvements to the Premises made by Lessor subsequent to the execution of this Lease by the Parties.

10.4   **Joint Assessment**. If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available. Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5   **Personal Property Taxes**. Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises. When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor. If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

## 11. Utilities and Services.

11.1   **Services Provided by Lessor**. Lessor shall provide heating, ventilation, air conditioning, reasonable amounts of electricity for normal lighting and office machines, water for reasonable and normal drinking and lavatory use in connection with an office, and replacement light bulbs and/or fluorescent tubes and ballasts for standard overhead fixtures. Lessor shall also provide janitorial services to the Premises and Common Areas 5 times per week, excluding Building Holidays, or pursuant to the attached janitorial schedule, if any. Lessor shall not, however, be required to provide janitorial services to kitchens or storage areas included within the Premises.

11.2   **Services Exclusive to Lessee**. Notwithstanding the provisions of paragraph 11.1, Lessee shall pay for all water, gas, light, power, telephone and other utilities and services specially or exclusively supplied and/or metered exclusively to the Premises or to Lessee, together with any taxes thereon. Notwithstanding the provisions of Paragraph 4.2(vi), if a service is deleted by Paragraph 1.13 and such service is not separately metered to the Premises, Lessee shall pay at Lessor's option, either Lessee's Share or a reasonable proportion to be determined by Lessor of all charges for such jointly metered service.

11.3   **Hours of Service**. Said services and utilities shall be provided during times set forth in Paragraph 1.12. Utilities and services required at other times shall be subject to advance request and reimbursement by Lessee to Lessor of the cost thereof.

INITIALS

INITIALS

© 2017 AIR CRE. All Rights Reserved.

OFG-21.10, Revised 11-01-2017

11.4     **Excess Usage by Lessee**. Lessee shall not make connection to the utilities except by or through existing outlets and shall not install or use machinery or equipment in or about the Premises that uses excess water, lighting or power, or suffer or permit any act that causes extra burden upon the utilities or services, including but not limited to security and trash services, over standard office usage for the Project. Lessor shall require Lessee to reimburse Lessor for any excess expenses or costs that may arise out of a breach of this subparagraph by Lessee. Lessor may, in its sole discretion, install at Lessee's expense supplemental equipment and/or separate metering applicable to Lessee's excess usage or loading.

11.5     **Interruptions**. There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

## 12. Assignment and Subletting.

12.1     **Lessor's Consent Required**.

(a)   Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "**assign or assignment**") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b)   Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent. The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c)   The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buyout or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent. "**Net Worth of Lessee**" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d)   An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a noncurable Breach without the necessity of any notice and grace period. If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect. Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e)   Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

(f)   Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g)   Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2     **Terms and Conditions Applicable to Assignment and Subletting**.

(a)   Regardless of Lessor's consent, no assignment or subletting shall : (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b)   Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment. Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c)   Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d)   In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e)   Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request. Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

INITIALS

INITIALS

© 2017 AIR CRE. All Rights Reserved.

OFG-21.10, Revised 11-01-2017

(f)   Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment or sublease to which Lessor has specifically consented to in writing.

(g)   Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing.  (See Paragraph 39.2)

12.3     **Additional Terms and Conditions Applicable to Subletting**.  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)   Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent.  In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee.  Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee.  Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease.  Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b)   In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c)   Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d)   No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)   Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice.  The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

## 13. Default; Breach; Remedies.

13.1     **Default; Breach**.  A "**Default**" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease.  A "**Breach**" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a)   The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b)   The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee. THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c)   The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.  In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d)   The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e)   A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b) or (c), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are

INITIALS                                                                                    INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                   OFG-21.10, Revised 11-01-2017

reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f)   The occurrence of any of the following events: (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "**debtor**" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g)   The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h)   If the performance of Lessee's obligations under this Lease is guaranteed: (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2    **Remedies**. If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals. Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor. In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a)   Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor. In such event Lessor shall be entitled to recover from Lessee: (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease. The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent. Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled. If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit. If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1. In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b)   Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations. Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c)   Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located. The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3    **Inducement Recapture.** Any agreement for free or abated rent or other charges, the cost of tenant improvements for Lessee paid for or performed by Lessor, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "**Inducement Provisions**," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

this Lease. Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee. The acceptance by Lessor of rent or the cure of the Breach which initiated the operation of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

      13.4    **Late Charges.** Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain. Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender. Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment. Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder. In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

      13.5    **Interest**. Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due shall bear interest from the 31st day after it was due. The interest ("**Interest**") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law. Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

      13.6    **Breach by Lessor**.

      (a)  **Notice of Breach**. Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor. For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished to Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

      (b)  **Performance by Lessee on Behalf of Lessor**. In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset. Lessee shall document the cost of said cure and supply said documentation to Lessor.

**14. Condemnation.** If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs. If more than 10% of the rentable floor area of the Premises, or more than 25% of Lessee's Reserved Parking Spaces, if any, are taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession. If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation. Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph. All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor. In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

**15. Brokerage Fees.**

      15.1    **Additional Commission.** In addition to the payments owed pursuant to Paragraph 1.10 above, Lessor agrees that: (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of

INITIALS

Page 17 of 25
Last Edited: 10/13/2020 9:04 PM

INITIALS

© 2017 AIR CRE. All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed.

15.2    **Assumption of Obligations**. Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed Lessor's obligation hereunder. Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31. If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest. In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent. In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

15.3    **Representations and Indemnities of Broker Relationships**. Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith. Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

**16. Estoppel Certificates.**

(a)    Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published BY AIR CRE, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

(b)    If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance. Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate. In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain. Accordingly, should the Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease. The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate. Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

(c)    If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years. All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

**17. Definition of Lessor.** The term "**Lessor**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease. In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor. Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor. Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

**18. Severability.** The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19. Days.** Unless otherwise specifically indicated to the contrary, the word "**days**" as used in this Lease shall mean and refer to calendar days.

INITIALS

Page 18 of 25
Last Edited: 10/13/2020 9:04 PM

INITIALS

© 2017 AIR CRE. All Rights Reserved.

OFG-21.10, Revised 11-01-2017

**20. Limitation on Liability.** The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Project, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

**21. Time of Essence.** Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**22. No Prior or Other Agreements; Broker Disclaimer.** This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective. Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises. Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

**23. Notices.**

   23.1    **Notice Requirements.** All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23. The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices. Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice. A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

   23.2    **Date of Notice.** Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon. If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid. Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier. Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed delivered upon actual receipt. If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

**24. Waivers.**

   (a)  No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof. Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

   (b)  The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee. Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

   (c)  THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

**25. Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

   (a)  When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction. Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

   (i)  *Lessor's Agent.* A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only. A Lessor's agent or subagent has the following affirmative obligations: *To the Lessor*: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor. *To the Lessee and the Lessor:* (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

   (ii)  *Lessee's Agent.* An agent can agree to act as agent for the Lessee only. In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the

INITIALS

INITIALS

© 2017 AIR CRE. All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Lessor. An agent acting only for a Lessee has the following affirmative obligations. _To the Lessee_: A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee. _To the Lessee and the Lessor_: (a) Diligent exercise of reasonable skills and care in performance of the agent's duties. (b) A duty of honest and fair dealing and good faith. (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties. An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(iii) _Agent Representing Both Lessor and Lessee_. A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee. In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee. (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii). In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered. The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests. Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction. A real estate agent is a person qualified to advise about real estate. If legal or tax advice is desired, consult a competent professional.

(b) Brokers have no responsibility with respect to any default or breach hereof by either Party. The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c) Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

**26. No Right To Holdover**. Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease. In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination. Holdover Base Rent shall be calculated on a monthly basis. Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

**27. Cumulative Remedies.** No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

**28. Covenants and Conditions; Construction of Agreement.** All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions. In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease. Whenever required by the context, the singular shall include the plural and vice versa. This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

**29. Binding Effect; Choice of Law.** This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located. Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

**30. Subordination; Attornment; Non-Disturbance.**

30.1    **Subordination**. This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, **"Security Device"**), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof. Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as **"Lender"**) shall have no liability or obligation to perform any of the obligations of Lessor under this Lease. Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2    **Attornment**. In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease

INITIALS

INITIALS

© 2017 AIR CRE. All Rights Reserved.

OFG-21.10, Revised 11-01-2017

will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor, (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new owner.

30.3    **Non-Disturbance**. With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "**Non-Disturbance Agreement**") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4    **Self-Executing**. The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

**31. Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "**Prevailing Party**" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

**32. Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

**33. Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

**34. Signs.** Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Lessor may not place any sign on the exterior of the Building that covers any of the windows of the Premises. Except for ordinary "For Sublease" signs which may be placed only on the Premises, Lessee shall not place any sign upon the Project without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

**35. Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

**36. Consents.** All requests for consent shall be in writing. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or

INITIALS

INITIALS

© 2017 AIR CRE. All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following such request.

**37. Guarantor.**

37.1    **Execution**. The Guarantors, if any, shall each execute a guaranty in the form most recently published BY AIR CRE.

37.2    **Default**. It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide:  (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

**38. Quiet Possession.**  Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

**39. Options.**  If Lessee is granted any option, as defined below, then the following provisions shall apply.

39.1    **Definition**. "Option" shall mean:  (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2    **Options Personal To Original Lessee**. Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3    **Multiple Options**. In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4    **Effect of Default on Options**.

(a)   Lessee shall have no right to exercise an Option:  (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b)   The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c)   An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

**40. Security Measures.**  Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same. Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties. In the event, however, that Lessor should elect to provide security services, then the cost thereof shall be an Operating Expense.

**41. Reservations.**

(a)   Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee. Lessor may also: change the name, address or title of the Building or Project upon at least 90 days prior written notice; provide and install, at Lessee's expense, Building standard graphics on the door of the Premises and such portions of the Common Areas as Lessor shall reasonably deem appropriate; grant to any lessee the exclusive right to conduct any business as long as such exclusive right does not conflict with any rights expressly given herein; and to place such signs, notices or displays as Lessor reasonably deems necessary or advisable upon the roof, exterior of the Building or the Project or on signs in the Common Areas. Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights. The obstruction of Lessee's view, air, or light by any structure erected in the vicinity of the Building, whether by Lessor or third parties, shall in no way

INITIALS

Page 22 of 25
Last Edited: 10/13/2020 9:04 PM

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

affect this Lease or impose any liability upon Lessor.

(b)  Lessor also reserves the right to move Lessee to other space of comparable size in the Building or Project.  Lessor must provide at least 45 days prior written notice of such move, and the new space must contain improvements of comparable quality to those contained within the Premises.  Lessor shall pay the reasonable out of pocket costs that Lessee incurs with regard to such relocation, including the expenses of moving and necessary stationary revision costs.  In no event, however, shall Lessor be required to pay an amount in excess of two months Base Rent.  Lessee may not be relocated more than once during the term of this Lease.

(c)  Lessee shall not:  (i) use a representation (photographic or otherwise) of the Building or Project or their name(s) in connection with Lessee's business; or (ii) suffer or permit anyone, except in emergency, to go upon the roof of the Building.

**42. Performance Under Protest.**  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.  A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

**43. Authority; Multiple Parties; Execution.**

(a)  If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf.  Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b)  If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder.  It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c)  This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**44. Conflict.**  Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

**45. Offer**.  Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party.  This Lease is not intended to be binding until executed and delivered by all Parties hereto.

**46. Amendments.**  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification.  As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

**47. Waiver of Jury Trial.  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.**

**48. Arbitration of Disputes.**  An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☑ is ☐ is not attached to this Lease.

**49. Accessibility; Americans with Disabilities Act.**

(a)  The Premises:

☑ have not undergone an inspection by a Certified Access Specialist (CASp).  Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all

INITIALS

Page 23 of 25
Last Edited: 10/13/2020 9:04 PM

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction related accessibility standards.

In the event that the Premises have been issued an inspection report by a CASp the Lessor shall provide a copy of the disability access inspection certificate to Lessee within 7 days of the execution of this Lease.

(b)  Since compliance with the Americans with Disabilities Act (ADA) and other state and local accessibility statutes are dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation.  In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in compliance with ADA or other accessibility statutes, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

**LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.**

**ATTENTION:  NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:**
**1.   SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.**
**2.   RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING AND SIZE OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.**

**WARNING:  IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.**

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: _____ | Executed at: Calabasas, CA |
| On: _____ | On: 10/19/20 |
| **By LESSOR:** | **By LESSEE:** |
| Calmur, LLC | Nobility Management, LLC a California limited liability company |
| By: _____ | By: _____ |
| Name Printed: Stan Megerdichian | Name Printed: Mark Rabinovich |
| Title: Managing Member | Title: Vice President, Legal/Administration |
| Phone: _____ | Phone: 818-533-6180 |
| Fax: _____ | Fax: 818-475-5252 |
| Email: _____ | Email: mrabinovich@nobilitymail.com |
| By: _____ | By: _____ |
| Name Printed: _____ | Name Printed: _____ |
| Title: _____ | Title: _____ |
| Phone: _____ | Phone: _____ |
| Fax: _____ | Fax: _____ |
| Email: _____ | Email: _____ |
| Address: _____ | Address: 26500 West Agoura Rd., #200, Calabasas, CA 91302 (prior to lease commencement, the address of the Premises after lease commencement) |
| Federal ID No.: _____ | Federal ID No.: _____ |

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.    OFG-21.10, Revised 11-01-2017

**BROKER**

 Pacific Partners Commercial, Inc. 

Attn: _Chris Swatosh_
Title: _Executive VP_

Address: _23901 Calabasas Rd., Suite 2024,_
_Calabasas, CA 91302_
Phone: _818-862-2848_
Fax: _818-798-3090_
Email: _chris@pacificpartnerscre.com_
Federal ID No.: _____
Broker/Agent BRE License #: _PPC-01803294 /_
_CS-01803294_

**BROKER**

 Pacific Partners Commercial, Inc. 

Attn: _Chris Swatosh_
Title: _Executive VP_

Address: _23901 Calabasas Rd., Suite 2024,_
_Calabasas, CA 91302_
Phone: _818-862-2848_
Fax: _818-798-3090_
Email: _chris@pacificpartnerscre.com_
Federal ID No.: _____
Broker/Agent BRE License #: _PPC-01093508 / Chris_
_01803294_

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

_____
INITIALS

© 2017 AIR CRE. All Rights Reserved.

Page 25 of 25
Last Edited: 10/13/2020 9:04 PM

_____
INITIALS

OFG-21.10, Revised 11-01-2017



## ADDENDUM

**Date:** October 13, 2020

**By and Between**

**Lessor:** Calmur, LLC

**Lessee:** Nobility Management, LLC a California limited liability company

**Property Address:** 26025 Mureau Rd., Suite 110, Calabasas, CA 91302

(street address, city, state, zip)

Paragraph: _

51. Attorney Review:  Lessor and Lessee hereby acknowledge that this contract has been prepared by Broker and is hereby submitted to Lessor and Lessee by Broker for review by independent attorney for the respective parties.  Broker makes no representation as to the legal sufficiency, tax consequences, ADA compliance, environmental condition of the Premises, nor the suitability of the Premises for the purposes of the Lessee's use.  It is the Tenant's sole responsibility to confirm with the local governing body that its use is acceptable at the Premises.  Furthermore, Lessor and Lessee hereby acknowledge and agree that they have been strongly advised by Broker to obtain legal advice, financial advice, and other professional advice, as the case may be, with regard to this contract. Neither Lessor or Lessee are relying upon any representation(s) as such may have been made by Broker as reason(s) for executing this contract.

52.  Rent Abatement:  Lessee shall have months 2, 3, 4, 5, 13, and 14 of the initial lease term free from Monthly Base Rent by 50%.

53.  Signage:  Lessee shall have the right to install landlord approved signage above the entrance to the Premises at its sole cost and expense and per any and all applicable government and association rules, regulations and codes.  Please note, the city may not allow building signage.

54.  Tenant Improvements:  Landlord will cause the construction of a mutually agreed to space plan, which shall be attached hereto.  Landlord shall contribute an allowance of up to $324,184.00 toward the construction costs.  Upon Lease Commencement, Tenant shall pay Landlord any costs to complete the mutually agreed to space plan over $326,760.00.  At the time of drafting this lease, the improvements are estimated to cost $371,826.47.  The actual cost may differ from the estimate as the construction process is fluid.
The scope of improvements shall include, but not be limited to:
*new carpet and/or flooring throughout premises
*new paint throughout premises
*addition and or demo of interior office walls
*glass partition walls in new offices
*electrical/data outlets and floor power cores where designated by Tenant.  Tenant may use any existing conduit and cabling in the Premises however Landlord makes no representation to the condition or compatibility with the Tenant's needs.  New data conduit and wiring will not be provided by landlord and shall be the responsibility of the Tenant.

55.  After Hours HVAC:  HVAC service can be provided outside of Business Hours for the Building at an additional hourly cost of $35.00 per hour.

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

ADD-1.01, Revised 07-28-2017

56.  Permitted Transfers.  Notwithstanding anything herein to the contrary, Tenant may Transfer all or part of its interest in this Lease (including, without limitation, any interest held by Junior Tenant) or all or part of the Premises (a "Permitted Transfer") as follows, and to the following types of entities (a "Permitted Transferee"), provided such Permitted Transferee operates in the Premises for the use permitted in accordance with this Lease:

•        Transfers to an affiliate of Tenant (for purposes hereof, an affiliate means any person or entity which, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common ownership or management control with the party in question) provided that such affiliate shall have similar financial strength as Tenant on the date hereof; or

•        Transfers to any corporation, limited partnership, limited liability partnership, limited liability company or other business entity in which or with which Tenant, or its corporate successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions governing merger and consolidation of business entities, so long as Tenant's obligations hereunder are assumed by the entity surviving such merger or created by such consolidation provided that such entity shall have similar financial strength as Tenant on the date hereof;

•        Transfers as a result of a sale of all, or substantially all, of Tenant's assets or stock/membership interest provided that such transferee shall have similar financial strength as Tenant on the date hereof; or

In connection with any Permitted Transfer (which includes any Permitted Subleases), without limiting any other provision of this Lease, the following requirements shall apply: (a) Tenant shall provide no less than thirty (30) days prior written notice to Landlord of any such Permitted Transfer; (b) Tenant shall provide certified financial statements of the proposed Permitted Transferee which establish similar financial strength as the Tenant on the date hereof; (c) if Tenant shall no longer exist, following the Permitted Transfer (but not a Permitted Sublease), because of a merger, consolidation, acquisition, or sale of all or substantially all of the Tenant's assets, the surviving or acquiring entity shall deliver to Landlord a written express assumption of the obligations of Tenant hereunder arising on or after the assumption date (an "Assumption") no less than ten (10) days prior to the Permitted Transfer (the effectiveness of which may be conditioned on completion of the transaction giving rise to the Permitted Transfer); and, (d) no later than thirty (30) days after the effective date of any Permitted Transfer, Tenant agrees to furnish Landlord with (I) to the extent not prohibited by any confidentiality agreement, copies of the instruments effecting any of the foregoing Transfers; provided, however, that Tenant may redact all financial terms and other sensitive information; (II) documentation establishing Tenant's satisfaction of the requirements applicable to any such Transfer; and (III) evidence of insurance as required under this Lease with respect to the Permitted Transferee.  If Tenant fails to deliver any of the foregoing, or Permitted Transferee fails to deliver any Assumption contemplated hereunder, Landlord may withhold its consent to the transfer and exercise the rights provided in paragraph 12.1(d).

Notwithstanding the foregoing, paragraph 12 hereof shall apply to all other transfers, assignments and subleases.

In the event of any conflict between the provisions of this Addendum and the printed provisions of the Lease, this Addendum shall

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

ADD-1.01, Revised 07-28-2017

control.

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

ADD-1.01, Revised 07-28-2017



# RENT ADJUSTMENT(S)
## STANDARD LEASE ADDENDUM

**Dated:** October 13, 2020
**By and Between**
 **Lessor:** Calmur, LLC
 **Lessee:** Nobility Management, LLC a California limited liability company
 **Property Address:** 26025 Mureau Rd., Suite 110, Calabasas, CA 91302
  (street address, city, state, zip)

Paragraph: 57

### A. RENT ADJUSTMENTS:

The monthly rent for each month of the adjustment period(s) specified below shall be increased using the method(s) indicated below:
(Check Method(s) to be Used and Fill in Appropriately)

☐ I. Cost of Living Adjustment(s) (COLA)

 a. On (Fill in COLA Dates): _____ the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill in Urban Area): _____, All Items (1982-1984 = 100), herein referred to as "CPI".

 b. The monthly Base Rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one): the ☐ first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐ (Fill in Other "Base Month"): _____. The sum so calculated shall constitute the new monthly Base Rent hereunder, but in no event, shall any such new monthly Base Rent be less than the Base Rent payable for the month immediately preceding the Base Rent adjustment.

 c. In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

☐ II. Market Rental Value Adjustment(s) (MRV)

 a. On (Fill in MRV Adjustment Date(s): _____ the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

  1) Four months prior to each Market Rental Value Adjustment Date described above, the Parties shall attempt to agree upon what the new MRV will be on the adjustment date. If agreement cannot be reached within thirty days, then:

   (a) Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30 days. Any associated costs will be split equally between the Parties, or

   (b) Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:

    (i) Within 15 days thereafter, Lessor and Lessee shall each select an independent third party ☐ appraiser or

INITIALS

INITIALS

© 2017 AIR CRE. All Rights Reserved.

RA-7.01, Revised 07-28-2017

~~broker ("Consultant" - check one) of their choice to act as an arbitrator (Note: the parties may not select either of the Brokers that was involved in negotiating the Lease). The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.~~

~~(ii) The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto. The decision of a majority of the arbitrators shall be binding on the Parties. The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.~~

~~(iii) If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.~~

~~(iv) The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, i.e., the one that is NOT the closest to the actual MRV.~~

~~2) When determining MRV, the Lessor, Lessee and Consultants shall consider the terms of comparable market transactions which shall include, but no limited to, rent, rental adjustments, abated rent, lease term and financial condition of tenants.~~

~~3) Notwithstanding the foregoing, the new Base Rent shall not be less than the rent payable for the month immediately preceding the rent adjustment.~~

~~b. Upon the establishment of each New Market Rental Value:~~

~~1) the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and~~

~~2) the first month of each Market Rental Value term shall become the new 'Base Month' for the purpose of calculating any further Adjustments.~~

☑ **III.  Fixed Rental Adjustment(s) (FRA)**

The Base Rent shall be increased to the following amounts on the dates set forth below:

| On (Fill in FRA Adjustment Date(s)): | The New Base Rent shall be: |
|---|---|
| February 1, 2022 | $27,646.23 |
| February 1, 2023 | $28,475.62 |
| February 1, 2024 | $29,329.86 |
| February 1, 2025 | $30,209.78 |
| February 1, 2026 | $31,116.08 |

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

RA-7.01, Revised 07-28-2017

# AIR CRE

## OPTION(S) TO EXTEND
### STANDARD LEASE ADDENDUM

**Dated:** October 13, 2020
**By and Between**
**Lessor:** Calmur, LLC
**Lessee:** Nobility Management, LLC a California limited liability company
**Property Address:** 26025 Mureau Rd., Suite 110, Calabasas, CA 91302
(street address, city, state, zip)

Paragraph: 58

**A. OPTION(S) TO EXTEND:**

Lessor hereby grants to Lessee the option to extend the term of this Lease for one (1) additional sixty (60) month period(s) commencing when the prior term expires upon each and all of the following terms and conditions:

(i) In order to exercise an option to extend, Lessee must give written notice of such election to Lessor and Lessor must receive the same at least 9 but not more than 12 months prior to the date that the option period would commence, time being of the essence. If proper notification of the exercise of an option is not given and/or received, such option shall automatically expire. Options (if there are more than one) may only be exercised consecutively.

(ii) The provisions of paragraph 39, including those relating to Lessee's Default set forth in paragraph 39.4 of this Lease, are conditions of this Option.

(iii) Except for the provisions of this Lease granting an option or options to extend the term, all of the terms and conditions of this Lease except where specifically modified by this option shall apply.

(iv) This Option is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and without the intention of thereafter assigning or subletting.

(v) The monthly rent for each month of the option period shall be calculated as follows, using the method(s) indicated below:

(Check Method(s) to be Used and Fill in Appropriately)

☐ I. Cost of Living Adjustment(s) (COLA)

a. On (Fill in COLA Dates): _____ the Base Rent shall be adjusted by the change, if any, from the Base Month specified below, in the Consumer Price Index of the Bureau of Labor Statistics of the U.S. Department of Labor for (select one): ☐ CPI W (Urban Wage Earners and Clerical Workers) or ☐ CPI U (All Urban Consumers), for (Fill in Urban Area): _____. All Items (1982-1984 = 100), herein referred to as "CPI".

b. The monthly Base Rent payable in accordance with paragraph A.I.a. of this Addendum shall be calculated as follows: the Base Rent set forth in paragraph 1.5 of the attached Lease, shall be multiplied by a fraction the numerator of which shall be the CPI of the calendar month 2 months prior to the month(s) specified in paragraph A.I.a. above during which the adjustment is to take effect, and the denominator of which shall be the CPI of the calendar month which is 2 months prior to (select one): ☐ the first month of the term of this Lease as set forth in paragraph 1.3 ("Base Month") or ☐ (Fill in Other "Base Month"): _____. The sum so calculated shall constitute the new monthly Base Rent hereunder, but in no event, shall any such new monthly Base Rent be less than the Base Rent payable for the month immediately preceding the rent adjustment.

c. In the event the compilation and/or publication of the CPI shall be transferred to any other governmental department or bureau or agency or shall be discontinued, then the index most nearly the same as the CPI shall be used to make such calculation. In the event that the Parties cannot agree on such alternative index, then the matter shall be submitted for decision to the American Arbitration Association in accordance with the then rules of said Association and the decision of the arbitrators shall be binding upon the parties. The cost of said Arbitration shall be paid equally by the Parties.

INITIALS _____

Page 1 of 3
Last Edited: 10/13/2020 9:04 PM

INITIALS _____

© 2017 AIR CRE. All Rights Reserved.

OE-6.00, Revised 01-03-2017

☑ II.    **Market Rental Value Adjustment(s) (MRV)**

a.    On (Fill in MRV Adjustment Date(s))  ~~the first month of the Extended term~~  the Base Rent shall be adjusted to the "Market Rental Value" of the property as follows:

1)    ~~Four months prior to~~ ~~each Market Rental Value Adjustment Date described above,~~ Within 60 days of the date Tenant gives notice to extend the lease the Parties shall attempt to agree upon what the new MRV will be on the adjustment date. If agreement cannot be reached during this period, ~~within thirty days,~~ then the notice is waived and the lease will terminate on the current terms expiration date.~~.~~

~~(a)    Lessor and Lessee shall immediately appoint a mutually acceptable appraiser or broker to establish the new MRV within the next 30 days.  Any associated costs will be split equally between the Parties, or~~

~~(b)    Both Lessor and Lessee shall each immediately make a reasonable determination of the MRV and submit such determination, in writing, to arbitration in accordance with the following provisions:~~

~~(i)    Within 15 days thereafter, Lessor and Lessee shall each select an independent third party ☐ appraiser or ☐ broker ("Consultant" - check one) of their choice to act as an arbitrator (Note: the parties may not select either of the Brokers that was involved in negotiating the Lease).  The two arbitrators so appointed shall immediately select a third mutually acceptable Consultant to act as a third arbitrator.~~

~~(ii)    The 3 arbitrators shall within 30 days of the appointment of the third arbitrator reach a decision as to what the actual MRV for the Premises is, and whether Lessor's or Lessee's submitted MRV is the closest thereto.  The decision of a majority of the arbitrators shall be binding on the Parties.  The submitted MRV which is determined to be the closest to the actual MRV shall thereafter be used by the Parties.~~

~~(iii)    If either of the Parties fails to appoint an arbitrator within the specified 15 days, the arbitrator timely appointed by one of them shall reach a decision on his or her own, and said decision shall be binding on the Parties.~~

~~(iv)    The entire cost of such arbitration shall be paid by the party whose submitted MRV is not selected, ie. the one that is NOT the closest to the actual MRV.~~

2)    When determining MRV, the Lessor, Lessee and Consultants shall consider the terms of comparable market transactions which shall include, but not limited to, rent, rental adjustments, abated rent, lease term and financial condition of tenants.

3)    Notwithstanding the foregoing, the new Base Rent shall not be less than the rent payable for the month immediately preceding the rent adjustment.

b.    Upon the establishment of each New Market Rental Value:

1)    the new MRV will become the new "Base Rent" for the purpose of calculating any further Adjustments, and

2)    the first month of each Market Rental Value term shall become the new "Base Month" for the purpose of calculating any further Adjustments.

☐ ~~III.    Fixed Rental Adjustment(s) (FRA)~~

Beginning the 13th month of the Extended Term, The Base Rent shall escalate by three (3%) percent annually.  ~~be increased to the following amounts on the dates set forth below:~~

| ~~On (Fill in FRA Adjustment Date(s)):~~ | ~~The New Base Rent shall be:~~ |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OE-6.00, Revised 01-03-2017

☐ ~~IV.   Initial Term Adjustments~~

~~The formula used to calculate  adjustments to the Base Rate during the original Term of the Lease shall continue to be used during the extended term.~~

**B.   NOTICE:**

Unless specified otherwise herein, notice of any rental adjustments, other than Fixed Rental Adjustments, shall be made as specified in paragraph 23 of the Lease.

**C.   BROKER'S FEE**:

The Brokers shall be paid a Brokerage Fee for each adjustment specified above in accordance with paragraph 15 of the Lease or if applicable, paragraph 9 of the Sublease.

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OE-6.00, Revised 01-03-2017

# AIRCRE

## ARBITRATION AGREEMENT
### STANDARD LEASE ADDENDUM

**Dated:**  October 13, 2020

**By and Between**

**Lessor:**  Calmur, LLC

**Lessee:**  Nobility Management, LLC a California limited liability company

**Property Address:**     26025 Mureau Rd., Suite 110, Calabasas, CA 91302
(street address, city, state, zip)

Paragraph:  59

### A.  ARBITRATION OF DISPUTES:

Except as provided in Paragraph B below, the Parties agree to resolve any and all claims, disputes or disagreements arising under this Lease, including, but not limited to any matter relating to Lessor's failure to approve an assignment, sublease or other transfer of Lessee's interest in the Lease under Paragraph 12 of this Lease, any other defaults by Lessor, or any defaults by Lessee by and through arbitration as provided below and irrevocably waive any and all rights to the contrary.  The Parties agree to at all times conduct themselves in strict, full, complete and timely accordance with the terms hereof and that any attempt to circumvent the terms of this Arbitration Agreement shall be absolutely null and void and of no force or effect whatsoever.

### B.  DISPUTES EXCLUDED FROM ARBITRATION:

The following claims, disputes or disagreements under this Lease are expressly excluded from the arbitration procedures set forth herein: 1. Disputes for which a different resolution determination is specifically set forth in this Lease, 2. All claims by either party which (a) seek anything other than enforcement or determination of rights under this Lease, or (b) are primarily founded upon matters of fraud, willful misconduct, bad faith or any other allegations of tortious action, and seek the award of punitive or exemplary damages, 3. Claims relating to (a) Lessor's exercise of any unlawful detainer rights pursuant to applicable law or (b) rights or remedies used by Lessor to gain possession of the Premises or terminate Lessee's right of possession to the Premises, all of which disputes shall be resolved by suit filed in the applicable court of jurisdiction, the decision of which court shall be subject to appeal pursuant to applicable law 4. Any claim or dispute that is within the jurisdiction of the Small Claims Court and 5. All claims arising under Paragraph 39 of this Lease.

### C.  APPOINTMENT OF AN ARBITRATOR:

All disputes subject to this Arbitration Agreement, shall be determined by binding arbitration before: ☑ a retired judge of the applicable court of jurisdiction (e.g., the Superior Court of the State of California) affiliated with Judicial Arbitration & Mediation Services, Inc. ("JAMS"), ☐ the American Arbitration Association ("AAA") under its commercial arbitration rules, ☐ _____ , or as may be otherwise mutually agreed by Lessor and Lessee (the "Arbitrator").  In the event that the parties elect to use an arbitrator other than one affiliated with JAMS or AAA then such arbitrator shall be obligated to comply with the Code of Ethics for Arbitrators in Commercial Disputes (see: http://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_003867). Such arbitration shall be initiated by the Parties, or either of them, within ten (10) days after either party sends written notice (the "Arbitration Notice") of a demand to arbitrate by registered or certified mail to the other party and to the Arbitrator.  The Arbitration Notice shall contain a description of the subject matter of the arbitration, the dispute with respect thereto, the amount involved, if any, and the remedy or determination sought.  If the Parties have agreed to use JAMS they may agree on a retired judge from the JAMS panel.  If they are unable to agree within ten days, JAMS will provide a list of three available judges and each party may strike one.  The remaining judge (or if there are two, the one selected by JAMS) will serve as the Arbitrator.  If the Parties have elected to utilize AAA or some other organization, the Arbitrator shall be selected in accordance with said organization's rules.  In the event the Arbitrator is not selected as provided for above for any reason, the party initiating arbitration shall apply to the appropriate Court for the appointment of a qualified retired judge to act as the Arbitrator.

### D.  ARBITRATION PROCEDURE:

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

INITIALS

ARB-3.01, Revised 07-28-2017

1. **PRE-HEARING ACTIONS**. The Arbitrator shall schedule a pre-hearing conference to resolve procedural matters, arrange for the exchange of information, obtain stipulations, and narrow the issues. The Parties will submit proposed discovery schedules to the Arbitrator at the pre-hearing conference. The scope and duration of discovery will be within the sole discretion of the Arbitrator. The Arbitrator shall have the discretion to order a pre-hearing exchange of information by the Parties, including, without limitation, production of requested documents, exchange of summaries of testimony of proposed witnesses, and examination by deposition of parties and third-party witnesses. This discretion shall be exercised in favor of discovery reasonable under the circumstances. The Arbitrator shall issue subpoenas and subpoenas duces tecum as provided for in the applicable statutory or case law (e.g., in California Code of Civil Procedure Section 1282.6).

2. **THE DECISION**. The arbitration shall be conducted in the city or county within which the Premises are located at a reasonably convenient site. Any Party may be represented by counsel or other authorized representative. In rendering a decision(s), the Arbitrator shall determine the rights and obligations of the Parties according to the substantive laws and the terms and provisions of this Lease. The Arbitrator's decision shall be based on the evidence introduced at the hearing, including all logical and reasonable inferences therefrom. The Arbitrator may make any determination and/or grant any remedy or relief that is just and equitable. The decision must be based on, and accompanied by, a written statement of decision explaining the factual and legal basis for the decision as to each of the principal controverted issues. The decision shall be conclusive and binding, and it may thereafter be confirmed as a judgment by the court of applicable jurisdiction, subject only to challenge on the grounds set forth in the applicable statutory or case law (e.g., in California Code of Civil Procedure Section 1286.2). The validity and enforceability of the Arbitrator's decision is to be determined exclusively by the court of appropriate jurisdiction pursuant to the provisions of this Lease. The Arbitrator may award costs, including without limitation, Arbitrator's fees and costs, attorneys' fees, and expert and witness costs, to the prevailing party, if any, as determined by the Arbitrator in his discretion.

Whenever a matter which has been submitted to arbitration involves a dispute as to whether or not a particular act or omission (other than a failure to pay money) constitutes a Default, the time to commence or cease such action shall be tolled from the date that the Notice of Arbitration is served through and until the date the Arbitrator renders his or her decision. Provided, however, that this provision shall NOT apply in the event that the Arbitrator determines that the Arbitration Notice was prepared in bad faith.

Whenever a dispute arises between the Parties concerning whether or not the failure to make a payment of money constitutes a default, the service of an Arbitration Notice shall NOT toll the time period in which to pay the money. The Party allegedly obligated to pay the money may, however, elect to pay the money "under protest" by accompanying said payment with a written statement setting forth the reasons for such protest. If thereafter, the Arbitrator determines that the Party who received said money was not entitled to such payment, said money shall be promptly returned to the Party who paid such money under protest together with Interest thereon as defined in Paragraph 13.5. If a Party makes a payment "under protest" but no Notice of Arbitration is filed within thirty days, then such protest shall be deemed waived. (See also Paragraph 42 or 43)

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE: No part of these works may be reproduced in any form without permission in writing.

INITIALS

INITIALS

© 2017 AIR CRE. All Rights Reserved.

ARB-3.01, Revised 07-28-2017

**Exhibit 2**

## AMENDMENT TO STANDARD MULTI-TENANT OFFICE LEASE

THIS AMENDMENT OF STANDARD MULTI-TENNAT OFFICE LEASE (the "**Amendment**") is made by and between CALMUR LLC ("**Lessor**"), NOBILITY MANAGEMENT, LLC ("**Lessee**"), and YURY GAMPEL, an individual ("**Guarantor**"), on June 12, 2023 (herein the "**Effective Date**").  This Amendment constitutes a written amendment and modification of that certain Standard Multi-Tenant Lease between Lessor and Lessee dated October 13, 2020 (the "**Lease**") pertaining to approximately 11,009 useable square (or 11,317 rentable) feet of office space known as 26025 Mureau Road, Suite 110, Calabasas, California 91302 (the "**Premises**").  For the purpose of this Amendment, Lessor, Lessee, and Guarantors may be collectively referred to as the "**Parties**" and individually as a "**Party**".

### RECITALS

A.      The term of the Lease commenced on May 1, 2021.  As of the date of this Agreement, the Lease is set to expire on July 31, 2026, as set forth in the Commencement Date Memorandum dated June 16, 2021.

B.      The Parties acknowledge that, pursuant to the Lease, the current rent payable for the Premises is approximately $2.516 per rentable square foot per month for the total of $28,475.62 per month (the "**Applicable RSF Rate**").

C.      The original security deposit under the Lease was $62,232.15 (the "**Security Deposit**").

D.      On or about May 15, 2023, Lessee filed for protection under Chapter 11 of the United States Bankruptcy Code.

E.      Guarantor has guaranteed performance of Lessee under the Lease up to the total of $200,000.00.

F.      Following the Lessee's bankruptcy filing, the Parties have engaged in good faith negotiations regarding the Lease.

### AMENDMENT

NOW, THEREFORE, in consideration of the promises, the terms, conditions, and covenants contained herein and for other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto agree as follows:

1.      **The Term of the Lease**.  The term of the Lease is modified to two (2) years and three (3) months from the Commencement Date.  Accordingly, the Lease Expiration Date for the purposes of the Lease is modified to July 31, 2023 (hereafter "**Modified Expiration Date**").

2.      **Premises, Relocation**.  Lessee agrees, effective August 1, 2023, it shall relocate from Unit 110 to a second-floor unit, Unit 210 or any other space in the Building below 4,900 rentable sq. feet as Lessor may designate (the "**Substitute Unit**").  Lessor and Lessee shall evidence the date of move to the Substitute Unit in writing; this date shall be hereafter referred to as the "**Relocation Date**".  Lessor and

1

Document ID: c719191d416c94b5d253ece8b93cbfe2b90a78337fe27872e75e074fd215be62

Lessee will execute a new lease for unit 210.  providing for a monthly rent payment of $11,941.00 per month until the end of its term on July 31, 2024.  Upon the execution of the new lease, the original Lease shall be deemed merged into the new lease agreement and Lessor shall be have no further claims against Nobility, including without limitation its estate in bankruptcy, except as set forth in this Amendment and the new lease obligations under the Lease except for those stated in the new lease agreement and this Amendment.

3.     **Certain Furniture**.   Lessor may permit Lessee to retain certain furniture (the "**Excess Furniture**") in unit 110 until the unit is leased to a third party (a "**New Tenant**") or upon Lessor giving notice to Lessee to remove the Excess Furniture.  If a New Tenant is interested in acquiring the Excess Furniture, Lessee shall have the right to negotiate the terms thereof with the New Tenant and shall be entitled to proceeds, if any, therefrom.  If a New Tenant is not interested in acquiring the retained furniture or upon notice of removal from the Lessor, Lessee shall remove at Lessee's cost within 30 days of the written notice by Lessor.  If Lessee fails to remove the Excess Furniture within the aforementioned thirty (30) day period, Lessor shall be entitled to storage costs of $500.00 per day of delay.  If Lessee fails to remove the Excess Furniture within 15 days after the expiration of the 30-day period, the title to the Excess Furniture will automatically be transferred to Lessor.  While no further instruments shall be required to evidence the transfer described hereunder, Lessee shall have an obligation to execute such additional transfer documentation as Lessor may request to evidence the transfer.

4.     **Modification of Rent**.  For all periods between May 15, 2023 and June 30, 2023 the Lessee's monthly Base Rent for the Premises at Unit 110 shall be $28,475.62 per month. For the month of July 2023, the monthly rent for suite 110 (and after the new lease is executed – for unit 210) shall be $11,941.00.

5.     **Security Deposit**.  The Security Deposit shall be reduced by the amount of $14,237.81 for the rent period in May 2023, which shall be retained by Landlord.  It shall be further reduced by the amount of $10,000.00 retained by Landlord to compensate Lessor for attorney fees associated with the negotiation of this Amendment, which amount both Landlord and Lessee deem reasonable.  The remaining amount of $37,994.35 shall be held as Security Deposit under the new lease to unit 210, provided however that any amount otherwise refundable to Lessee pursuant to the terms of the new lease at the end of its term shall be retained by Lessor as further consideration for the Lessor's agreement to modify the Lease. Lessor and Lessee hereby agree that Lessor shall be entitled to full rent, without any deductions or offsets, until the Modified Expiration Date; accordingly, Lessor shall have no obligation whatsoever to further reduce the remaining Security Deposit by any amounts of unpaid rent from the date of this Amendment forward.

6.     **Agreement to Cooperate with Landlord**. While occupying the Unit 110, Lessee hereby agrees to cooperate with Landlord's marketing efforts relating to this Unit.

7.     **Satisfaction of Guarantee**.  As an additional inducement to Lessor and in full satisfaction of his obligations under the Guaranty of Lease dated October 13, 2021, as subsequently modified in that certain First Addendum to Guaranty of Lease dated October 19, 2021, Yury Gampel hereby agrees that commencing on June 15, 2023, he shall make eleven (11) monthly installment payments, each equal to $16,666.67 and one (1) installment payment of $16,666.63 for a total of $200,000.00.  The payments shall be made via ACH to the account normally designated for payment of rent or such other account as Lessor may reasonably designate.

2

8. **Other Terms of the Lease to Remain in Full Force and Effect**.  Except as expressly set forth herein above, the terms of the Lease shall remain in full force and effect.

9. **Miscellaneous**.  This Amendment hereby incorporates by reference the Recitals hereinabove as well as each provision of the Lease not inconsistent herewith.  This Addendum shall supersede only the inconsistent terms and conditions of the Lease**.**

10. **Approval by the Bankruptcy Court**: Due to the fact that Lessee is in an active Chapter 11 proceeding, this Amendment is subject to approval by the United States Bankruptcy Court ("Bankruptcy Court").  Lessee agrees to file the necessary documents with the Bankruptcy Court to approve this Amendment.  Should the Bankruptcy Court not approve the Amendment, this Amendment will be deemed null and void.

The parties hereto have executed this Addendum as of the Effective Date included above.

[SIGNATURES ON NEXT PAGE]

3

Document ID: c719191d416c94b5d253ece8b93cbfe2b90a78337fe27872e75e074fd215be62

**AMENDMENT TO STANDARD MULTI-TENANT OFFICE LEASE**

**SIGNATURE PAGE**

_____

By Calmur, LLC (Lessor))
Name: Stan Megerdichian
Title: Manager

_____

By Nobility Management, LLC (Lessee)
Name: Mark Rabinovich
Title: Manager

_____

By Yury Gampel (Guarantor)
Name: Yury Gampel
Title: Guarantor

4

Document ID: c719191d416c94b5d253ece8b93cbfe2b90a78337fe27872e75e074fd215be62

**Exhibit 3**

**AIRCRE**

# STANDARD MULTI-TENANT OFFICE LEASE - GROSS

**1.    Basic Provisions ("Basic Provisions").**

1.1    **Parties.**  This Lease ("**Lease**"), dated for reference purposes only  June 30, 2023 , is made by and between  Calmur, LLC  ("**Lessor**") and  Nobility Management, LLC a California limited liability company  ("**Lessee**"), (collectively the "**Parties**", or individually a "**Party**").

1.2(a)    **Premises:**  That certain Portion of the Project (as defined below), commonly known as (street address, suite, city, state):  26025 Mureau Rd., Suite 210, Calabasas, CA 91302  ("**Premises**").  The Premises are located in the County of  Los Angeles , and consist of approximately  4,894  rentable square feet and approximately  4,617  useable square feet.  In addition to Lessee's rights to use and occupy the Premises as hereinafter specified, Lessee shall have non-exclusive rights to the Common Areas (as defined in Paragraph 2.7 below) as hereinafter specified, but shall not have any rights to the roof, the exterior walls, the area above the dropped ceilings, or the utility raceways of the building containing the Premises ("**Building**") or to any other buildings in the Project. The Premises, the Building, the Common Areas, the land upon which they are located, along with all other buildings and improvements thereon, are herein collectively referred to as the "**Project**."  The Project consists of approximately  45,304  rentable square feet.  (See also Paragraph 2)

1.2(b)    **Parking:**   20    unreserved and  zero  reserved vehicle parking spaces at a monthly cost of  zero  per unreserved space and  zero  per reserved space.  (See Paragraph 2.6)

1.3    **Term:**   1    years and  0    months ("**Original Term**") commencing  August 1, 2023  ("**Commencement Date**") and ending  July 31, 2024  ("**Expiration Date**").  (See also Paragraph 3)

1.4    **Early Possession:**  If the Premises are available Lessee may have non-exclusive possession of the Premises commencing  so long as tenant does not interfere with landlord's improvements, Tenant shall have 15 days of early occupancy  ("**Early Possession Date**").  (See also Paragraphs 3.2 and 3.3)

1.5    **Base Rent:**   $11,941.00  per month ("**Base Rent**"), payable on the  first  day of each month commencing  August 1, 2023 .  (See also Paragraph 4)

☐  If this box is checked, there are provisions in this Lease for the Base Rent to be adjusted.  See Paragraph  ___ .

1.6    **Lessee's Share of Operating Expense Increase**:  ten point six  percent (  10.6  %) ("**Lessee's Share**").  In the event that that size of the Premises and/or the Project are modified during the term of this Lease, Lessor shall recalculate Lessee's Share to reflect such modification.

1.7    **Base Rent and Other Monies Paid Upon Execution:**
(a)    **Base Rent:**   $11,941.00  for the period  August 1, 2023 through August 31, 2023 .
(b)    **Security Deposit:**   $37,994.34 (already on file, see paragraph 52)  ("**Security Deposit**").  (See also Paragraph 5)
(c)    **Parking**:   NA    for the period  NA   .
(d)    **Other:**   NA    for  ___ .
(e)    **Total Due Upon Execution of this Lease:**   $11,941.00 .

1.8    **Agreed Use**:   general office .  (See also Paragraph 6)

1.9    **Base Year; Insuring Party**.  The Base Year is  2023 .  Lessor is the "**Insuring Party**". (See also Paragraphs 4.2 and 8)

1.10    **Real Estate Brokers.**  (See also Paragraph 15 and 25)
(a)    **Representation**:  The following real estate brokers (the "**Brokers**") and brokerage relationships exist in this transaction (check applicable boxes): <span style="color:red">NONE.</span>

☐  ___  represents Lessor exclusively ("**Lessor's Broker**");
☐  ___  represents Lessee exclusively ("**Lessee's Broker**"); or
☐  ___  represents both Lessor and Lessee ("**Dual Agency**").

~~(b)    **Payment to Brokers.**  Upon execution and delivery of this Lease by both Parties, Lessor shall pay to the Brokers the brokerage fee agreed to in a separate written agreement (or if there is no such agreement, the sum of ___ or ___ % of the total Base Rent) for the brokerage services rendered by the Brokers.~~

1.11    **Guarantor.**  The obligations of the Lessee under this Lease are to be guaranteed by  NONE  ("**Guarantor**").  (See also Paragraph 37)

1.12    **Business Hours for the Building**:   8    a.m. to  6    p.m., Mondays through Fridays (except Building Holidays) and  9    a.m. to  1    p.m. on Saturdays (except Building Holidays).  "**Building Holidays**" shall mean the dates of observation of New Year's Day, President's Day, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, Christmas Day, and  ___ .

_____    _____
INITIALS    INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                    OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

1.13     **Lessor Supplied Services**.  Notwithstanding the provisions of Paragraph 11.1, Lessor is NOT obligated to provide the following within the Premises:

☑ Janitorial services

☐ Electricity

☑ Other (specify):  HVAC service after Business Hours for the Building per paragraph 1.12.

1.14     **Attachments.**  Attached hereto are the following, all of which constitute a part of this Lease:

☑ an Addendum consisting of Paragraphs  51   through  55   ;

☐ a plot plan depicting the Premises;

☑ a current set of the Rules and Regulations;

☐ a Work Letter;

☐ a janitorial schedule;

☑ other (specify):  Arbitration Agreement, Rules and Regulations .

## 2.  Premises.

2.1  **Letting**.  Lessor hereby leases to Lessee, and Lessee hereby leases from Lessor, the Premises, for the term, at the rental, and upon all of the terms, covenants and conditions set forth in this Lease.  While the approximate square footage of the Premises may have been used in the marketing of the Premises for purposes of comparison, the Base Rent stated herein is NOT tied to square footage and is not subject to adjustment should the actual size be determined to be different.  **NOTE: Lessee is advised to verify the actual size prior to executing this Lease.**

2.2  **Condition**.  Lessor shall deliver the Premises to Lessee in a clean condition on the Commencement Date or the Early Possession Date, whichever first occurs ("**Start Date**"), and warrants that the existing electrical, plumbing, fire sprinkler, lighting, heating, ventilating and air conditioning systems ("**HVAC**"), and all other items which the Lessor is obligated to construct pursuant to the Work Letter attached hereto, if any, other than those constructed by Lessee, shall be in good operating condition on said date, that the structural elements of the roof, bearing walls and foundation of the Unit shall be free of material defects, and that the Premises do not contain hazardous levels of any mold or fungi defined as toxic under applicable state or federal law.  Lessor also warrants, that unless otherwise specified in writing, Lessor is unaware of (i) any recorded Notices of Default affecting the Premise; (ii) any delinquent amounts due under any loan secured by the Premises; and (iii) any bankruptcy proceeding affecting the Premises.

2.3  **Compliance**.  Lessor warrants that to the best of its knowledge the improvements on the Premises and the Common Areas comply with the building codes, applicable laws, covenants or restrictions of record, regulations, and ordinances ("**Applicable Requirements**") that were in effect at the time that each improvement, or portion thereof, was constructed.  Said warranty does not apply to the use to which Lessee will put the Premises, modifications which may be required by the Americans with Disabilities Act or any similar laws as a result of Lessee's use (see Paragraph 49), or to any Alterations or Utility Installations (as defined in Paragraph 7.3(a)) made or to be made by Lessee.  **NOTE: Lessee is responsible for determining whether or not the zoning and other Applicable Requirements are appropriate for Lessee's intended use, and acknowledges that past uses of the Premises may no longer be allowed.**  If the Premises do not comply with said warranty, Lessor shall, except as otherwise provided, promptly after receipt of written notice from Lessee setting forth with specificity the nature and extent of such non-compliance, rectify the same.  If the Applicable Requirements are hereafter changed so as to require during the term of this Lease the construction of an addition to or an alteration of the Premises, the remediation of any Hazardous Substance, or the reinforcement or other physical modification of the Premises ("**Capital Expenditure**"), Lessor and Lessee shall allocate the cost of such work as follows:

(a)  Subject to Paragraph 2.3(c) below, if such Capital Expenditures are required as a result of the specific and unique use of the Premises by Lessee as compared with uses by tenants in general, Lessee shall be fully responsible for the cost thereof, provided, however, that if such Capital Expenditure is required during the last 2 years of this Lease and the cost thereof exceeds 6 months' Base Rent, Lessee may instead terminate this Lease unless Lessor notifies Lessee, in writing, within 10 days after receipt of Lessee's termination notice that Lessor has elected to pay the difference between the actual cost thereof and the amount equal to 6 months' Base Rent.  If Lessee elects termination, Lessee shall immediately cease the use of the Premises which requires such Capital Expenditure and deliver to Lessor written notice specifying a termination date at least 90 days thereafter.  Such termination date shall, however, in no event be earlier than the last day that Lessee could legally utilize the Premises without commencing such Capital Expenditure.

(b)  If such Capital Expenditure is not the result of the specific and unique use of the Premises by Lessee (such as, governmentally mandated seismic modifications), then Lessor shall pay for such Capital Expenditure and Lessee shall only be obligated to pay, each month during the remainder of the term of this Lease or any extension thereof, on the date that on which the Base Rent is due, an amount equal to 1/144th of the portion of such costs reasonably attributable to the Premises.  Lessee shall pay Interest on the balance but may prepay its obligation at any time.  If, however, such Capital Expenditure is required during the last 2

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

years of this Lease or if Lessor reasonably determines that it is not economically feasible to pay its share thereof, Lessor shall have the option to terminate this Lease upon 90 days prior written notice to Lessee unless Lessee notifies Lessor, in writing, within 10 days after receipt of Lessor's termination notice that Lessee will pay for such Capital Expenditure.  If Lessor does not elect to terminate, and fails to tender its share of any such Capital Expenditure, Lessee may advance such funds and deduct same, with Interest, from Rent until Lessor's share of such costs have been fully paid.  If Lessee is unable to finance Lessor's share, or if the balance of the Rent due and payable for the remainder of this Lease is not sufficient to fully reimburse Lessee on an offset basis, Lessee shall have the right to terminate this Lease upon 30 days written notice to Lessor.

(c)  Notwithstanding the above, the provisions concerning Capital Expenditures are intended to apply only to non-voluntary, unexpected, and new Applicable Requirements.  If the Capital Expenditures are instead triggered by Lessee as a result of an actual or proposed change in use, change in intensity of use, or modification to the Premises then, and in that event, Lessee shall either: (i) immediately cease such changed use or intensity of use and/or take such other steps as may be necessary to eliminate the requirement for such Capital Expenditure, or (ii) complete such Capital Expenditure at its own expense.  Lessee shall not have any right to terminate this Lease.

2.4  **Acknowledgements**.  Lessee acknowledges that:  (a) it has been given an opportunity to inspect and measure the Premises, (b) Lessee has been advised by Lessor and/or Brokers to satisfy itself with respect to the size and condition of the Premises (including but not limited to the electrical, HVAC and fire sprinkler systems, security, environmental  aspects, and compliance with Applicable Requirements), and their suitability for Lessee's intended use, (c) Lessee has made such investigation as it deems necessary with reference to such matters and assumes all responsibility therefor as the same relate to its occupancy of the Premises, (d) it is not relying on any representation as to the size of the Premises made by Brokers or Lessor, (e) the square footage of the Premises was not material to Lessee's decision to lease the Premises and pay the Rent stated herein, and (f) neither Lessor, Lessor's agents, nor Brokers have made any oral or written representations or warranties with respect to said matters other than as set forth in this Lease.  In addition, Lessor acknowledges that: (i) Brokers have made no representations, promises or warranties concerning Lessee's ability to honor the Lease or suitability to occupy the Premises, and (ii) it is Lessor's sole responsibility to investigate the financial capability and/or suitability of all proposed tenants.

2.5  **Lessee as Prior Owner/Occupant**.  The warranties made by Lessor in Paragraph 2 shall be of no force or effect if immediately prior to the Start Date, Lessee was the owner or occupant of the Premises.  In such event, Lessee shall be responsible for any necessary corrective work.

2.6  **Vehicle Parking**.  So long as Lessee is not in default, and subject to the Rules and Regulations attached hereto, and as established by Lessor from time to time, Lessee shall be entitled to rent and use the number of parking spaces specified in Paragraph 1.2(b) at the rental rate applicable from time to time for monthly parking as set by Lessor and/or its licensee.

(a)  If Lessee commits, permits or allows any of the prohibited activities described in the Lease or the rules then in effect, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove or tow away the vehicle involved and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

(b)  The monthly rent per parking space specified in Paragraph 1.2(b) is subject to change upon 30 days prior written notice to Lessee.  The rent for the parking is payable one month in advance prior to the first day of each calendar month.

2.7  **Common Areas - Definition**.  The term "**Common Areas**" is defined as all areas and facilities outside the Premises and within the exterior boundary line of the Project and interior utility raceways and installations within the  Premises that are provided and designated by the Lessor from time to time for the general nonexclusive use of Lessor, Lessee and other tenants of the Project and their respective employees, suppliers, shippers, customers, contractors and invitees, including, but not limited to, common entrances, lobbies, corridors, stairwells, public restrooms, elevators, parking areas, loading and unloading areas, trash areas, roadways, walkways, driveways and landscaped areas.

2.8  **Common Areas - Lessee's Rights**.  Lessor grants to Lessee, for the benefit of Lessee and its employees, suppliers, shippers, contractors, customers and invitees, during the term of this Lease, the non-exclusive right to use, in common with others entitled to such use, the Common Areas as they exist from time to time, subject to any rights, powers, and privileges reserved by Lessor under the terms hereof or under the terms of any rules and regulations or restrictions governing the use of the Project.  Under no circumstances shall the right herein granted to use the Common Areas be deemed to include the right to store any property, temporarily or permanently, in the Common Areas.  Any such storage shall be permitted only by the prior written consent of Lessor or Lessor's designated agent, which consent may be revoked at any time.  In the event that any unauthorized storage shall occur, then Lessor shall have the right, without notice, in addition to such other rights and remedies that it may have, to remove the property and charge the cost to Lessee, which cost shall be immediately payable upon demand by Lessor.

2.9  **Common Areas - Rules and Regulations**.  Lessor or such other person(s) as Lessor may appoint shall have the exclusive control and management of the Common Areas and shall have the right, from time to time, to adopt, modify, amend and enforce reasonable rules and regulations ("**Rules and Regulations**") for the management, safety, care, and cleanliness of the grounds, the parking and unloading of vehicles and the preservation of good order, as well as for the convenience of other occupants or tenants of the Building and the Project and their invitees.  The Lessee agrees to abide by and conform to all such Rules and Regulations, and

_____                      Last Edited: 7/12/2023 11:08 AM                      _____
INITIALS                                                                          INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                      OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

shall use its best efforts to cause its employees, suppliers, shippers, customers, contractors and invitees to so abide and conform. Lessor shall not be responsible to Lessee for the noncompliance with said Rules and Regulations by other tenants of the Project.

2.10    **Common Areas - Changes**.  Lessor shall have the right, in Lessor's sole discretion, from time to time:

(a)  To make changes to the Common Areas, including, without limitation, changes in the location, size, shape and number of the lobbies, windows, stairways, air shafts, elevators, escalators, restrooms, driveways, entrances, parking spaces, parking areas, loading and unloading areas, ingress, egress, direction of traffic, landscaped areas, walkways and utility raceways;

(b)  To close temporarily any of the Common Areas for maintenance purposes so long as reasonable access to the Premises remains available;

(c)  To designate other land outside the boundaries of the Project to be a part of the Common Areas;

(d)  To add additional buildings and improvements to the Common Areas;

(e)  To use the Common Areas while engaged in making additional improvements, repairs or alterations to the Project, or any portion thereof; and

(f)  To do and perform such other acts and make such other changes in, to or with respect to the Common Areas and Project as Lessor may, in the exercise of sound business judgment, deem to be appropriate.

**3.    Term.**

3.1  **Term**.  The Commencement Date, Expiration Date and Original Term of this Lease are as specified in Paragraph 1.3.

3.2  **Early Possession**.  Any provision herein granting Lessee Early Possession of the Premises is subject to and conditioned upon the Premises being available for such possession prior to the Commencement Date.  Any grant of Early Possession only conveys a non-exclusive right to occupy the Premises.  If Lessee totally or partially occupies the Premises prior to the Commencement Date, the obligation to pay Base Rent shall be abated for the period of such Early Possession.  All other terms of this Lease (including but not limited to the obligations to pay Lessee's Share of the Operating Expense Increase) shall be in effect during such period.  Any such Early Possession shall not affect the Expiration Date.

3.3  **Delay In Possession**.  Lessor agrees to use its best commercially reasonable efforts to deliver possession of the Premises to Lessee by the Commencement Date.  If, despite said efforts, Lessor is unable to deliver possession by such date, Lessor shall not be subject to any liability therefor, nor shall such failure affect the validity of this Lease or change the Expiration Date.  Lessee shall not, however, be obligated to pay Rent or perform its other obligations until Lessor delivers possession of the Premises and any period of rent abatement that Lessee would otherwise have enjoyed shall run from the date of delivery of possession and continue for a period equal to what Lessee would otherwise have enjoyed under the terms hereof, but minus any days of delay caused by the acts or omissions of Lessee.  If possession is not delivered within 60 days after the Commencement Date, as the same may be extended under the terms of any Work Letter executed by Parties, Lessee may, at its option, by notice in writing within 10 days after the end of such 60 day period, cancel this Lease, in which event the Parties shall be discharged from all obligations hereunder.  If such written notice is not received by Lessor within said 10 day period, Lessee's right to cancel shall terminate.  If possession of the Premises is not delivered within 120 days after the Commencement Date, this Lease shall terminate unless other agreements are reached between Lessor and Lessee, in writing.

3.4  **Lessee Compliance**.  Lessor shall not be required to deliver possession of the Premises to Lessee until Lessee complies with its obligation to provide evidence of insurance (Paragraph 8.5).  Pending delivery of such evidence, Lessee shall be required to perform all of its obligations under this Lease from and after the Start Date, including the payment of Rent, notwithstanding Lessor's election to withhold possession pending receipt of such evidence of insurance.  Further, if Lessee is required to perform any other conditions prior to or concurrent with the Start Date, the Start Date shall occur but Lessor may elect to withhold possession until such conditions are satisfied.

**4.    Rent.**

4.1  **Rent Defined**.  All monetary obligations of Lessee to Lessor under the terms of this Lease (except for the Security Deposit) are deemed to be rent ("**Rent**").

4.2  **Operating Expense Increase**.  Lessee shall pay to Lessor during the term hereof, in addition to the Base Rent, Lessee's Share of the amount by which all Operating Expenses for each Comparison Year exceeds the amount of all Operating Expenses for the Base Year, such excess being hereinafter referred to as the "**Operating Expense Increase**", in accordance with the following provisions:

(a)  "**Base Year**" is as specified in Paragraph 1.9.

(b)  "**Comparison Year**" is defined as each calendar year during the term of this Lease subsequent to the Base Year; provided, however, Lessee shall have no obligation to pay a share of the Operating Expense Increase applicable to the first 12 months of the Lease Term (other than such as are mandated by a governmental authority, as to which government mandated expenses Lessee shall pay Lessee's Share, notwithstanding they occur during the first twelve (12) months).  Lessee's Share of the Operating Expense Increase for the first and last Comparison Years of the Lease Term shall be prorated according to that portion of such Comparison Year as to which Lessee is responsible for a share of such increase.

(c)  The following costs relating to the ownership and operation of the Project, calculated as if the Project was at least 95%

INITIALS

Page 4 of 25
Last Edited: 7/12/2023 11:08 AM

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

occupied,  are defined as "**Operating Expenses**":

(i)    Costs relating to the operation, repair, and maintenance in neat, clean, safe, good order and condition, but not the replacement (see subparagraph (g)), of the following:

(aa) The Common Areas, including their surfaces, coverings, decorative items, carpets, drapes and window coverings, and including parking areas, loading and unloading areas, trash areas, roadways, sidewalks, walkways, stairways, parkways, driveways, landscaped areas, striping, bumpers, irrigation systems, Common Area lighting facilities, building exteriors and roofs, fences and gates;

(bb) All heating, air conditioning, plumbing, electrical systems, life safety equipment, communication systems and other equipment used in common by, or for the benefit of, tenants or occupants of the Project, including elevators and escalators, tenant directories, fire detection systems including sprinkler system maintenance and repair.

(cc) All other areas and improvements that are within the exterior boundaries of the Project but outside of the Premises and/or any other space occupied by a tenant.

(ii)    The cost of trash disposal, janitorial and security services, pest control services, and the costs of any environmental inspections;

(iii)    The cost of any other service to be provided by Lessor that is elsewhere in this Lease stated to be an "Operating Expense";

(iv)    The cost of the premiums for the insurance policies maintained by Lessor pursuant to paragraph 8 and any deductible portion of an insured loss concerning the Building or the Common Areas;

(v)    The amount of the Real Property Taxes payable by Lessor pursuant to paragraph 10;

(vi)    The cost of water, sewer, gas, electricity, and other publicly mandated services not separately metered;

(vii) Labor, salaries, and applicable fringe benefits and costs, materials, supplies and tools, used in maintaining and/or cleaning the Project and accounting and management fees attributable to the operation of the Project;

(viii)    The cost of any capital improvement  to the Building or the Project not covered under the provisions of Paragraph 2.3 provided; however, that Lessor shall allocate the cost of any such capital improvement  over a 12 year period and Lessee shall not be required to pay more than Lessee's Share of 1/144th of the cost of such Capital Expenditure in any given month;

(ix)    The cost to replace equipment or improvements that have a useful life for accounting purposes of 5 years or less.

(x)    Reserves set aside for maintenance, repair and/or replacement of Common Area improvements and equipment.

(d)    Any item of Operating Expense that is specifically attributable to the Premises, the Building or to any other building in the Project or to the operation, repair and maintenance thereof, shall be allocated entirely to such Premises, Building, or other building.  However, any such item that is not specifically attributable to the Building or to any other building or to the operation, repair and maintenance thereof, shall be equitably allocated by Lessor to all buildings in the Project.

(e)    The inclusion of the improvements, facilities and services set forth in Subparagraph 4.2(c) shall not be deemed to impose an obligation upon Lessor to either have said improvements or facilities or to provide those services unless the Project already has the same, Lessor already provides the services, or Lessor has agreed elsewhere in this Lease to provide the same or some of them.

(f)    Lessee's Share of Operating Expense Increase is payable monthly on the same day as the Base Rent is due hereunder. The amount of such payments shall be based on Lessor's estimate of the Operating Expense Expenses.  Within 60 days after written request (but not more than once each year) Lessor shall deliver to Lessee a reasonably detailed statement showing Lessee's Share of the actual Common Area Operating Expenses for the preceding year.  If Lessee's payments during such Year exceed Lessee's Share, Lessee shall credit the amount of such over-payment against Lessee's future payments.  If Lessee's payments during such Year were less than Lessee's Share, Lessee shall pay to Lessor the amount of the deficiency within 10 days after delivery by Lessor to Lessee of said statement.  Lessor and Lessee shall forthwith adjust between them by cash payment any balance determined to exist with respect to that portion of the last Comparison Year for which Lessee is responsible as to Operating Expense Increases, notwithstanding that the Lease term may have terminated before the end of such Comparison Year.

(g)    Operating Expenses shall not include the costs of replacement for equipment or capital components such as the roof, foundations, exterior walls or a Common Area capital improvement, such as the parking lot paving, elevators, fences that have a useful life for accounting purposes of 5 years or more.

(h)    Operating Expenses shall not include any expenses paid by any tenant directly to third parties, or as to which Lessor is otherwise reimbursed by any third party, other tenant, or by insurance proceeds.

4.3  **Payment**.  Lessee shall cause payment of Rent to be received by Lessor in lawful money of the United States on or before the day on which it is due, without offset or deduction (except as specifically permitted in this Lease).  All monetary amounts shall be rounded to the nearest whole dollar.  In the event that any invoice prepared by Lessor is inaccurate such inaccuracy shall not constitute a waiver and Lessee shall be obligated to pay the amount set forth in this Lease.  Rent for any period during the term hereof which is for less than one full calendar month shall be prorated based upon the actual number of days of said month. Payment of Rent shall be made to Lessor at its address stated herein or to such other persons or place as Lessor may from time to

INITIALS

Last Edited: 7/12/2023 11:08 AM

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

time designate in writing.  Acceptance of a payment which is less than the amount then due shall not be a waiver of Lessor's rights to the balance of such Rent, regardless of Lessor's endorsement of any check so stating.  In the event that any check, draft, or other instrument of payment given by Lessee to Lessor is dishonored for any reason, Lessee agrees to pay to Lessor the sum of $25 in addition to any Late Charge and Lessor, at its option, may require all future Rent be paid by cashier's check.  Payments will be applied first to accrued late charges and attorney's fees, second to accrued interest, then to Base Rent and Common Area Operating Expenses, and any remaining amount to any other outstanding charges or costs.

**5.    Security Deposit.**  Lessee shall deposit with Lessor upon  execution hereof the Security Deposit as security for Lessee's faithful performance of its obligations under this Lease.  If Lessee fails to pay Rent, or otherwise Defaults under this Lease, Lessor may use, apply or retain all or any portion of said Security Deposit for the payment of any amount already due Lessor, for Rents which will be due in the future, and/ or to reimburse or compensate Lessor for any liability, expense, loss or damage which Lessor may suffer or incur by reason thereof.  If Lessor uses or applies all or any portion of the Security Deposit, Lessee shall within 10 days after written request therefor deposit monies with Lessor sufficient to restore said Security Deposit to the full amount required by this Lease.  If the Base Rent increases during the term of this Lease, Lessee shall, upon written request from Lessor, deposit additional monies with Lessor so that the total amount of the Security Deposit shall at all times bear the same proportion to the increased Base Rent as the initial Security Deposit bore to the initial Base Rent.  Should the Agreed Use be amended to accommodate a material change in the business of Lessee or to accommodate a sublessee or assignee, Lessor shall have the right to increase the Security Deposit to the extent necessary, in Lessor's reasonable judgment, to account for any increased wear and tear that the Premises may suffer as a result thereof.  If a change in control of Lessee occurs during this Lease and following such change the financial condition of Lessee is, in Lessor's reasonable judgment, significantly reduced, Lessee shall deposit such additional monies with Lessor as shall be sufficient to cause the Security Deposit to be at a commercially reasonable level based on such change in financial condition.  Lessor shall not be required to keep the Security Deposit separate from its general accounts.  Within 90 days after the expiration or termination of this Lease, Lessor shall return that portion of the Security Deposit not used or applied by Lessor.  Lessor shall upon written request provide Lessee with an accounting showing how that portion of the Security Deposit that was not returned was applied.  No part of the Security Deposit shall be considered to be held in trust, to bear interest or to be prepayment for any monies to be paid by Lessee under this Lease.  THE SECURITY DEPOSIT SHALL NOT BE USED BY LESSEE IN LIEU OF PAYMENT OF THE LAST MONTH'S RENT.

**6.    Use.**
    6.1  **Use**.  Lessee shall use and occupy the Premises only for the Agreed Use, or any other legal use which is reasonably comparable thereto, and for no other purpose.  Lessee shall not use or permit the use of the Premises in a manner that is unlawful, creates damage, waste or a nuisance, or that disturbs occupants of or causes damage to neighboring premises or properties.  Other than guide, signal and seeing eye dogs, Lessee shall not keep or allow in the Premises any pets, animals, birds, fish, or reptiles.  Lessor shall not unreasonably withhold or delay its consent to any written request for a modification of the Agreed Use, so long as the same will not impair the structural integrity of the improvements of the Building, will not adversely affect the mechanical, electrical, HVAC, and other systems of the Building, and/or will not affect the exterior appearance of the Building.  If Lessor elects to withhold consent, Lessor shall within 7 days after such request give written notification of same, which notice shall include an explanation of Lessor's objections to the change in the Agreed Use.
    6.2  **Hazardous Substances**.
      (a)  **Reportable Uses Require Consent**.  The term "**Hazardous Substance**" as used in this Lease shall mean any product, substance, or waste whose presence, use, manufacture, disposal, transportation, or release, either by itself or in combination with other materials expected to be on the Premises, is either: (i) potentially injurious to the public health, safety or welfare, the environment or the Premises, (ii) regulated or monitored by any governmental authority, or (iii) a basis for potential liability of Lessor to any governmental agency or third party under any applicable statute or common law theory.  Hazardous Substances shall include, but not be limited to, hydrocarbons, petroleum, gasoline, and/or crude oil or any products, byproducts or fractions thereof.  Lessee shall not engage in any activity in or on the Premises which constitutes a Reportable Use of Hazardous Substances without the express prior written consent of Lessor and timely compliance (at Lessee's expense) with all Applicable Requirements.  "**Reportable Use**" shall mean (i) the installation or use of any above or below ground storage tank, (ii) the generation, possession, storage, use, transportation, or disposal of a Hazardous Substance that requires a permit from, or with respect to which a report, notice, registration or business plan is required to be filed with, any governmental authority, and/or (iii) the presence at the Premises of a Hazardous Substance with respect to which any Applicable Requirements requires that a notice be given to persons entering or occupying the Premises or neighboring properties.  Notwithstanding the foregoing, Lessee may use any ordinary and customary materials reasonably required to be used in the normal course of the Agreed Use such as ordinary office supplies (copier toner, liquid paper, glue, etc.) and common household cleaning materials, so long as such use is in compliance with all Applicable Requirements, is not a Reportable Use, and does not expose the Premises or neighboring property to any meaningful risk of contamination or damage or expose Lessor to any liability therefor.  In addition, Lessor may condition its consent to any Reportable Use upon receiving such additional assurances as Lessor reasonably deems necessary to protect itself, the public, the Premises and/or the environment

INITIALS                                                  Last Edited: 7/12/2023 11:08 AM                                                  INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                                  OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

against damage, contamination, injury and/or liability, including, but not limited to, the installation (and removal on or before Lease expiration or termination) of protective modifications (such as concrete encasements) and/or increasing the Security Deposit.

(b)  **Duty to Inform Lessor**.  If Lessee knows, or has reasonable cause to believe, that a Hazardous Substance has come to be located in, on, under or about the Premises, other than as previously consented to by Lessor, Lessee shall immediately give written notice of such fact to Lessor, and provide Lessor with a copy of any report, notice, claim or other documentation which it has concerning the presence of such Hazardous Substance.

(c)  **Lessee Remediation**.  Lessee shall not cause or permit any Hazardous Substance to be spilled or released in, on, under, or about the Premises (including through the plumbing or sanitary sewer system) and shall promptly, at Lessee's expense, comply with all Applicable Requirements and take all investigatory and/or remedial action reasonably recommended, whether or not formally ordered or required, for the cleanup of any contamination of, and for the maintenance, security and/or monitoring of the Premises or neighboring properties, that was caused or materially contributed to by Lessee, or pertaining to or involving any Hazardous Substance brought onto the Premises during the term of this Lease, by or for Lessee, or any third party.

(d)  **Lessee Indemnification**.  Lessee shall indemnify, defend and hold Lessor, its agents, employees, lenders and ground lessor, if any, harmless from and against any and all loss of rents and/or damages, liabilities, judgments, claims, expenses, penalties, and attorneys' and consultants' fees arising out of or involving any Hazardous Substance brought onto the Premises by or for Lessee, or any third party (provided, however, that Lessee shall have no liability under this Lease with respect to underground migration of any Hazardous Substance under the Premises from areas outside of the Project not caused or contributed to by Lessee).  Lessee's obligations shall include, but not be limited to, the effects of any contamination or injury to person, property or the environment created or suffered by Lessee, and the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.  No termination, cancellation or release agreement entered into by Lessor and Lessee shall release Lessee from its obligations under this Lease with respect to Hazardous Substances, unless specifically so agreed by Lessor in writing at the time of such agreement.

(e)  **Lessor Indemnification**.  Except as otherwise provided in paragraph 8.7, Lessor and its successors and assigns shall indemnify, defend, reimburse and hold Lessee, its employees and lenders, harmless from and against any and all environmental damages, including the cost of remediation, which result from Hazardous Substances which existed on the Premises prior to Lessee's occupancy or which are caused by the gross negligence or willful misconduct of Lessor, its agents or employees.  Lessor's obligations, as and when required by the Applicable Requirements, shall include, but not be limited to, the cost of investigation, removal, remediation, restoration and/or abatement, and shall survive the expiration or termination of this Lease.

(f)  **Investigations and Remediations**.  Lessor shall retain the responsibility and pay for any investigations or remediation measures required by governmental entities having jurisdiction with respect to the existence of Hazardous Substances on the Premises prior to Lessee's occupancy, unless such remediation measure is required as a result of Lessee's use (including "Alterations", as defined in paragraph 7.3(a) below) of the Premises, in which event Lessee shall be responsible for such payment. Lessee shall cooperate fully in any such activities at the request of Lessor, including allowing Lessor and Lessor's agents to have reasonable access to the Premises at reasonable times in order to carry out Lessor's investigative and remedial responsibilities.

(g)  **Lessor Termination Option**.  If a Hazardous Substance Condition (see Paragraph 9.1(e)) occurs during the term of this Lease, unless Lessee is legally responsible therefor (in which case Lessee shall make the investigation and remediation thereof required by the Applicable Requirements and this Lease shall continue in full force and effect, but subject to Lessor's rights under Paragraph 6.2(d) and Paragraph 13), Lessor may, at Lessor's option, either (i) investigate and remediate such Hazardous Substance Condition, if required, as soon as reasonably possible at Lessor's expense, in which event this Lease shall continue in full force and effect, or (ii) if the estimated cost to remediate such condition exceeds 12 times the then monthly Base Rent or $100,000, whichever is greater, give written notice to Lessee, within 30 days after receipt by Lessor of knowledge of the occurrence of such Hazardous Substance Condition, of Lessor's desire to terminate this Lease as of the date 60 days following the date of such notice.  In the event Lessor elects to give a termination notice, Lessee may, within 10 days thereafter, give written notice to Lessor of Lessee's commitment to pay the amount by which the cost of the remediation of such Hazardous Substance Condition exceeds an amount equal to 12 times the then monthly Base Rent or $100,000, whichever is greater.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days following such commitment.  In such event, this Lease shall continue in full force and effect, and Lessor shall proceed to make such remediation as soon as reasonably possible after the required funds are available.  If Lessee does not give such notice and provide the required funds or assurance thereof within the time provided, this Lease shall terminate as of the date specified in Lessor's notice of termination.

6.3  **Lessee's Compliance with Applicable Requirements**.  Except as otherwise provided in this Lease, Lessee shall, at Lessee's sole expense, fully, diligently and in a timely manner, materially comply with all Applicable Requirements, the requirements of any applicable fire insurance underwriter or rating bureau, and the recommendations of Lessor's engineers and/or consultants which relate in any manner to the Premises, without regard to whether said Applicable Requirements are now in effect or become effective after the Start Date. Lessee shall, within 10 days after receipt of Lessor's written request, provide Lessor with copies of all permits and other documents, and other information evidencing Lessee's compliance with any Applicable Requirements specified by Lessor,

_____
INITIALS

Page 7 of 25
Last Edited: 7/12/2023 11:08 AM

_____
INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

and shall immediately upon receipt, notify Lessor in writing (with copies of any documents involved) of any threatened or actual claim, notice, citation, warning, complaint or report pertaining to or involving the failure of Lessee or the Premises to comply with any Applicable Requirements.  Likewise, Lessee shall immediately give written notice to Lessor of: (i) any water damage to the Premises and any suspected seepage, pooling, dampness or other condition conducive to the production of mold; or (ii) any mustiness or other odors that might indicate the presence of mold in the Premises.

6.4  **Inspection; Compliance**.  Lessor and Lessor's "**Lender**" (as defined in Paragraph 30) and consultants authorized by Lessor shall have the right to enter into Premises at any time, in the case of an emergency, and otherwise at reasonable times, after reasonable notice, for the purpose of inspecting and/or testing the condition of the Premises and/or for verifying compliance by Lessee with this Lease.  The cost of any such inspections shall be paid by Lessor, unless a violation of Applicable Requirements, or a Hazardous Substance Condition (see Paragraph 9.1e) is found to exist or be imminent, or the inspection is requested or ordered by a governmental authority.  In such case, Lessee shall upon request reimburse Lessor for the cost of such inspection, so long as such inspection is reasonably related to the violation or contamination.  In addition, Lessee shall provide copies of all relevant material safety data sheets (**MSDS**) to Lessor within 10 days of the receipt of written request therefor.  Lessee acknowledges that any failure on its part to allow such inspections or testing will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, should the Lessee fail to allow such inspections and/or testing in a timely fashion the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for the remainder to the Lease.  The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to allow such inspection and/or testing.  Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to such failure nor prevent the exercise of any of the other rights and remedies granted hereunder.

7.    **Maintenance; Repairs; Utility Installations; Trade Fixtures and Alterations.**

7.1  **Lessee's Obligations**.  Notwithstanding Lessor's obligation to keep the Premises in good condition and repair, Lessee shall be responsible for payment of the cost thereof to Lessor as additional rent for that portion of the cost of any maintenance and repair of the Premises, or any equipment (wherever located) that serves only Lessee or the Premises, to the extent such cost is attributable to abuse or misuse.  In addition, Lessee rather than the Lessor shall be responsible for the cost of painting, repairing or replacing wall coverings, and to repair or replace any similar improvements within the Premises.  Lessor may, at its option, upon reasonable notice, elect to have Lessee perform any particular such maintenance or repairs the cost of which is otherwise Lessee's responsibility hereunder."

7.2  **Lessor's Obligations**.  Subject to the provisions of Paragraphs 2.2 (Condition), 2.3 (Compliance), 4.2 (Operating Expenses), 6 (Use), 7.1 (Lessee's Obligations), 9 (Damage or Destruction) and 14 (Condemnation), Lessor, subject to reimbursement pursuant to Paragraph 4.2, shall keep in good order, condition and repair the foundations, exterior walls, structural condition of interior bearing walls, exterior roof, fire sprinkler system, fire alarm and/or smoke detection systems, fire hydrants, and the Common Areas.

7.3  **Utility Installations; Trade Fixtures; Alterations**.

(a)   **Definitions**.  The term "**Utility Installations**" refers to all floor and window coverings, air lines, vacuum lines, power panels, electrical distribution, security and fire protection systems, communication cabling, lighting fixtures, HVAC equipment, and plumbing in or on the Premises.  The term "**Trade Fixtures**" shall mean Lessee's machinery and equipment that can be removed without doing material damage to the Premises.  The term "**Alterations**" shall mean any modification of the improvements, other than Utility Installations or Trade Fixtures, whether by addition or deletion.  "**Lessee Owned Alterations and/or Utility Installations**" are defined as Alterations and/or Utility Installations made by Lessee that are not yet owned by Lessor pursuant to Paragraph 7.4(a).

(b)   **Consent**.  Lessee shall not make any Alterations or Utility Installations to the Premises without Lessor's prior written consent.  Lessee may, however, make non-structural Alterations or Utility Installations to the interior of the Premises (excluding the roof) without such consent but upon notice to Lessor, as long as they are not visible from the outside, do not involve puncturing, relocating or removing the roof, ceilings, floors or any existing walls, will not affect the electrical, plumbing, HVAC, and/or life safety systems, do not trigger the requirement for additional modifications and/or improvements to the Premises resulting from Applicable Requirements, such as compliance with Title 24, and the cumulative cost thereof during this Lease as extended does not exceed $2000.  Notwithstanding the foregoing, Lessee shall not make or permit any roof penetrations and/or install anything on the roof without the prior written approval of Lessor.  Lessor may, as a precondition to granting such approval, require Lessee to utilize a contractor chosen and/or approved by Lessor.  Any Alterations or Utility Installations that Lessee shall desire to make and which require the consent of the Lessor shall be presented to Lessor in written form with detailed plans.  Consent shall be deemed conditioned upon Lessee's:  (i) acquiring all applicable governmental permits, (ii) furnishing Lessor with copies of both the permits and the plans and specifications prior to commencement of the work, and (iii) compliance with all conditions of said permits and other Applicable Requirements in a prompt and expeditious manner.  Any Alterations or Utility Installations shall be performed in a workmanlike manner with good and sufficient materials.  Lessee shall promptly upon completion furnish Lessor with as-built plans

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                                    OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

and specifications.  For work which costs an amount in excess of one month's Base Rent, Lessor may condition its consent upon Lessee providing a lien and completion bond in an amount equal to 150% of the estimated cost of such Alteration or Utility Installation and/or upon Lessee's posting an additional Security Deposit with Lessor.

(c)   **Liens; Bonds**.  Lessee shall pay, when due, all claims for labor or materials furnished or alleged to have been furnished to or for Lessee at or for use on the Premises, which claims are or may be secured by any mechanic's or materialmen's lien against the Premises or any interest therein.  Lessee shall give Lessor not less than 10 days notice prior to the commencement of any work in, on or about the Premises, and Lessor shall have the right to post notices of non-responsibility.  If Lessee shall contest the validity of any such lien, claim or demand, then Lessee shall, at its sole expense defend and protect itself, Lessor and the Premises against the same and shall pay and satisfy any such adverse judgment that may be rendered thereon before the enforcement thereof.  If Lessor shall require, Lessee shall furnish a surety bond in an amount equal to 150% of the amount of such contested lien, claim or demand, indemnifying Lessor against liability for the same.  If Lessor elects to participate in any such action, Lessee shall pay Lessor's attorneys' fees and costs.

7.4  **Ownership; Removal; Surrender; and Restoration**.

(a)   **Ownership**.  Subject to Lessor's right to require removal or elect ownership as hereinafter provided, all Alterations and Utility Installations made by Lessee shall be the property of Lessee, but considered a part of the Premises.  Lessor may, at any time, elect in writing to be the owner of all or any specified part of the Lessee Owned Alterations and Utility Installations.  Unless otherwise instructed per paragraph 7.4(b) hereof, all Lessee Owned Alterations and Utility Installations shall, at the expiration or termination of this Lease, become the property of Lessor and be surrendered by Lessee with the Premises.

(b)   **Removal**.  By delivery to Lessee of written notice from Lessor not earlier than 90 and not later than 30 days prior to the end of the term of this Lease, Lessor may require that any or all Lessee Owned Alterations or Utility Installations be removed by the expiration or termination of this Lease.  Lessor may require the removal at any time of all or any part of any Lessee Owned Alterations or Utility Installations made without the required consent.

(c)   **Surrender; Restoration**.  Lessee shall surrender the Premises by the Expiration Date or any earlier termination date, with all of the improvements, parts and surfaces thereof clean and free of debris, and in good operating order, condition and state of repair, ordinary wear and tear excepted.  "Ordinary wear and tear" shall not include any damage or deterioration that would have been prevented by good maintenance practice.  Notwithstanding the foregoing, if the Lessee occupies the Premises for 12 months or less, then Lessee shall surrender the Premises in the same condition as delivered to Lessee on the Start Date with NO allowance for ordinary wear and tear.  Lessee shall repair any damage occasioned by the installation, maintenance or removal of Trade Fixtures, Lessee owned Alterations and/or Utility Installations, furnishings, and equipment as well as the removal of any storage tank installed by or for Lessee.  Lessee shall also remove from the Premises any and all Hazardous Substances brought onto the Premises by or for Lessee, or any third party (except Hazardous Substances which were deposited via underground migration from areas outside of the Premises) to the level specified in Applicable Requirements.  Trade Fixtures shall remain the property of Lessee and shall be removed by Lessee.  Any personal property of Lessee not removed on or before the Expiration Date or any earlier termination date shall be deemed to have been abandoned by Lessee and may be disposed of or retained by Lessor as Lessor may desire.  The failure by Lessee to timely vacate the Premises pursuant to this Paragraph 7.4(c) without the express written consent of Lessor shall constitute a holdover under the provisions of Paragraph 26 below.

**8.   Insurance; Indemnity.**

8.1  **Insurance Premiums**.  The cost of the premiums for the insurance policies maintained by Lessor pursuant to paragraph 8 are included as Operating Expenses (see paragraph 4.2 (c)(iv)).  Said costs shall include increases in the premiums resulting from additional coverage related to requirements of the holder of a mortgage or deed of trust covering the Premises, Building and/or Project, increased valuation of the Premises, Building and/or Project, and/or a general premium rate increase.  Said costs shall not, however, include any premium increases resulting from the nature of the occupancy of any other tenant of the Building.  If the Project was not insured for the entirety of the Base Year, then the base premium shall be the lowest annual premium reasonably obtainable for the required insurance as of the Start Date, assuming the most nominal use possible of the Building and/or Project.  In no event, however, shall Lessee be responsible for any portion of the premium cost attributable to liability insurance coverage in excess of $2,000,000 procured under Paragraph 8.2(b).

8.2  **Liability Insurance**.

(a)   **Carried by Lessee**.  Lessee shall obtain and keep in force a Commercial General Liability policy of insurance protecting Lessee and Lessor as an additional insured against claims for bodily injury, personal injury and property damage based upon or arising out of the ownership, use, occupancy or maintenance of the Premises and all areas appurtenant thereto.  Such insurance shall be on an occurrence basis providing single limit coverage in an amount not less than $1,000,000 per occurrence with an annual aggregate of not less than $2,000,000.  Lessee shall add Lessor as an additional insured by means of an endorsement at least as broad as the Insurance Service Organization's "Additional Insured-Managers or Lessors of Premises" Endorsement and coverage shall also be extended to include damage caused by heat, smoke or fumes from a hostile fire.  The policy shall not contain any

INITIALS                                                                                    INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                          OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

intra-insured exclusions as between insured persons or organizations, but shall include coverage for liability assumed under this Lease as an "insured contract" for the performance of Lessee's indemnity obligations under this Lease.  The limits of said insurance shall not, however, limit the liability of Lessee nor relieve Lessee of any obligation hereunder.  Lessee shall provide an endorsement on its liability policy(ies) which provides that its insurance shall be primary to and not contributory with any similar insurance carried by Lessor, whose insurance shall be considered excess insurance only.

(b)  **Carried by Lessor**.  Lessor shall maintain liability insurance as described in Paragraph 8.2(a), in addition to, and not in lieu of, the insurance required to be maintained by Lessee.  Lessee shall not be named as an additional insured therein.

8.3  **Property Insurance - Building, Improvements and Rental Value**.

(a)  **Building and Improvements**.  Lessor shall obtain and keep in force a policy or policies of insurance in the name of Lessor, with loss payable to Lessor, any ground-lessor, and to any Lender insuring loss or damage to the Building and/or Project.  The amount of such insurance shall be equal to the full insurable replacement cost of the Building and/or Project, as the same shall exist from time to time, or the amount required by any Lender, but in no event more than the commercially reasonable and available insurable value thereof.  Lessee Owned Alterations and Utility Installations, Trade Fixtures, and Lessee's personal property shall be insured by Lessee not by Lessor.  If the coverage is available and commercially appropriate, such policy or policies shall insure against all risks of direct physical loss or damage (except the perils of flood and/or earthquake unless required by a Lender), including coverage for debris removal and the enforcement of any Applicable Requirements requiring the upgrading, demolition, reconstruction or replacement of any portion of the Premises as the result of a covered loss.  Said policy or policies shall also contain an agreed valuation provision in lieu of any coinsurance clause, waiver of subrogation, and inflation guard protection causing an increase in the annual property insurance coverage amount by a factor of not less than the adjusted U.S. Department of Labor Consumer Price Index for All Urban Consumers for the city nearest to where the Premises are located.  If such insurance coverage has a deductible clause, the deductible amount shall not exceed $5,000 per occurrence.

(b)  **Rental Value**.  Lessor shall also obtain and keep in force a policy or policies in the name of Lessor with loss payable to Lessor and any Lender, insuring the loss of the full Rent for one year with an extended period of indemnity for an additional 180 days ("Rental Value insurance").  Said insurance shall contain an agreed valuation provision in lieu of any coinsurance clause, and the amount of coverage shall be adjusted annually to reflect the projected Rent otherwise payable by Lessee, for the next 12 month period.

(c)  **Adjacent Premises**.  Lessee shall pay for any increase in the premiums for the property insurance of the Building and for the Common Areas or other buildings in the Project if said increase is caused by Lessee's acts, omissions, use or occupancy of the Premises.

(d)  **Lessee's Improvements**.  Since Lessor is the Insuring Party, Lessor shall not be required to insure Lessee Owned Alterations and Utility Installations unless the item in question has become the property of Lessor under the terms of this Lease.

8.4  **Lessee's Property; Business Interruption Insurance; Worker's Compensation Insurance**.

(a)  **Property Damage**.  Lessee shall obtain and maintain insurance coverage on all of Lessee's personal property, Trade Fixtures, and Lessee Owned Alterations and Utility Installations.  Such insurance shall be full replacement cost coverage with a deductible of not to exceed $1,000 per occurrence.  The proceeds from any such insurance shall be used by Lessee for the replacement of personal property, Trade Fixtures and Lessee Owned Alterations and Utility Installations.

(b)  **Worker's Compensation Insurance**.  Lessee shall obtain and maintain Worker's Compensation Insurance in such amount as may be required by Applicable Requirements.  Such policy shall include a 'Waiver of Subrogation' endorsement.  Lessee shall provide Lessor with a copy of such endorsement along with the certificate of insurance or copy of the policy required by paragraph 8.5.

(c)  **Business Interruption**.  Lessee shall obtain and maintain loss of income and extra expense insurance in amounts as will reimburse Lessee for direct or indirect loss of earnings attributable to all perils commonly insured against by prudent lessees in the business of Lessee or attributable to prevention of access to the Premises as a result of such perils.

(d)  **No Representation of Adequate Coverage**.  Lessor makes no representation that the limits or forms of coverage of insurance specified herein are adequate to cover Lessee's property, business operations or obligations under this Lease.

8.5  **Insurance Policies**.  Insurance required herein shall be by companies maintaining during the policy term a "General Policyholders Rating" of at least A-, VII, as set forth in the most current issue of "Best's Insurance Guide", or such other rating as may be required by a Lender.  Lessee shall not do or permit to be done anything which invalidates the required insurance policies.  Lessee shall, prior to the Start Date, deliver to Lessor certified copies of policies of such insurance or certificates with copies of the required endorsements evidencing the existence and amounts of the required insurance.  No such policy shall be cancelable or subject to modification except after 10 days prior written notice to Lessor.  Lessee shall, at least 30 days prior to the expiration of such policies, furnish Lessor with evidence of renewals or "insurance binders" evidencing renewal thereof, or Lessor may increase his liability insurance coverage and charge the cost thereof to Lessee, which amount shall be payable by Lessee to Lessor upon demand.  Such policies shall be for a term of at least one year, or the length of the remaining term of this Lease, whichever is less.  If either Party shall fail to procure and maintain the insurance required to be carried by it, the other Party may, but shall not be required to, procure

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

and maintain the same.

**8.6  Waiver of Subrogation**.  Without affecting any other rights or remedies, Lessee and Lessor each hereby release and relieve the other, and waive their entire right to recover damages against the other, for loss of or damage to its property arising out of or incident to the perils required to be insured against herein.  The effect of such releases and waivers is not limited by the amount of insurance carried or required, or by any deductibles applicable hereto.  The Parties agree to have their respective property damage insurance carriers waive any right to subrogation that such companies may have against Lessor or Lessee, as the case may be, so long as the insurance is not invalidated thereby.

**8.7  Indemnity**.  Except for Lessor's gross negligence or willful misconduct, Lessee shall indemnify, protect, defend and hold harmless the Premises, Lessor and its agents, Lessor's master or ground lessor, partners and Lenders, from and against any and all claims, loss of rents and/or damages, liens, judgments, penalties, attorneys' and consultants' fees, expenses and/or liabilities arising out of, involving, or in connection with, a Breach of the Lease by Lessee and/or the use and/or occupancy of the Premises and/or Project by Lessee and/or by Lessee's employees, contractors or invitees.  If any action or proceeding is brought against Lessor by reason of any of the foregoing matters, Lessee shall upon notice defend the same at Lessee's expense by counsel reasonably satisfactory to Lessor and Lessor shall cooperate with Lessee in such defense.  Lessor need not have first paid any such claim in order to be defended or indemnified.

**8.8  Exemption of Lessor and its Agents from Liability**.  Notwithstanding the negligence or breach of this Lease by Lessor or its agents, neither Lessor nor its agents shall be liable under any circumstances for: (i) injury or damage to the person or goods, wares, merchandise or other property of Lessee, Lessee's employees, contractors, invitees, customers, or any other person in or about the Premises, whether such damage or injury is caused by or results from fire, steam, electricity, gas, water or rain, indoor air quality, the presence of mold or from the breakage, leakage, obstruction or other defects of pipes, fire sprinklers, wires, appliances, plumbing, HVAC or lighting fixtures, or from any other cause, whether the said injury or damage results from conditions arising upon the Premises or upon other portions of the Building, or from other sources or places, (ii) any damages arising from any act or neglect of any other tenant of Lessor or from the failure of Lessor or its agents to enforce the provisions of any other lease in the Project, or (iii) injury to Lessee's business or for any loss of income or profit therefrom.  Instead, it is intended that Lessee's sole recourse in the event of such damages or injury be to file a claim on the insurance policy(ies) that Lessee is required to maintain pursuant to the provisions of paragraph 8.

**8.9  Failure to Provide Insurance**.  Lessee acknowledges that any failure on its part to obtain or maintain the insurance required herein will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, for any month or portion thereof that Lessee does not maintain the required insurance and/or does not provide Lessor with the required binders or certificates evidencing the existence of the required insurance, the Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater.  The parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to maintain the required insurance.  Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to maintain such insurance, prevent the exercise of any of the other rights and remedies granted hereunder, nor relieve Lessee of its obligation to maintain the insurance specified in this Lease.

**9.  Damage or Destruction.**

9.1  **Definitions**.

(a)  "**Premises Partial Damage**" shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations, which can reasonably be repaired in 3 months or less from the date of the damage or destruction, and the cost thereof does not exceed a sum equal to 6 month's Base Rent.  Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(b)  "**Premises Total Destruction**" shall mean damage or destruction to the improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which cannot reasonably be repaired in 3 months or less from the date of the damage or destruction and/or the cost thereof exceeds a sum equal to 6 month's Base Rent.  Lessor shall notify Lessee in writing within 30 days from the date of the damage or destruction as to whether or not the damage is Partial or Total.

(c)  "**Insured Loss**" shall mean damage or destruction to improvements on the Premises, other than Lessee Owned Alterations and Utility Installations and Trade Fixtures, which was caused by an event required to be covered by the insurance described in Paragraph 8.3(a), irrespective of any deductible amounts or coverage limits involved.

(d)  "**Replacement Cost**" shall mean the cost to repair or rebuild the improvements owned by Lessor at the time of the occurrence to their condition existing immediately prior thereto, including demolition, debris removal and upgrading required by the operation of Applicable Requirements, and without deduction for depreciation.

(e)  "**Hazardous Substance Condition**" shall mean the occurrence or discovery of a condition involving the presence of, or a contamination by, a Hazardous Substance, in, on, or under the Premises which requires restoration.

_____    _____
INITIALS                                              Page 11 of 25                                        INITIALS
                                              Last Edited: 7/12/2023 11:08 AM

© 2017 AIR CRE.  All Rights Reserved.                                        OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

9.2  **Partial Damage - Insured Loss**.  If a Premises Partial Damage that is an Insured Loss occurs, then Lessor shall, at Lessor's expense, repair such damage (but not Lessee's Trade Fixtures or Lessee Owned Alterations and Utility Installations) as soon as reasonably possible and this Lease shall continue in full force and effect; provided, however, that Lessee shall, at Lessor's election, make the repair of any damage or destruction the total cost to repair of which is $5,000 or less, and, in such event, Lessor shall make any applicable insurance proceeds available to Lessee on a reasonable basis for that purpose.  Notwithstanding the foregoing, if the required insurance was not in force or the insurance proceeds are not sufficient to effect such repair, the Insuring Party shall promptly contribute the shortage in proceeds as and when required to complete said repairs.  In the event, however, such shortage was due to the fact that, by reason of the unique nature of the improvements, full replacement cost insurance coverage was not commercially reasonable and available, Lessor shall have no obligation to pay for the shortage in insurance proceeds or to fully restore the unique aspects of the Premises unless Lessee provides Lessor with the funds to cover same, or adequate assurance thereof, within 10 days following receipt of written notice of such shortage and request therefor.  If Lessor receives said funds or adequate assurance thereof within said 10 day period, the party responsible for making the repairs shall complete them as soon as reasonably possible and this Lease shall remain in full force and effect.  If such funds or assurance are not received, Lessor may nevertheless elect by written notice to Lessee within 10 days thereafter to:  (i) make such restoration and repair as is commercially reasonable with Lessor paying any shortage in proceeds, in which case this Lease shall remain in full force and effect, or (ii) have this Lease terminate 30 days thereafter.  Lessee shall not be entitled to reimbursement of any funds contributed by Lessee to repair any such damage or destruction.  Premises Partial Damage due to flood or earthquake shall be subject to Paragraph 9.3, notwithstanding that there may be some insurance coverage, but the net proceeds of any such insurance shall be made available for the repairs if made by either Party.

9.3  **Partial Damage - Uninsured Loss**.  If a Premises Partial Damage that is not an Insured Loss occurs, unless caused by a negligent or willful act of Lessee (in which event Lessee shall make the repairs at Lessee's expense), Lessor may either:  (i) repair such damage as soon as reasonably possible at Lessor's expense (subject to reimbursement pursuant to Paragraph 4.2), in which event this Lease shall continue in full force and effect, or (ii) terminate this Lease by giving written notice to Lessee within 30 days after receipt by Lessor of knowledge of the occurrence of such damage.  Such termination shall be effective 60 days following the date of such notice.  In the event Lessor elects to terminate this Lease, Lessee shall have the right within 10 days after receipt of the termination notice to give written notice to Lessor of Lessee's commitment to pay for the repair of such damage without reimbursement from Lessor.  Lessee shall provide Lessor with said funds or satisfactory assurance thereof within 30 days after making such commitment.  In such event this Lease shall continue in full force and effect, and Lessor shall proceed to make such repairs as soon as reasonably possible after the required funds are available.  If Lessee does not make the required commitment, this Lease shall terminate as of the date specified in the termination notice.

9.4  **Total Destruction**.  Notwithstanding any other provision hereof, if a Premises Total Destruction occurs, this Lease shall terminate 60 days following such Destruction.  If the damage or destruction was caused by the gross negligence or willful misconduct of Lessee, Lessor shall have the right to recover Lessor's damages from Lessee, except as provided in Paragraph 8.6.

9.5  **Damage Near End of Term**.  If at any time during the last 6 months of this Lease there is damage for which the cost to repair exceeds one month's Base Rent, whether or not an Insured Loss, Lessor may terminate this Lease effective 60 days following the date of occurrence of such damage by giving a written termination notice to Lessee within 30 days after the date of occurrence of such damage.  Notwithstanding the foregoing, if Lessee at that time has an exercisable option to extend this Lease or to purchase the Premises, then Lessee may preserve this Lease by, (a) exercising such option and (b) providing Lessor with any shortage in insurance proceeds (or adequate assurance thereof) needed to make the repairs on or before the earlier of (i) the date which is 10 days after Lessee's receipt of Lessor's written notice purporting to terminate this Lease, or (ii) the day prior to the date upon which such option expires.  If Lessee duly exercises such option during such period and provides Lessor with funds (or adequate assurance thereof) to cover any shortage in insurance proceeds, Lessor shall, at Lessor's commercially reasonable expense, repair such damage as soon as reasonably possible and this Lease shall continue in full force and effect.  If Lessee fails to exercise such option and provide such funds or assurance during such period, then this Lease shall terminate on the date specified in the termination notice and Lessee's option shall be extinguished.

9.6  **Abatement of Rent; Lessee's Remedies**.

(a)  **Abatement**.  In the event of Premises Partial Damage or Premises Total Destruction or a Hazardous Substance Condition for which Lessee is not responsible under this Lease, the Rent payable by Lessee for the period required for the repair, remediation or restoration of such damage shall be abated in proportion to the degree to which Lessee's use of the Premises is impaired, but not to exceed the proceeds received from the Rental Value insurance.  All other obligations of Lessee hereunder shall be performed by Lessee, and Lessor shall have no liability for any such damage, destruction, remediation, repair or restoration except as provided herein.

(b)  **Remedies**.  If Lessor is obligated to repair or restore the Premises and does not commence, in a substantial and meaningful way, such repair or restoration within 90 days after such obligation shall accrue, Lessee may, at any time prior to the commencement of such repair or restoration, give written notice to Lessor and to any Lenders of which Lessee has actual notice, of

© 2017 AIR CRE.  All Rights Reserved.                                                              OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

Lessee's election to terminate this Lease on a date not less than 60 days following the giving of such notice.  If Lessee gives such notice and such repair or restoration is not commenced within 30 days thereafter, this Lease shall terminate as of the date specified in said notice.  If the repair or restoration is commenced within such 30 days, this Lease shall continue in full force and effect.  "Commence" shall mean either the unconditional authorization of the preparation of the required plans, or the beginning of the actual work on the Premises, whichever first occurs.

9.7  **Termination; Advance Payments**.  Upon termination of this Lease pursuant to Paragraph 6.2(g) or Paragraph 9, an equitable adjustment shall be made concerning advance Base Rent and any other advance payments made by Lessee to Lessor.  Lessor shall, in addition, return to Lessee so much of Lessee's Security Deposit as has not been, or is not then required to be, used by Lessor.

**10.  Real Property Taxes.**

10.1  **Definitions**.  As used herein, the term "**Real Property Taxes**" shall include any form of assessment; real estate, general, special, ordinary or extraordinary, or rental levy or tax (other than inheritance, personal income or estate taxes); improvement bond; and/or license fee imposed upon or levied against any legal or equitable interest of Lessor in the Project, Lessor's right to other income therefrom, and/or Lessor's business of leasing, by any authority having the direct or indirect power to tax and where the funds are generated with reference to the Project address.  "**Real Property Taxes**" shall also include any tax, fee, levy, assessment or charge, or any increase therein: (i) imposed by reason of events occurring during the term of this Lease, including but not limited to, a change in the ownership of the Project, (ii) a change in the improvements thereon, and/or (iii) levied or assessed on machinery or equipment provided by Lessor to Lessee pursuant to this Lease.

10.2  **Payment of Taxes**.  Except as otherwise provided in Paragraph 10.3, Lessor shall pay the Real Property Taxes applicable to the Project, and said payments shall be included in the calculation of Operating Expenses in accordance with the provisions of Paragraph 4.2.

10.3  **Additional Improvements**.  Operating Expenses shall not include Real Property Taxes specified in the tax assessor's records and work sheets as being caused by additional improvements placed upon the Project by other lessees or by Lessor for the exclusive enjoyment of such other lessees.  Notwithstanding Paragraph 10.2 hereof, Lessee shall, however, pay to Lessor at the time Operating Expenses are payable under Paragraph 4.2, the entirety of any increase in Real Property Taxes if assessed solely by reason of Alterations, Trade Fixtures or Utility Installations placed upon the Premises by Lessee or at Lessee's request or by reason of any alterations or improvements to the Premises made by Lessor subsequent to the execution of this Lease by the Parties.

10.4  **Joint Assessment**.  If the Building is not separately assessed, Real Property Taxes allocated to the Building shall be an equitable proportion of the Real Property Taxes for all of the land and improvements included within the tax parcel assessed, such proportion to be determined by Lessor from the respective valuations assigned in the assessor's work sheets or such other information as may be reasonably available.  Lessor's reasonable determination thereof, in good faith, shall be conclusive.

10.5  **Personal Property Taxes**.  Lessee shall pay prior to delinquency all taxes assessed against and levied upon Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all personal property of Lessee contained in the Premises.  When possible, Lessee shall cause its Lessee Owned Alterations and Utility Installations, Trade Fixtures, furnishings, equipment and all other personal property to be assessed and billed separately from the real property of Lessor.  If any of Lessee's said property shall be assessed with Lessor's real property, Lessee shall pay Lessor the taxes attributable to Lessee's property within 10 days after receipt of a written statement setting forth the taxes applicable to Lessee's property.

**11.  Utilities and Services.**

11.1  **Services Provided by Lessor**.  Lessor shall provide heating, ventilation, air conditioning, reasonable amounts of electricity for normal lighting and office machines, water for reasonable and normal drinking and lavatory use in connection with an office, and replacement light bulbs and/or fluorescent tubes and ballasts for standard overhead fixtures.  Lessor shall also provide janitorial services to the Premises and Common Areas 5 times per week, excluding Building Holidays, or pursuant to the attached janitorial schedule, if any.  Lessor shall not, however, be required to provide janitorial services to kitchens or storage areas included within the Premises.

11.2  **Services Exclusive to Lessee**.  Notwithstanding the provisions of paragraph 11.1, Lessee shall pay for all water, gas, light, power, telephone and other utilities and services specially or exclusively supplied and/or metered exclusively to the Premises or to Lessee, together with any taxes thereon.  Notwithstanding the provisions of Paragraph 4.2(vi), if a service is deleted by Paragraph 1.13 and such service is not separately metered to the Premises, Lessee shall pay at Lessor's option, either Lessee's Share or a reasonable proportion to be determined by Lessor of all charges for such jointly metered service.

11.3  **Hours of Service**.  Said services and utilities shall be provided during times set forth in Paragraph 1.12.  Utilities and services required at other times shall be subject to advance request and reimbursement by Lessee to Lessor of the cost thereof.

11.4  **Excess Usage by Lessee**.  Lessee shall not make connection to the utilities except by or through existing outlets and shall not install or use machinery or equipment in or about the Premises that uses excess water, lighting or power, or suffer or permit any act that causes extra burden upon the utilities or services, including but not limited to security and trash services, over standard office usage for the Project.  Lessor shall require Lessee to reimburse Lessor for any excess expenses or costs that may arise out of a

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

breach of this subparagraph by Lessee.  Lessor may, in its sole discretion, install at Lessee's expense supplemental equipment and/or separate metering applicable to Lessee's excess usage or loading.

11.5    **Interruptions**.  There shall be no abatement of rent and Lessor shall not be liable in any respect whatsoever for the inadequacy, stoppage, interruption or discontinuance of any utility or service due to riot, strike, labor dispute, breakdown, accident, repair or other cause beyond Lessor's reasonable control or in cooperation with governmental request or directions.

## 12. Assignment and Subletting.

12.1    **Lessor's Consent Required**.

(a)    Lessee shall not voluntarily or by operation of law assign, transfer, mortgage or encumber (collectively, "**assign or assignment**") or sublet all or any part of Lessee's interest in this Lease or in the Premises without Lessor's prior written consent.

(b)    Unless Lessee is a corporation and its stock is publicly traded on a national stock exchange, a change in the control of Lessee shall constitute an assignment requiring consent.  The transfer, on a cumulative basis, of 25% or more of the voting control of Lessee shall constitute a change in control for this purpose.

(c)    The involvement of Lessee or its assets in any transaction, or series of transactions (by way of merger, sale, acquisition, financing, transfer, leveraged buyout or otherwise), whether or not a formal assignment or hypothecation of this Lease or Lessee's assets occurs, which results or will result in a reduction of the Net Worth of Lessee by an amount greater than 25% of such Net Worth as it was represented at the time of the execution of this Lease or at the time of the most recent assignment to which Lessor has consented, or as it exists immediately prior to said transaction or transactions constituting such reduction, whichever was or is greater, shall be considered an assignment of this Lease to which Lessor may withhold its consent.  "**Net Worth of Lessee**" shall mean the net worth of Lessee (excluding any guarantors) established under generally accepted accounting principles.

(d)    An assignment or subletting without consent shall, at Lessor's option, be a Default curable after notice per Paragraph 13.1(d), or a noncurable Breach without the necessity of any notice and grace period.  If Lessor elects to treat such unapproved assignment or subletting as a noncurable Breach, Lessor may either: (i) terminate this Lease, or (ii) upon 30 days written notice, increase the monthly Base Rent to 110% of the Base Rent then in effect.  Further, in the event of such Breach and rental adjustment, (i) the purchase price of any option to purchase the Premises held by Lessee shall be subject to similar adjustment to 110% of the price previously in effect, and (ii) all fixed and non-fixed rental adjustments scheduled during the remainder of the Lease term shall be increased to 110% of the scheduled adjusted rent.

(e)    Lessee's remedy for any breach of Paragraph 12.1 by Lessor shall be limited to compensatory damages and/or injunctive relief.

(f)    Lessor may reasonably withhold consent to a proposed assignment or subletting if Lessee is in Default at the time consent is requested.

(g)    Notwithstanding the foregoing, allowing a de minimis portion of the Premises, ie. 20 square feet or less, to be used by a third party vendor in connection with the installation of a vending machine or payphone shall not constitute a subletting.

12.2    **Terms and Conditions Applicable to Assignment and Subletting**.

(a)    Regardless of Lessor's consent, no assignment or subletting shall : (i) be effective without the express written assumption by such assignee or sublessee of the obligations of Lessee under this Lease, (ii) release Lessee of any obligations hereunder, or (iii) alter the primary liability of Lessee for the payment of Rent or for the performance of any other obligations to be performed by Lessee.

(b)    Lessor may accept Rent or performance of Lessee's obligations from any person other than Lessee pending approval or disapproval of an assignment.  Neither a delay in the approval or disapproval of such assignment nor the acceptance of Rent or performance shall constitute a waiver or estoppel of Lessor's right to exercise its remedies for Lessee's Default or Breach.

(c)    Lessor's consent to any assignment or subletting shall not constitute a consent to any subsequent assignment or subletting.

(d)    In the event of any Default or Breach by Lessee, Lessor may proceed directly against Lessee, any Guarantors or anyone else responsible for the performance of Lessee's obligations under this Lease, including any assignee or sublessee, without first exhausting Lessor's remedies against any other person or entity responsible therefor to Lessor, or any security held by Lessor.

(e)    Each request for consent to an assignment or subletting shall be in writing, accompanied by information relevant to Lessor's determination as to the financial and operational responsibility and appropriateness of the proposed assignee or sublessee, including but not limited to the intended use and/or required modification of the Premises, if any, together with a fee of $500 as consideration for Lessor's considering and processing said request.  Lessee agrees to provide Lessor with such other or additional information and/or documentation as may be reasonably requested. (See also Paragraph 36)

(f)    Any assignee of, or sublessee under, this Lease shall, by reason of accepting such assignment, entering into such sublease, or entering into possession of the Premises or any portion thereof, be deemed to have assumed and agreed to conform and comply with each and every term, covenant, condition and obligation herein to be observed or performed by Lessee during the term of said assignment or sublease, other than such obligations as are contrary to or inconsistent with provisions of an assignment

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

or sublease to which Lessor has specifically consented to in writing.

(g)  Lessor's consent to any assignment or subletting shall not transfer to the assignee or sublessee any Option granted to the original Lessee by this Lease unless such transfer is specifically consented to by Lessor in writing.  (See Paragraph 39.2)

12.3    **Additional Terms and Conditions Applicable to Subletting**.  The following terms and conditions shall apply to any subletting by Lessee of all or any part of the Premises and shall be deemed included in all subleases under this Lease whether or not expressly incorporated therein:

(a)  Lessee hereby assigns and transfers to Lessor all of Lessee's interest in all Rent payable on any sublease, and Lessor may collect such Rent and apply same toward Lessee's obligations under this Lease; provided, however, that until a Breach shall occur in the performance of Lessee's obligations, Lessee may collect said Rent.  In the event that the amount collected by Lessor exceeds Lessee's then outstanding obligations any such excess shall be refunded to Lessee.  Lessor shall not, by reason of the foregoing or any assignment of such sublease, nor by reason of the collection of Rent, be deemed liable to the sublessee for any failure of Lessee to perform and comply with any of Lessee's obligations to such sublessee.  Lessee hereby irrevocably authorizes and directs any such sublessee, upon receipt of a written notice from Lessor stating that a Breach exists in the performance of Lessee's obligations under this Lease, to pay to Lessor all Rent due and to become due under the sublease.  Sublessee shall rely upon any such notice from Lessor and shall pay all Rents to Lessor without any obligation or right to inquire as to whether such Breach exists, notwithstanding any claim from Lessee to the contrary.

(b)  In the event of a Breach by Lessee, Lessor may, at its option, require sublessee to attorn to Lessor, in which event Lessor shall undertake the obligations of the sublessor under such sublease from the time of the exercise of said option to the expiration of such sublease; provided, however, Lessor shall not be liable for any prepaid rents or security deposit paid by such sublessee to such sublessor or for any prior Defaults or Breaches of such sublessor.

(c)  Any matter requiring the consent of the sublessor under a sublease shall also require the consent of Lessor.

(d)  No sublessee shall further assign or sublet all or any part of the Premises without Lessor's prior written consent.

(e)  Lessor shall deliver a copy of any notice of Default or Breach by Lessee to the sublessee, who shall have the right to cure the Default of Lessee within the grace period, if any, specified in such notice.  The sublessee shall have a right of reimbursement and offset from and against Lessee for any such Defaults cured by the sublessee.

## 13.  Default; Breach; Remedies.

13.1    **Default; Breach**.  A "**Default**" is defined as a failure by the Lessee to comply with or perform any of the terms, covenants, conditions or Rules and Regulations under this Lease.  A "**Breach**" is defined as the occurrence of one or more of the following Defaults, and the failure of Lessee to cure such Default within any applicable grace period:

(a)  The abandonment of the Premises; or the vacating of the Premises without providing a commercially reasonable level of security, or where the coverage of the property insurance described in Paragraph 8.3 is jeopardized as a result thereof, or without providing reasonable assurances to minimize potential vandalism.

(b)  The failure of Lessee to make any payment of Rent or any Security Deposit required to be made by Lessee hereunder, whether to Lessor or to a third party, when due, to provide reasonable evidence of insurance or surety bond, or to fulfill any obligation under this Lease which endangers or threatens life or property, where such failure continues for a period of 3 business days following written notice to Lessee.  THE ACCEPTANCE BY LESSOR OF A PARTIAL PAYMENT OF RENT OR SECURITY DEPOSIT SHALL NOT CONSTITUTE A WAIVER OF ANY OF LESSOR'S RIGHTS, INCLUDING LESSOR'S RIGHT TO RECOVER POSSESSION OF THE PREMISES.

(c)  The failure of Lessee to allow Lessor and/or its agents access to the Premises or the commission of waste, act or acts constituting public or private nuisance, and/or an illegal activity on the Premises by Lessee, where such actions continue for a period of 3 business days following written notice to Lessee.  In the event that Lessee commits waste, a nuisance or an illegal activity a second time then, the Lessor may elect to treat such conduct as a non-curable Breach rather than a Default.

(d)  The failure by Lessee to provide (i) reasonable written evidence of compliance with Applicable Requirements, (ii) the service contracts, (iii) the rescission of an unauthorized assignment or subletting, (iv) an Estoppel Certificate or financial statements, (v) a requested subordination, (vi) evidence concerning any guaranty and/or Guarantor, (vii) any document requested under Paragraph 41, (viii) material safety data sheets (MSDS), or (ix) any other documentation or information which Lessor may reasonably require of Lessee under the terms of this Lease, where any such failure continues for a period of 10 days following written notice to Lessee.

(e)  A Default by Lessee as to the terms, covenants, conditions or provisions of this Lease, or of the rules adopted under Paragraph 2.9 hereof, other than those described in subparagraphs 13.1(a), (b) or (c), above, where such Default continues for a period of 30 days after written notice; provided, however, that if the nature of Lessee's Default is such that more than 30 days are reasonably required for its cure, then it shall not be deemed to be a Breach if Lessee commences such cure within said 30 day period and thereafter diligently prosecutes such cure to completion.

(f)  The occurrence of any of the following events:  (i) the making of any general arrangement or assignment for the benefit of creditors; (ii) becoming a "**debtor**" as defined in 11 U.S.C. § 101 or any successor statute thereto (unless, in the case of a petition

INITIALS                                                                                                                                                            INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                                            OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

filed against Lessee, the same is dismissed within 60 days); (iii) the appointment of a trustee or receiver to take possession of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where possession is not restored to Lessee within 30 days; or (iv) the attachment, execution or other judicial seizure of substantially all of Lessee's assets located at the Premises or of Lessee's interest in this Lease, where such seizure is not discharged within 30 days; provided, however, in the event that any provision of this subparagraph is contrary to any applicable law, such provision shall be of no force or effect, and not affect the validity of the remaining provisions.

(g)   The discovery that any financial statement of Lessee or of any Guarantor given to Lessor was materially false.

(h)   If the performance of Lessee's obligations under this Lease is guaranteed:  (i) the death of a Guarantor, (ii) the termination of a Guarantor's liability with respect to this Lease other than in accordance with the terms of such guaranty, (iii) a Guarantor's becoming insolvent or the subject of a bankruptcy filing, (iv) a Guarantor's refusal to honor the guaranty, or (v) a Guarantor's breach of its guaranty obligation on an anticipatory basis, and Lessee's failure, within 60 days following written notice of any such event, to provide written alternative assurance or security, which, when coupled with the then existing resources of Lessee, equals or exceeds the combined financial resources of Lessee and the Guarantors that existed at the time of execution of this Lease.

13.2      **Remedies**.  If Lessee fails to perform any of its affirmative duties or obligations, within 10 days after written notice (or in case of an emergency, without notice), Lessor may, at its option, perform such duty or obligation on Lessee's behalf, including but not limited to the obtaining of reasonably required bonds, insurance policies, or governmental licenses, permits or approvals.  Lessee shall pay to Lessor an amount equal to 115% of the costs and expenses incurred by Lessor in such performance upon receipt of an invoice therefor.  In the event of a Breach, Lessor may, with or without further notice or demand, and without limiting Lessor in the exercise of any right or remedy which Lessor may have by reason of such Breach:

(a)   Terminate Lessee's right to possession of the Premises by any lawful means, in which case this Lease shall terminate and Lessee shall immediately surrender possession to Lessor.  In such event Lessor shall be entitled to recover from Lessee:  (i) the unpaid Rent which had been earned at the time of termination; (ii) the worth at the time of award of the amount by which the unpaid rent which would have been earned after termination until the time of award exceeds the amount of such rental loss that the Lessee proves could have been reasonably avoided; (iii) the worth at the time of award of the amount by which the unpaid rent for the balance of the term after the time of award exceeds the amount of such rental loss that the Lessee proves could be reasonably avoided; and (iv) any other amount necessary to compensate Lessor for all the detriment proximately caused by the Lessee's failure to perform its obligations under this Lease or which in the ordinary course of things would be likely to result therefrom, including but not limited to the cost of recovering possession of the Premises, expenses of reletting, including necessary renovation and alteration of the Premises, reasonable attorneys' fees, and that portion of any leasing commission paid by Lessor in connection with this Lease applicable to the unexpired term of this Lease.  The worth at the time of award of the amount referred to in provision (iii) of the immediately preceding sentence shall be computed by discounting such amount at the discount rate of the Federal Reserve Bank of the District within which the Premises are located at the time of award plus one percent.  Efforts by Lessor to mitigate damages caused by Lessee's Breach of this Lease shall not waive Lessor's right to recover any damages to which Lessor is otherwise entitled.  If termination of this Lease is obtained through the provisional remedy of unlawful detainer, Lessor shall have the right to recover in such proceeding any unpaid Rent and damages as are recoverable therein, or Lessor may reserve the right to recover all or any part thereof in a separate suit.  If a notice and grace period required under Paragraph 13.1 was not previously given, a notice to pay rent or quit, or to perform or quit given to Lessee under the unlawful detainer statute shall also constitute the notice required by Paragraph 13.1.  In such case, the applicable grace period required by Paragraph 13.1 and the unlawful detainer statute shall run concurrently, and the failure of Lessee to cure the Default within the greater of the two such grace periods shall constitute both an unlawful detainer and a Breach of this Lease entitling Lessor to the remedies provided for in this Lease and/or by said statute.

(b)   Continue the Lease and Lessee's right to possession and recover the Rent as it becomes due, in which event Lessee may sublet or assign, subject only to reasonable limitations.  Acts of maintenance, efforts to relet, and/or the appointment of a receiver to protect the Lessor's interests, shall not constitute a termination of the Lessee's right to possession.

(c)   Pursue any other remedy now or hereafter available under the laws or judicial decisions of the state wherein the Premises are located.  The expiration or termination of this Lease and/or the termination of Lessee's right to possession shall not relieve Lessee from liability under any indemnity provisions of this Lease as to matters occurring or accruing during the term hereof or by reason of Lessee's occupancy of the Premises.

13.3      **Inducement Recapture.**  Any agreement for free or abated rent or other charges, the cost of tenant improvements for Lessee paid for or performed by Lessor, or for the giving or paying by Lessor to or for Lessee of any cash or other bonus, inducement or consideration for Lessee's entering into this Lease, all of which concessions are hereinafter referred to as "**Inducement Provisions**," shall be deemed conditioned upon Lessee's full and faithful performance of all of the terms, covenants and conditions of this Lease.  Upon Breach of this Lease by Lessee, any such Inducement Provision shall automatically be deemed deleted from this Lease and of no further force or effect, and any rent, other charge, bonus, inducement or consideration theretofore abated, given or paid by Lessor under such an Inducement Provision shall be immediately due and payable by Lessee to Lessor, notwithstanding any subsequent cure of said Breach by Lessee.  The acceptance by Lessor of rent or the cure of the Breach which initiated the operation

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

of this paragraph shall not be deemed a waiver by Lessor of the provisions of this paragraph unless specifically so stated in writing by Lessor at the time of such acceptance.

13.4    **Late Charges**.  Lessee hereby acknowledges that late payment by Lessee of Rent will cause Lessor to incur costs not contemplated by this Lease, the exact amount of which will be extremely difficult to ascertain.  Such costs include, but are not limited to, processing and accounting charges, and late charges which may be imposed upon Lessor by any Lender.  Accordingly, if any Rent shall not be received by Lessor within 5 days after such amount shall be due, then, without any requirement for notice to Lessee, Lessee shall immediately pay to Lessor a one-time late charge equal to 10% of each such overdue amount or $100, whichever is greater.  The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs Lessor will incur by reason of such late payment.  Acceptance of such late charge by Lessor shall in no event constitute a waiver of Lessee's Default or Breach with respect to such overdue amount, nor prevent the exercise of any of the other rights and remedies granted hereunder.  In the event that a late charge is payable hereunder, whether or not collected, for 3 consecutive installments of Base Rent, then notwithstanding any provision of this Lease to the contrary, Base Rent shall, at Lessor's option, become due and payable quarterly in advance.

13.5    **Interest**.  Any monetary payment due Lessor hereunder, other than late charges, not received by Lessor, when due shall bear interest from the  31st day after it was due.  The interest ("**Interest**") charged shall be computed at the rate of 10% per annum but shall not exceed the maximum rate allowed by law.  Interest is payable in addition to the potential late charge provided for in Paragraph 13.4.

13.6    **Breach by Lessor**.

(a)  **Notice of Breach**.  Lessor shall not be deemed in breach of this Lease unless Lessor fails within a reasonable time to perform an obligation required to be performed by Lessor.  For purposes of this Paragraph, a reasonable time shall in no event be less than 30 days after receipt by Lessor, and any Lender whose name and address shall have been furnished to Lessee in writing for such purpose, of written notice specifying wherein such obligation of Lessor has not been performed; provided, however, that if the nature of Lessor's obligation is such that more than 30 days are reasonably required for its performance, then Lessor shall not be in breach if performance is commenced within such 30 day period and thereafter diligently pursued to completion.

(b)  **Performance by Lessee on Behalf of Lessor**.  In the event that neither Lessor nor Lender cures said breach within 30 days after receipt of said notice, or if having commenced said cure they do not diligently pursue it to completion, then Lessee may elect to cure said breach at Lessee's expense and offset from Rent the actual and reasonable cost to perform such cure, provided, however, that such offset shall not exceed an amount equal to the greater of one month's Base Rent or the Security Deposit, reserving Lessee's right to seek reimbursement from Lessor for any such expense in excess of such offset.  Lessee shall document the cost of said cure and supply said documentation to Lessor.

**14. Condemnation.**  If the Premises or any portion thereof are taken under the power of eminent domain or sold under the threat of the exercise of said power (collectively "Condemnation"), this Lease shall terminate as to the part taken as of the date the condemning authority takes title or possession, whichever first occurs.  If more than 10% of the rentable floor area of the Premises, or more than 25% of Lessee's Reserved Parking Spaces, if any, are taken by Condemnation, Lessee may, at Lessee's option, to be exercised in writing within 10 days after Lessor shall have given Lessee written notice of such taking (or in the absence of such notice, within 10 days after the condemning authority shall have taken possession) terminate this Lease as of the date the condemning authority takes such possession.  If Lessee does not terminate this Lease in accordance with the foregoing, this Lease shall remain in full force and effect as to the portion of the Premises remaining, except that the Base Rent shall be reduced in proportion to the reduction in utility of the Premises caused by such Condemnation.  Condemnation awards and/or payments shall be the property of Lessor, whether such award shall be made as compensation for diminution in value of the leasehold, the value of the part taken, or for severance damages; provided, however, that Lessee shall be entitled to any compensation paid by the condemnor for Lessee's relocation expenses, loss of business goodwill and/or Trade Fixtures, without regard to whether or not this Lease is terminated pursuant to the provisions of this Paragraph.  All Alterations and Utility Installations made to the Premises by Lessee, for purposes of Condemnation only, shall be considered the property of the Lessee and Lessee shall be entitled to any and all compensation which is payable therefor.  In the event that this Lease is not terminated by reason of the Condemnation, Lessor shall repair any damage to the Premises caused by such Condemnation.

**15. Brokerage Fees.**

15.1    **Additional Commission**.  In addition to the payments owed pursuant to Paragraph 1.10 above, Lessor agrees that:  (a) if Lessee exercises any Option, (b) if Lessee or anyone affiliated with Lessee acquires from Lessor any rights to the Premises or other premises owned by Lessor and located within the Project, (c) if Lessee remains in possession of the Premises, with the consent of Lessor, after the expiration of this Lease, or (d) if Base Rent is increased, whether by agreement or operation of an escalation clause herein, then, Lessor shall pay Brokers a fee in accordance with the fee schedule of the Brokers in effect at the time the Lease was executed.

15.2    **Assumption of Obligations**.  Any buyer or transferee of Lessor's interest in this Lease shall be deemed to have assumed

INITIALS                                                                                                    INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                    OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

Lessor's obligation hereunder.  Brokers shall be third party beneficiaries of the provisions of Paragraphs 1.10, 15, 22 and 31.  If Lessor fails to pay to Brokers any amounts due as and for brokerage fees pertaining to this Lease when due, then such amounts shall accrue Interest.  In addition, if Lessor fails to pay any amounts to Lessee's Broker when due, Lessee's Broker may send written notice to Lessor and Lessee of such failure and if Lessor fails to pay such amounts within 10 days after said notice, Lessee shall pay said monies to its Broker and offset such amounts against Rent.  In addition, Lessee's Broker shall be deemed to be a third party beneficiary of any commission agreement entered into by and/or between Lessor and Lessor's Broker for the limited purpose of collecting any brokerage fee owed.

       15.3     **Representations and Indemnities of Broker Relationships**.  Lessee and Lessor each represent and warrant to the other that it has had no dealings with any person, firm, broker or finder (other than the Brokers, if any) in connection with this Lease, and that no one other than said named Brokers is entitled to any commission or finder's fee in connection herewith.  Lessee and Lessor do each hereby agree to indemnify, protect, defend and hold the other harmless from and against liability for compensation or charges which may be claimed by any such unnamed broker, finder or other similar party by reason of any dealings or actions of the indemnifying Party, including any costs, expenses, attorneys' fees reasonably incurred with respect thereto.

**16.  Estoppel Certificates.**

      (a)  Each Party (as "**Responding Party**") shall within 10 days after written notice from the other Party (the "**Requesting Party**") execute, acknowledge and deliver to the Requesting Party a statement in writing in form similar to the then most current "**Estoppel Certificate**" form published BY AIR CRE, plus such additional information, confirmation and/or statements as may be reasonably requested by the Requesting Party.

      (b)  If the Responding Party shall fail to execute or deliver the Estoppel Certificate within such 10 day period, the Requesting Party may execute an Estoppel Certificate stating that: (i) the Lease is in full force and effect without modification except as may be represented by the Requesting Party, (ii) there are no uncured defaults in the Requesting Party's performance, and (iii) if Lessor is the Requesting Party, not more than one month's rent has been paid in advance.  Prospective purchasers and encumbrancers may rely upon the Requesting Party's Estoppel Certificate, and the Responding Party shall be estopped from denying the truth of the facts contained in said Certificate.  In addition, Lessee acknowledges that any failure on its part to provide such an Estoppel Certificate will expose Lessor to risks and potentially cause Lessor to incur costs not contemplated by this Lease, the extent of which will be extremely difficult to ascertain.  Accordingly, should the Lessee fail to execute and/or deliver a requested Estoppel Certificate in a timely fashion the monthly Base Rent shall be automatically increased, without any requirement for notice to Lessee, by an amount equal to 10% of the then existing Base Rent or $100, whichever is greater for remainder of the Lease.  The Parties agree that such increase in Base Rent represents fair and reasonable compensation for the additional risk/costs that Lessor will incur by reason of Lessee's failure to provide the Estoppel Certificate.  Such increase in Base Rent shall in no event constitute a waiver of Lessee's Default or Breach with respect to the failure to provide the Estoppel Certificate nor prevent the exercise of any of the other rights and remedies granted hereunder.

      (c)  If Lessor desires to finance, refinance, or sell the Premises, or any part thereof, Lessee and all Guarantors shall within 10 days after written notice from Lessor deliver to any potential lender or purchaser designated by Lessor such financial statements as may be reasonably required by such lender or purchaser, including but not limited to Lessee's financial statements for the past 3 years.  All such financial statements shall be received by Lessor and such lender or purchaser in confidence and shall be used only for the purposes herein set forth.

**17.  Definition of Lessor.**  The term "**Lessor**" as used herein shall mean the owner or owners at the time in question of the fee title to the Premises, or, if this is a sublease, of the Lessee's interest in the prior lease.  In the event of a transfer of Lessor's title or interest in the Premises or this Lease, Lessor shall deliver to the transferee or assignee (in cash or by credit) any unused Security Deposit held by Lessor.  Upon such transfer or assignment and delivery of the Security Deposit, as aforesaid, the prior Lessor shall be relieved of all liability with respect to the obligations and/or covenants under this Lease thereafter to be performed by the Lessor.  Subject to the foregoing, the obligations and/or covenants in this Lease to be performed by the Lessor shall be binding only upon the Lessor as hereinabove defined.

**18.  Severability.**  The invalidity of any provision of this Lease, as determined by a court of competent jurisdiction, shall in no way affect the validity of any other provision hereof.

**19.  Days.**  Unless otherwise specifically indicated to the contrary, the word "**days**" as used in this Lease shall mean and refer to calendar days.

**20.  Limitation on Liability.**  The obligations of Lessor under this Lease shall not constitute personal obligations of Lessor, or its partners, members, directors, officers or shareholders, and Lessee shall look to the Project, and to no other assets of Lessor, for the satisfaction of any liability of Lessor with respect to this Lease, and shall not seek recourse against Lessor's partners, members, directors, officers or shareholders, or any of their personal assets for such satisfaction.

INITIALS                                                  INITIALS

© 2017 AIR CRE.  All Rights Reserved.                     OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

**21.  Time of Essence.**  Time is of the essence with respect to the performance of all obligations to be performed or observed by the Parties under this Lease.

**22.  No Prior or Other Agreements; Broker Disclaimer**.  This Lease contains all agreements between the Parties with respect to any matter mentioned herein, and no other prior or contemporaneous agreement or understanding shall be effective.  Lessor and Lessee each represents and warrants to the Brokers that it has made, and is relying solely upon, its own investigation as to the nature, quality, character and financial responsibility of the other Party to this Lease and as to the use, nature, quality and character of the Premises.  Brokers have no responsibility with respect thereto or with respect to any default or breach hereof by either Party.

**23.  Notices.**

23.1    **Notice Requirements**.  All notices required or permitted by this Lease or applicable law shall be in writing and may be delivered in person (by hand or by courier) or may be sent by regular, certified or registered mail or U.S. Postal Service Express Mail, with postage prepaid, or by facsimile transmission, or by email, and shall be deemed sufficiently given if served in a manner specified in this Paragraph 23.  The addresses noted adjacent to a Party's signature on this Lease shall be that Party's address for delivery or mailing of notices.  Either Party may by written notice to the other specify a different address for notice, except that upon Lessee's taking possession of the Premises, the Premises shall constitute Lessee's address for notice.  A copy of all notices to Lessor shall be concurrently transmitted to such party or parties at such addresses as Lessor may from time to time hereafter designate in writing.

23.2    **Date of Notice**.  Any notice sent by registered or certified mail, return receipt requested, shall be deemed given on the date of delivery shown on the receipt card, or if no delivery date is shown, the postmark thereon.  If sent by regular mail the notice shall be deemed given 72 hours after the same is addressed as required herein and mailed with postage prepaid.  Notices delivered by United States Express Mail or overnight courier that guarantees next day delivery shall be deemed given 24 hours after delivery of the same to the Postal Service or courier.  Notices delivered by hand, or transmitted by facsimile transmission or by email shall be deemed delivered upon actual receipt.  If notice is received on a Saturday, Sunday or legal holiday, it shall be deemed received on the next business day.

**24.  Waivers.**

(a)  No waiver by Lessor of the Default or Breach of any term, covenant or condition hereof by Lessee, shall be deemed a waiver of any other term, covenant or condition hereof, or of any subsequent Default or Breach by Lessee of the same or of any other term, covenant or condition hereof.  Lessor's consent to, or approval of, any act shall not be deemed to render unnecessary the obtaining of Lessor's consent to, or approval of, any subsequent or similar act by Lessee, or be construed as the basis of an estoppel to enforce the provision or provisions of this Lease requiring such consent.

(b)  The acceptance of Rent by Lessor shall not be a waiver of any Default or Breach by Lessee.  Any payment by Lessee may be accepted by Lessor on account of monies or damages due Lessor, notwithstanding any qualifying statements or conditions made by Lessee in connection therewith, which such statements and/or conditions shall be of no force or effect whatsoever unless specifically agreed to in writing by Lessor at or before the time of deposit of such payment.

(c)  THE PARTIES AGREE THAT THE TERMS OF THIS LEASE SHALL GOVERN WITH REGARD TO ALL MATTERS RELATED THERETO AND HEREBY WAIVE THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE TO THE EXTENT THAT SUCH STATUTE IS INCONSISTENT WITH THIS LEASE.

**25.  Disclosures Regarding The Nature of a Real Estate Agency Relationship.**

(a)  When entering into a discussion with a real estate agent regarding a real estate transaction, a Lessor or Lessee should from the outset understand what type of agency relationship or representation it has with the agent or agents in the transaction.  Lessor and Lessee acknowledge being advised by the Brokers in this transaction, as follows:

(i)  *Lessor's Agent*.  A Lessor's agent under a listing agreement with the Lessor acts as the agent for the Lessor only.  A Lessor's agent or subagent has the following affirmative obligations:  *To the Lessor*:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessor.  *To the Lessee and the Lessor*:  (a) Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other Party which does not involve the affirmative duties set forth above.

(ii)  *Lessee's Agent*.  An agent can agree to act as agent for the Lessee only.  In these situations, the agent is not the Lessor's agent, even if by agreement the agent may receive compensation for services rendered, either in full or in part from the Lessor.  An agent acting only for a Lessee has the following affirmative obligations.  *To the Lessee*:  A fiduciary duty of utmost care, integrity, honesty, and loyalty in dealings with the Lessee.  *To the Lessee and the Lessor*:  (a) Diligent exercise of reasonable skills and care in performance of the agent's duties.  (b) A duty of honest and fair dealing and good faith.  (c) A duty to disclose all facts known to the agent materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Parties.  An agent is not obligated to reveal to either Party any confidential information obtained from the other

_____                          Page 19 of 25                          _____
INITIALS              Last Edited: 7/12/2023 11:08 AM              INITIALS

© 2017 AIR CRE.  All Rights Reserved.                          OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

Party which does not involve the affirmative duties set forth above.

(iii) *Agent Representing Both Lessor and Lessee*.  A real estate agent, either acting directly or through one or more associate licenses, can legally be the agent of both the Lessor and the Lessee in a transaction, but only with the knowledge and consent of both the Lessor and the Lessee.  In a dual agency situation, the agent has the following affirmative obligations to both the Lessor and the Lessee: (a) A fiduciary duty of utmost care, integrity, honesty and loyalty in the dealings with either Lessor or the Lessee.  (b) Other duties to the Lessor and the Lessee as stated above in subparagraphs (i) or (ii).  In representing both Lessor and Lessee, the agent may not without the express permission of the respective Party, disclose to the other Party that the Lessor will accept rent in an amount less than that indicated in the listing or that the Lessee is willing to pay a higher rent than that offered.  The above duties of the agent in a real estate transaction do not relieve a Lessor or Lessee from the responsibility to protect their own interests.  Lessor and Lessee should carefully read all agreements to assure that they adequately express their understanding of the transaction.  A real estate agent is a person qualified to advise about real estate.  If legal or tax advice is desired, consult a competent professional.

(b)  Brokers have no responsibility with respect to any default or breach hereof by either Party.  The Parties agree that no lawsuit or other legal proceeding involving any breach of duty, error or omission relating to this Lease may be brought against Broker more than one year after the Start Date and that the liability (including court costs and attorneys' fees), of any Broker with respect to any such lawsuit and/or legal proceeding shall not exceed the fee received by such Broker pursuant to this Lease; provided, however, that the foregoing limitation on each Broker's liability shall not be applicable to any gross negligence or willful misconduct of such Broker.

(c)  Lessor and Lessee agree to identify to Brokers as "Confidential" any communication or information given Brokers that is considered by such Party to be confidential.

**26.  No Right To Holdover**.  Lessee has no right to retain possession of the Premises or any part thereof beyond the expiration or termination of this Lease.  In the event that Lessee holds over, then the Base Rent shall be increased to 150% of the Base Rent applicable immediately preceding the expiration or termination.  Holdover Base Rent shall be calculated on a monthly basis.  Nothing contained herein shall be construed as consent by Lessor to any holding over by Lessee.

**27.  Cumulative Remedies.**  No remedy or election hereunder shall be deemed exclusive but shall, wherever possible, be cumulative with all other remedies at law or in equity.

**28.  Covenants and Conditions; Construction of Agreement.**  All provisions of this Lease to be observed or performed by Lessee are both covenants and conditions.  In construing this Lease, all headings and titles are for the convenience of the Parties only and shall not be considered a part of this Lease.  Whenever required by the context, the singular shall include the plural and vice versa.  This Lease shall not be construed as if prepared by one of the Parties, but rather according to its fair meaning as a whole, as if both Parties had prepared it.

**29.  Binding Effect; Choice of Law.**  This Lease shall be binding upon the parties, their personal representatives, successors and assigns and be governed by the laws of the State in which the Premises are located.  Any litigation between the Parties hereto concerning this Lease shall be initiated in the county in which the Premises are located.

**30.  Subordination; Attornment; Non-Disturbance.**

30.1    **Subordination**.  This Lease and any Option granted hereby shall be subject and subordinate to any ground lease, mortgage, deed of trust, or other hypothecation or security device (collectively, "**Security Device**"), now or hereafter placed upon the Premises, to any and all advances made on the security thereof, and to all renewals, modifications, and extensions thereof.  Lessee agrees that the holders of any such Security Devices (in this Lease together referred to as "**Lender**") shall have no liability or obligation to perform any of the obligations of Lessor under this Lease.  Any Lender may elect to have this Lease and/or any Option granted hereby superior to the lien of its Security Device by giving written notice thereof to Lessee, whereupon this Lease and such Options shall be deemed prior to such Security Device, notwithstanding the relative dates of the documentation or recordation thereof.

30.2    **Attornment**.  In the event that Lessor transfers title to the Premises, or the Premises are acquired by another upon the foreclosure or termination of a Security Device to which this Lease is subordinated (i) Lessee shall, subject to the non-disturbance provisions of Paragraph 30.3, attorn to such new owner, and upon request, enter into a new lease, containing all of the terms and provisions of this Lease, with such new owner for the remainder of the term hereof, or, at the election of the new owner, this Lease will automatically become a new lease between Lessee and such new owner, and (ii) Lessor shall thereafter be relieved of any further obligations hereunder and such new owner shall assume all of Lessor's obligations, except that such new owner shall not: (a) be liable for any act or omission of any prior lessor or with respect to events occurring prior to acquisition of ownership; (b) be subject to any offsets or defenses which Lessee might have against any prior lessor,  (c) be bound by prepayment of more than one month's rent, or (d) be liable for the return of any security deposit paid to any prior lessor which was not paid or credited to such new  owner.

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

30.3 **Non-Disturbance**. With respect to Security Devices entered into by Lessor after the execution of this Lease, Lessee's subordination of this Lease shall be subject to receiving a commercially reasonable non-disturbance agreement (a "**Non-Disturbance Agreement**") from the Lender which Non-Disturbance Agreement provides that Lessee's possession of the Premises, and this Lease, including any options to extend the term hereof, will not be disturbed so long as Lessee is not in Breach hereof and attorns to the record owner of the Premises. Further, within 60 days after the execution of this Lease, Lessor shall, if requested by Lessee, use its commercially reasonable efforts to obtain a Non-Disturbance Agreement from the holder of any pre-existing Security Device which is secured by the Premises. In the event that Lessor is unable to provide the Non-Disturbance Agreement within said 60 days, then Lessee may, at Lessee's option, directly contact Lender and attempt to negotiate for the execution and delivery of a Non-Disturbance Agreement.

30.4 **Self-Executing**. The agreements contained in this Paragraph 30 shall be effective without the execution of any further documents; provided, however, that, upon written request from Lessor or a Lender in connection with a sale, financing or refinancing of the Premises, Lessee and Lessor shall execute such further writings as may be reasonably required to separately document any subordination, attornment and/or Non-Disturbance Agreement provided for herein.

**31. Attorneys' Fees.** If any Party or Broker brings an action or proceeding involving the Premises whether founded in tort, contract or equity, or to declare rights hereunder, the Prevailing Party (as hereafter defined) in any such proceeding, action, or appeal thereon, shall be entitled to reasonable attorneys' fees. Such fees may be awarded in the same suit or recovered in a separate suit, whether or not such action or proceeding is pursued to decision or judgment. The term, "**Prevailing Party**" shall include, without limitation, a Party or Broker who substantially obtains or defeats the relief sought, as the case may be, whether by compromise, settlement, judgment, or the abandonment by the other Party or Broker of its claim or defense. The attorneys' fees award shall not be computed in accordance with any court fee schedule, but shall be such as to fully reimburse all attorneys' fees reasonably incurred. In addition, Lessor shall be entitled to attorneys' fees, costs and expenses incurred in the preparation and service of notices of Default and consultations in connection therewith, whether or not a legal action is subsequently commenced in connection with such Default or resulting Breach ($200 is a reasonable minimum per occurrence for such services and consultation).

**32. Lessor's Access; Showing Premises; Repairs.** Lessor and Lessor's agents shall have the right to enter the Premises at any time, in the case of an emergency, and otherwise at reasonable times after reasonable prior notice for the purpose of showing the same to prospective purchasers, lenders, or tenants, and making such alterations, repairs, improvements or additions to the Premises as Lessor may deem necessary or desirable and the erecting, using and maintaining of utilities, services, pipes and conduits through the Premises and/or other premises as long as there is no material adverse effect on Lessee's use of the Premises. All such activities shall be without abatement of rent or liability to Lessee.

**33. Auctions.** Lessee shall not conduct, nor permit to be conducted, any auction upon the Premises without Lessor's prior written consent. Lessor shall not be obligated to exercise any standard of reasonableness in determining whether to permit an auction.

**34. Signs.** Lessor may place on the Premises ordinary "For Sale" signs at any time and ordinary "For Lease" signs during the last 6 months of the term hereof. Lessor may not place any sign on the exterior of the Building that covers any of the windows of the Premises. Except for ordinary "For Sublease" signs which may be placed only on the Premises, Lessee shall not place any sign upon the Project without Lessor's prior written consent. All signs must comply with all Applicable Requirements.

**35. Termination; Merger.** Unless specifically stated otherwise in writing by Lessor, the voluntary or other surrender of this Lease by Lessee, the mutual termination or cancellation hereof, or a termination hereof by Lessor for Breach by Lessee, shall automatically terminate any sublease or lesser estate in the Premises; provided, however, that Lessor may elect to continue any one or all existing subtenancies. Lessor's failure within 10 days following any such event to elect to the contrary by written notice to the holder of any such lesser interest, shall constitute Lessor's election to have such event constitute the termination of such interest.

**36. Consents.** All requests for consent shall be in writing. Except as otherwise provided herein, wherever in this Lease the consent of a Party is required to an act by or for the other Party, such consent shall not be unreasonably withheld or delayed. Lessor's actual reasonable costs and expenses (including but not limited to architects', attorneys', engineers' and other consultants' fees) incurred in the consideration of, or response to, a request by Lessee for any Lessor consent, including but not limited to consents to an assignment, a subletting or the presence or use of a Hazardous Substance, shall be paid by Lessee upon receipt of an invoice and supporting documentation therefor. Lessor's consent to any act, assignment or subletting shall not constitute an acknowledgment that no Default or Breach by Lessee of this Lease exists, nor shall such consent be deemed a waiver of any then existing Default or Breach, except as may be otherwise specifically stated in writing by Lessor at the time of such consent. The failure to specify herein any particular condition to Lessor's consent shall not preclude the imposition by Lessor at the time of consent of such further or other conditions as are then reasonable with reference to the particular matter for which consent is being given. In the event that either Party disagrees with any determination made by the other hereunder and reasonably requests the reasons for such determination, the determining party shall furnish its reasons in writing and in reasonable detail within 10 business days following

_____   Page 21 of 25   _____
INITIALS   Last Edited: 7/12/2023 11:08 AM   INITIALS

© 2017 AIR CRE.  All Rights Reserved.   OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

such request.

**37. Guarantor.**

37.1    **Execution**.  The Guarantors, if any, shall each execute a guaranty in the form most recently published BY AIR CRE.

37.2    **Default**.  It shall constitute a Default of the Lessee if any Guarantor fails or refuses, upon request to provide:  (a) evidence of the execution of the guaranty, including the authority of the party signing on Guarantor's behalf to obligate Guarantor, and in the case of a corporate Guarantor, a certified copy of a resolution of its board of directors authorizing the making of such guaranty, (b) current financial statements, (c) an Estoppel Certificate, or (d) written confirmation that the guaranty is still in effect.

**38. Quiet Possession.**  Subject to payment by Lessee of the Rent and performance of all of the covenants, conditions and provisions on Lessee's part to be observed and performed under this Lease, Lessee shall have quiet possession and quiet enjoyment of the Premises during the term hereof.

**39. Options.**  If Lessee is granted any option, as defined below, then the following provisions shall apply.

39.1    **Definition**.  "Option" shall mean:  (a) the right to extend or reduce the term of or renew this Lease or to extend or reduce the term of or renew any lease that Lessee has on other property of Lessor; (b) the right of first refusal or first offer to lease either the Premises or other property of Lessor; (c) the right to purchase, the right of first offer to purchase or the right of first refusal to purchase the Premises or other property of Lessor.

39.2    **Options Personal To Original Lessee**.  Any Option granted to Lessee in this Lease is personal to the original Lessee, and cannot be assigned or exercised by anyone other than said original Lessee and only while the original Lessee is in full possession of the Premises and, if requested by Lessor, with Lessee certifying that Lessee has no intention of thereafter assigning or subletting.

39.3    **Multiple Options**.  In the event that Lessee has any multiple Options to extend or renew this Lease, a later Option cannot be exercised unless the prior Options have been validly exercised.

39.4    **Effect of Default on Options**.

(a)   Lessee shall have no right to exercise an Option:  (i) during the period commencing with the giving of any notice of Default and continuing until said Default is cured, (ii) during the period of time any Rent is unpaid (without regard to whether notice thereof is given Lessee), (iii) during the time Lessee is in Breach of this Lease, or (iv) in the event that Lessee has been given 3 or more notices of separate Default, whether or not the Defaults are cured, during the 12 month period immediately preceding the exercise of the Option.

(b)   The period of time within which an Option may be exercised shall not be extended or enlarged by reason of Lessee's inability to exercise an Option because of the provisions of Paragraph 39.4(a).

(c)   An Option shall terminate and be of no further force or effect, notwithstanding Lessee's due and timely exercise of the Option, if, after such exercise and prior to the commencement of the extended term or completion of the purchase, (i) Lessee fails to pay Rent for a period of 30 days after such Rent becomes due (without any necessity of Lessor to give notice thereof), or (ii) if Lessee commits a Breach of this Lease.

**40. Security Measures.**  Lessee hereby acknowledges that the Rent payable to Lessor hereunder does not include the cost of guard service or other security measures, and that Lessor shall have no obligation whatsoever to provide same.  Lessee assumes all responsibility for the protection of the Premises, Lessee, its agents and invitees and their property from the acts of third parties.  In the event, however, that Lessor should elect to provide security services, then the cost thereof shall be an Operating Expense.

**41. Reservations.**

(a)   Lessor reserves the right: (i) to grant, without the consent or joinder of Lessee, such easements, rights and dedications that Lessor deems necessary, (ii) to cause the recordation of parcel maps and restrictions, (iii) to create and/or install new utility raceways, so long as such easements, rights, dedications, maps, restrictions, and utility raceways do not unreasonably interfere with the use of the Premises by Lessee.  Lessor may also: change the name, address or title of the Building or Project upon at least 90 days prior written notice; provide and install, at Lessee's expense, Building standard graphics on the door of the Premises and such portions of the Common Areas as Lessor shall reasonably deem appropriate; grant to any lessee the exclusive right to conduct any business as long as such exclusive right does not conflict with any rights expressly given herein; and to place such signs, notices or displays as Lessor reasonably deems necessary or advisable upon the roof, exterior of the Building or the Project or on signs in the Common Areas.  Lessee agrees to sign any documents reasonably requested by Lessor to effectuate such rights.  The obstruction of Lessee's view, air, or light by any structure erected in the vicinity of the Building, whether by Lessor or third parties, shall in no way affect this Lease or impose any liability upon Lessor.

(b)   Lessor also reserves the right to move Lessee to other space of comparable size in the Building or Project.  Lessor must provide at least 45 days prior written notice of such move, and the new space must contain improvements of comparable quality to those contained within the Premises.  Lessor shall pay the reasonable out of pocket costs that Lessee incurs with regard to such relocation, including the expenses of moving and necessary stationary revision costs.  In no event, however, shall Lessor be required

INITIALS                                        INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                        OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

to pay an amount in excess of two months Base Rent.  Lessee may not be relocated more than once during the term of this Lease.

(c)    Lessee shall not: (i) use a representation (photographic or otherwise) of the Building or Project or their name(s) in connection with Lessee's business; or (ii) suffer or permit anyone, except in emergency, to go upon the roof of the Building.

**42.  Performance Under Protest.**  If at any time a dispute shall arise as to any amount or sum of money to be paid by one Party to the other under the provisions hereof, the Party against whom the obligation to pay the money is asserted shall have the right to make payment "under protest" and such payment shall not be regarded as a voluntary payment and there shall survive the right on the part of said Party to institute suit for recovery of such sum.  If it shall be adjudged that there was no legal obligation on the part of said Party to pay such sum or any part thereof, said Party shall be entitled to recover such sum or so much thereof as it was not legally required to pay.  A Party who does not initiate suit for the recovery of sums paid "under protest" within 6 months shall be deemed to have waived its right to protest such payment.

**43.  Authority; Multiple Parties; Execution.**

(a)    If either Party hereto is a corporation, trust, limited liability company, partnership, or similar entity, each individual executing this Lease on behalf of such entity represents and warrants that he or she is duly authorized to execute and deliver this Lease on its behalf.  Each Party shall, within 30 days after request, deliver to the other Party satisfactory evidence of such authority.

(b)    If this Lease is executed by more than one person or entity as "Lessee", each such person or entity shall be jointly and severally liable hereunder.  It is agreed that any one of the named Lessees shall be empowered to execute any amendment to this Lease, or other document ancillary thereto and bind all of the named Lessees, and Lessor may rely on the same as if all of the named Lessees had executed such document.

(c)    This Lease may be executed by the Parties in counterparts, each of which shall be deemed an original and all of which together shall constitute one and the same instrument.

**44.  Conflict.**  Any conflict between the printed provisions of this Lease and the typewritten or handwritten provisions shall be controlled by the typewritten or handwritten provisions.

**45.  Offer**.  Preparation of this Lease by either party or their agent and submission of same to the other Party shall not be deemed an offer to lease to the other Party.  This Lease is not intended to be binding until executed and delivered by all Parties hereto.

**46.  Amendments.**  This Lease may be modified only in writing, signed by the Parties in interest at the time of the modification.  As long as they do not materially change Lessee's obligations hereunder, Lessee agrees to make such reasonable non-monetary modifications to this Lease as may be reasonably required by a Lender in connection with the obtaining of normal financing or refinancing of the Premises.

**47.  Waiver of Jury Trial.  THE PARTIES HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO TRIAL BY JURY IN ANY ACTION OR PROCEEDING INVOLVING THE PROPERTY OR ARISING OUT OF THIS AGREEMENT.**

**48.  Arbitration of Disputes.**  An Addendum requiring the Arbitration of all disputes between the Parties and/or Brokers arising out of this Lease ☑ is ☐ is not attached to this Lease.

**49.  Accessibility; Americans with Disabilities Act.**

(a)    The Premises:

☑ have not undergone an inspection by a Certified Access Specialist (CASp).  Note: A Certified Access Specialist (CASp) can inspect the subject premises and determine whether the subject premises comply with all of the applicable construction-related accessibility standards under state law. Although state law does not require a CASp inspection of the subject premises, the commercial property owner or lessor may not prohibit the lessee or tenant from obtaining a CASp inspection of the subject premises for the occupancy or potential occupancy of the lessee or tenant, if requested by the lessee or tenant. The parties shall mutually agree on the arrangements for the time and manner of the CASp inspection, the payment of the fee for the CASp inspection, and the cost of making any repairs necessary to correct violations of construction-related accessibility standards within the premises.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises met all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential.

☐ have undergone an inspection by a Certified Access Specialist (CASp) and it was determined that the Premises did not meet all applicable construction-related accessibility standards pursuant to California Civil Code §55.51 et seq.  Lessee acknowledges that it received a copy of the inspection report at least 48 hours prior to executing this Lease and agrees to keep such report confidential except as necessary to complete repairs and corrections of violations of construction related accessibility standards.

In the event that the Premises have been issued an inspection report by a CASp the Lessor shall provide a copy of the disability

INITIALS _____

INITIALS _____

© 2017 AIR CRE.  All Rights Reserved.

OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

access inspection certificate to Lessee within 7 days of the execution of this Lease.

(b)  Since compliance with the Americans with Disabilities Act (ADA) and other state and local accessibility statutes are dependent upon Lessee's specific use of the Premises, Lessor makes no warranty or representation as to whether or not the Premises comply with ADA or any similar legislation.  In the event that Lessee's use of the Premises requires modifications or additions to the Premises in order to be in compliance with ADA or other accessibility statutes, Lessee agrees to make any such necessary modifications and/or additions at Lessee's expense.

**LESSOR AND LESSEE HAVE CAREFULLY READ AND REVIEWED THIS LEASE AND EACH TERM AND PROVISION CONTAINED HEREIN, AND BY THE EXECUTION OF THIS LEASE SHOW THEIR INFORMED AND VOLUNTARY CONSENT THERETO.  THE PARTIES HEREBY AGREE THAT, AT THE TIME THIS LEASE IS EXECUTED, THE TERMS OF THIS LEASE ARE COMMERCIALLY REASONABLE AND EFFECTUATE THE INTENT AND PURPOSE OF LESSOR AND LESSEE WITH RESPECT TO THE PREMISES.**

**ATTENTION:  NO REPRESENTATION OR RECOMMENDATION IS MADE BY AIR CRE OR BY ANY BROKER AS TO THE LEGAL SUFFICIENCY, LEGAL EFFECT, OR TAX CONSEQUENCES OF THIS LEASE OR THE TRANSACTION TO WHICH IT RELATES.  THE PARTIES ARE URGED TO:**

**1.    SEEK ADVICE OF COUNSEL AS TO THE LEGAL AND TAX CONSEQUENCES OF THIS LEASE.**

**2.    RETAIN APPROPRIATE CONSULTANTS TO REVIEW AND INVESTIGATE THE CONDITION OF THE PREMISES.  SAID INVESTIGATION SHOULD INCLUDE BUT NOT BE LIMITED TO: THE POSSIBLE PRESENCE OF HAZARDOUS SUBSTANCES, THE ZONING AND SIZE OF THE PREMISES, THE STRUCTURAL INTEGRITY, THE CONDITION OF THE ROOF AND OPERATING SYSTEMS, COMPLIANCE WITH THE AMERICANS WITH DISABILITIES ACT AND THE SUITABILITY OF THE PREMISES FOR LESSEE'S INTENDED USE.**

**WARNING:  IF THE PREMISES ARE LOCATED IN A STATE OTHER THAN CALIFORNIA, CERTAIN PROVISIONS OF THE LEASE MAY NEED TO BE REVISED TO COMPLY WITH THE LAWS OF THE STATE IN WHICH THE PREMISES ARE LOCATED.**

The parties hereto have executed this Lease at the place and on the dates specified above their respective signatures.

| | |
|---|---|
| Executed at: ___ | Executed at: ___ |
| On: ___ | On: ___ |
| **By LESSOR**: | **By LESSEE**: |
|  Calmur, LLC  |  Nobility Management, LLC a California limited liability company  |
| By: | By: |
| Name Printed:  Stan Megerdichian  | Name Printed:  Mark Rabinovich  |
| Title:  Managing Member  | Title:  Vice President, Legal/Administration  |
| Phone: ___ | Phone:  818-533-6180  |
| Fax: ___ | Fax:  818-475-5252  |
| Email: ___ | Email:  mrabinovich@nobilitymail.com  |
| By: | By: |
| Name Printed: ___ | Name Printed: ___ |
| Title: ___ | Title: ___ |
| Phone: ___ | Phone: ___ |
| Fax: ___ | Fax: ___ |
| Email: ___ | Email: ___ |
| Address: ___ | Address:  26500 West Agoura Rd., #200, Calabasas, CA 91302 (prior to lease commencement, the address of the Premises after lease commencement)  |
| Federal ID No.: ___ | Federal ID No.: ___ |

**BROKER**                                                      **BROKER**

 Pacific Partners Commercial, Inc.                Pacific Partners Commercial, Inc. 

Attn:  Chris Swatosh                                Attn:  Chris Swatosh 

_____                                                                                        _____
INITIALS                                                                                       INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

Title: <u>Executive VP</u>                                    Title: <u>Executive VP</u>

Address: <u>23901 Calabasas Rd., Suite 2024, Calabasas, CA</u>        Address: <u>23901 Calabasas Rd., Suite 2024, Calabasas, CA</u>
<u>91302</u>                                             <u>91302</u>
Phone: <u>818-862-2848</u>                                   Phone: <u>818-862-2848</u>
Fax: <u>818-798-3090</u>                                     Fax: <u>818-798-3090</u>
Email: <u>chris@pacificpartnerscre.com</u>                       Email: <u>chris@pacificpartnerscre.com</u>
Federal ID No.: ____                                   Federal ID No.: ____
Broker/Agent BRE License #: <u>PPC-01803294 / CS-01803294</u>      Broker/Agent BRE License #: <u>PPC-01093508 / Chris 01803294</u>

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

_____                    Page 25 of 25                    _____
INITIALS                   Last Edited: 7/12/2023 11:08 AM               INITIALS

© 2017 AIR CRE.  All Rights Reserved.                            OFG-21.10, Revised 11-01-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31



# ADDENDUM

**Date:** ___June 30, 2023___

**By and Between**

  **Lessor:** ___Calmur, LLC___

  **Lessee:** ___Nobility Management, LLC a California limited liability company___

**Property Address:** ___26025 Mureau Rd., Suite 210, Calabasas, CA 91302___
                                  (street address, city, state, zip)

Paragraph: ___

51. Attorney Review:  Lessor and Lessee hereby acknowledge that this contract has been prepared by Broker and is hereby submitted to Lessor and Lessee by Broker for review by independent attorney for the respective parties.  Broker makes no representation as to the legal sufficiency, tax consequences, ADA compliance, environmental condition of the Premises, nor the suitability of the Premises for the purposes of the Lessee's use.  It is the Tenant's sole responsibility to confirm with the local governing body that its use is acceptable at the Premises.  Furthermore, Lessor and Lessee hereby acknowledge and agree that they have been strongly advised by Broker to obtain legal advice, financial advice, and other professional advice, as the case may be, with regard to this contract.  Neither Lessor or Lessee are relying upon any representation(s) as such may have been made by Broker as reason(s) for executing this contract.

52. Security Deposit:  Any amount otherwise refundable to Lessee pursuant to the terms of the new lease at the end of its term shall be retained by Lessor as further consideration for the Lessor's agreement to amend the previous Lease for suite 110. Lessor and Lessee hereby agree that Lessor shall be entitled to full rent, without any deductions or offsets, until the Modified Expiration Date; accordingly, Lessor shall have no obligation whatsoever to further reduce the remaining Security Deposit by any amounts of unpaid rent from the date of this Amendment forward.

53. After Hours HVAC:  HVAC service can be provided outside of Business Hours for the Building at an additional hourly cost of $35.00 per hour.

54. Approval by the Bankruptcy Court: Due to the fact that Lessee is in an active Chapter 11 proceeding, this Amendment is subject to approval by the United States Bankruptcy Court ("Bankruptcy Court"). Lessee agrees to file the necessary documents with the Bankruptcy Court to approve this Amendment. Should the Bankruptcy Court not approve the Amendment, this Amendment will be deemed null and void.

55. Permitted Transfers.  Notwithstanding anything herein to the contrary, Tenant may Transfer all or part of its interest in this Lease (including, without limitation, any interest held by Junior Tenant) or all or part of the Premises (a "Permitted Transfer") as follows, and to the following types of entities (a "Permitted Transferee"), without the written consent of Landlord provided such Permitted Transferee operates in the Premises for the use permitted in accordance with this Lease:

• Transfers to an affiliate of Tenant (for purposes hereof, an affiliate means any person or entity which, directly or indirectly, through one or more intermediaries, controls, is controlled by, or is under common ownership or management control with the party in question) provided that such affiliate shall have similar financial strength as Tenant on the date hereof; or

• Transfers to any corporation, limited partnership, limited liability partnership, limited liability company or other business entity in which or with which Tenant, or its corporate successors or assigns, is merged or consolidated, in accordance with applicable statutory provisions governing merger and consolidation of business entities, so long as Tenant's obligations hereunder are assumed by the entity surviving such merger or created by such consolidation provided that such entity shall have similar financial strength as Tenant on the date hereof;

---

INITIALS

Page 1 of 2
Last Edited: 7/12/2023 11:08 AM

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

ADD-1.01, Revised 07-28-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

- Transfers as a result of a sale of all, or substantially all, of Tenant's assets or stock/membership interest provided that such transferee shall have similar financial strength as Tenant on the date hereof; or

In connection with any Permitted Transfer (which includes any Permitted Subleases), without limiting any other provision of this Lease, the following requirements shall apply: (a) Tenant shall provide no less than thirty (30) days prior written notice to Landlord of any such Permitted Transfer; (b) if Tenant shall no longer exist, following the Permitted Transfer (but not a Permitted Sublease), because of a merger, consolidation, acquisition, or sale of all or substantially all of the Tenant's assets, the surviving or acquiring entity shall deliver to Landlord a written express assumption of the obligations of Tenant hereunder arising on or after the assumption date (an "Assumption") no less than ten (10) days prior to the Permitted Transfer (the effectiveness of which may be conditioned on completion of the transaction giving rise to the Permitted Transfer); and, (c) no later than thirty (30) days after the effective date of any Permitted Transfer, Tenant agrees to furnish Landlord with (I) to the extent not prohibited by any confidentiality agreement, copies of the instruments effecting any of the foregoing Transfers; provided, however, that Tenant may redact all financial terms and other sensitive information; (II) documentation establishing Tenant's satisfaction of the requirements applicable to any such Transfer; and (III) evidence of insurance as required under this Lease with respect to the Permitted Transferee.  If Tenant fails to deliver any of the foregoing, or Permitted Transferee fails to deliver any Assumption contemplated hereunder, Landlord may (but has not obligation to) terminate this Lease within ten (10) days after Landlord gives a written notice of intention to terminate to Tenant and Permitted Transferee.

Landlord shall retain the right to consent for transferring the lease to new non-affiliate owner(s), which will require review or proposed transferee's credit and financials.

In the event of any conflict between the provisions of this Addendum and the printed provisions of the Lease, this Addendum shall control.

**AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com**
**NOTICE:  No part of these works may be reproduced in any form without permission in writing.**

INITIALS

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

ADD-1.01, Revised 07-28-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

# AIR CRE

## ARBITRATION AGREEMENT
### STANDARD LEASE ADDENDUM

**Dated:**    June 30, 2023
**By and Between**
**Lessor:**    Calmur, LLC
**Lessee:**    Nobility Management, LLC a California limited liability company

**Property Address:**        26025 Mureau Rd., Suite 210, Calabasas, CA 91302
(street address, city, state, zip)

Paragraph:   56

A.  **ARBITRATION OF DISPUTES**:

Except as provided in Paragraph B below, the Parties agree to resolve any and all claims, disputes or disagreements arising under this Lease, including, but not limited to any matter relating to Lessor's failure to approve an assignment, sublease or other transfer of Lessee's interest in the Lease under Paragraph 12 of this Lease, any other defaults by Lessor, or any defaults by Lessee by and through arbitration as provided below and irrevocably waive any and all rights to the contrary.  The Parties agree to at all times conduct themselves in strict, full, complete and timely accordance with the terms hereof and that any attempt to circumvent the terms of this Arbitration Agreement shall be absolutely null and void and of no force or effect whatsoever.

B.  **DISPUTES EXCLUDED FROM ARBITRATION**:

The following claims, disputes or disagreements under this Lease are expressly excluded from the arbitration procedures set forth herein: 1. Disputes for which a different resolution determination is specifically set forth in this Lease, 2. All claims by either party which (a) seek anything other than enforcement or determination of rights under this Lease, or (b) are primarily founded upon matters of fraud, willful misconduct, bad faith or any other allegations of tortious action, and seek the award of punitive or exemplary damages, 3. Claims relating to (a) Lessor's exercise of any unlawful detainer rights pursuant to applicable law or (b) rights or remedies used by Lessor to gain possession of the Premises or terminate Lessee's right of possession to the Premises, all of which disputes shall be resolved by suit filed in the applicable court of jurisdiction, the decision of which court shall be subject to appeal pursuant to applicable law 4. Any claim or dispute that is within the jurisdiction of the Small Claims Court and 5. All claims arising under Paragraph 39 of this Lease.

C.  **APPOINTMENT OF AN ARBITRATOR**:

All disputes subject to this Arbitration Agreement, shall be determined by binding arbitration before: ☑ a retired judge of the applicable court of jurisdiction (e.g., the Superior Court of the State of California) affiliated with Judicial Arbitration & Mediation Services, Inc. ("JAMS"), ☐ the American Arbitration Association ("AAA") under its commercial arbitration rules, ☐ ___ , or as may be otherwise mutually agreed by Lessor and Lessee (the "Arbitrator").  In the event that the parties elect to use an arbitrator other than one affiliated with JAMS or AAA then such arbitrator shall be obligated to comply with the Code of Ethics for Arbitrators in Commercial Disputes (see: http://www.adr.org/aaa/ShowProperty?nodeId=/UCM/ADRSTG_003867).  Such arbitration shall be initiated by the Parties, or either of them, within ten (10) days after either party sends written notice (the "Arbitration Notice") of a demand to arbitrate by registered or certified mail to the other party and to the Arbitrator.  The Arbitration Notice shall contain a description of the subject matter of the arbitration, the dispute with respect thereto, the amount involved, if any, and the remedy or determination sought.  If the Parties have agreed to use JAMS they may agree on a retired judge from the JAMS panel.  If they are unable to agree within ten days, JAMS will provide a list of three available judges and each party may strike one.  The remaining judge (or if there are two, the one selected by JAMS) will serve as the Arbitrator.  If the Parties have elected to utilize AAA or some other organization, the Arbitrator shall be selected in accordance with said organization's rules.  In the event the Arbitrator is not selected as provided for above for any reason, the party initiating arbitration shall apply to the appropriate Court for the appointment of a qualified retired judge to act as the Arbitrator.

D.  **ARBITRATION PROCEDURE**:

_____                                         Page 1 of 2                                         _____
INITIALS                                    Last Edited: 7/12/2023 11:08 AM                                    INITIALS

© 2017 AIR CRE.  All Rights Reserved.                                    ARB-3.01, Revised 07-28-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

1.  **PRE-HEARING ACTIONS**.  The Arbitrator shall schedule a pre-hearing conference to resolve procedural matters, arrange for the exchange of information, obtain stipulations, and narrow the issues.  The Parties will submit proposed discovery schedules to the Arbitrator at the pre-hearing conference.  The scope and duration of discovery will be within the sole discretion of the Arbitrator.  The Arbitrator shall have the discretion to order a pre-hearing exchange of information by the Parties, including, without limitation, production of requested documents, exchange of summaries of testimony of proposed witnesses, and examination by deposition of parties and third-party witnesses.  This discretion shall be exercised in favor of discovery reasonable under the circumstances.  The Arbitrator shall issue subpoenas and subpoenas duces tecum as provided for in the applicable statutory or case law (e.g., in California Code of Civil Procedure Section 1282.6).

2.  **THE DECISION**.  The arbitration shall be conducted in the city or county within which the Premises are located at a reasonably convenient site.  Any Party may be represented by counsel or other authorized representative.  In rendering a decision(s), the Arbitrator shall determine the rights and obligations of the Parties according to the substantive laws and the terms and provisions of this Lease.  The Arbitrator's decision shall be based on the evidence introduced at the hearing, including all logical and reasonable inferences therefrom.  The Arbitrator may make any determination and/or grant any remedy or relief that is just and equitable.  The decision must be based on, and accompanied by, a written statement of decision explaining the factual and legal basis for the decision as to each of the principal controverted issues.  The decision shall be conclusive and binding, and it may thereafter be confirmed as a judgment by the court of applicable jurisdiction, subject only to challenge on the grounds set forth in the applicable statutory or case law (e.g., in California Code of Civil Procedure Section 1286.2).  The validity and enforceability of the Arbitrator's decision is to be determined exclusively by the court of appropriate jurisdiction pursuant to the provisions of this Lease.  The Arbitrator may award costs, including without limitation, Arbitrator's fees and costs, attorneys' fees, and expert and witness costs, to the prevailing party, if any, as determined by the Arbitrator in his discretion.

Whenever a matter which has been submitted to arbitration involves a dispute as to whether or not a particular act or omission (other than a failure to pay money) constitutes a Default, the time to commence or cease such action shall be tolled from the date that the Notice of Arbitration is served through and until the date the Arbitrator renders his or her decision.  Provided, however, that this provision shall NOT apply in the event that the Arbitrator determines that the Arbitration Notice was prepared in bad faith.

Whenever a dispute arises between the Parties concerning whether or not the failure to make a payment of money constitutes a default, the service of an Arbitration Notice shall NOT toll the time period in which to pay the money.  The Party allegedly obligated to pay the money may, however, elect to pay the money "under protest" by accompanying said payment with a written statement setting forth the reasons for such protest.  If thereafter, the Arbitrator determines that the Party who received said money was not entitled to such payment, said money shall be promptly returned to the Party who paid such money under protest together with Interest thereon as defined in Paragraph 13.5.  If a Party makes a payment "under protest" but no Notice of Arbitration is filed within thirty days, then such protest shall be deemed waived.  (See also Paragraph 42 or 43)

AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com
NOTICE:  No part of these works may be reproduced in any form without permission in writing.

_SM_ _____

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

_MR_ _____

INITIALS

ARB-3.01, Revised 07-28-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

# AIRCRE

# RULES AND REGULATIONS FOR
# STANDARD OFFICE  LEASE

**Date:**     October 19, 2018

**By and Between**

  **Lessor:**    Calmur, LLC

  **Lessee:**     Nobility Management, LLC a California limited liability  company

**Property Address:**      26025 Mureau Rd., Suite 210, Calabasas, CA 91302
           (street address, city, state, zip)

## GENERAL RULES

1.  Lessee shall not suffer or permit the obstruction of any Common Areas, including driveways, walkways and stairways.

2.  Lessor reserves the right to refuse access to any persons Lessor in good faith judges to be a threat to the safety and reputation of the Project and its occupants.

3.  Lessee shall not make or permit any noise or odors that annoy or interfere with other lessees or persons having business within the Project.

4.  Lessee shall not keep animals or birds within the Project, and shall not bring bicycles, motorcycles or other vehicles into areas not designated as authorized for same.

5.  Lessee shall not make, suffer or permit litter except in appropriate receptacles for that purpose.

6.  Lessee shall not alter any lock or install new or additional locks or bolts.

7.  Lessee shall be responsible for the inappropriate use of any toilet rooms, plumbing or other utilities.  No foreign substances of any kind are to be inserted therein.

8.  Lessee shall not deface the walls, partitions or other surfaces of the Premises or Project.

9.  Lessee shall not suffer or permit anything in or around the Premises or Building that causes excessive vibration or floor loading in any part of the Project.

10.  Furniture, significant freight and equipment shall be moved into or out of the building only with the Lessor's knowledge and consent, and subject to such reasonable limitations, techniques and timing, as may be designated by Lessor.  Lessee shall be responsible for any damage to the Office Building Project arising from any such activity.

11.  Lessee shall not employ any service or contractor for services or work to be performed in the Building, except as approved by Lessor.

12.  Lessor reserves the right to close and lock the Building on Saturdays,  Sundays and Building Holidays,  and on other days between the hours of  6:00   P.M. and  8:00   A.M. of the following day.  If Lessee uses the Premises during such periods, Lessee shall be responsible for securely locking any doors it may have opened for entry.

13.  Lessee shall return all keys at the termination of its tenancy and shall be responsible for the cost of replacing any keys that are lost.

14.  No window coverings, shades or awnings shall be installed or used by Lessee.

15.  No Lessee, employee or invitee shall go upon the roof of the Building.

16.  Lessee shall not suffer or permit smoking or carrying of lighted cigars or cigarettes in areas reasonably designated by Lessor or by applicable governmental agencies as non-smoking areas.

17.  Lessee shall not use any method of heating or air conditioning other than as provided by Lessor.

18.  Lessee shall not install, maintain or operate any vending machines upon the Premises without Lessor's written consent.

19.  The Premises shall not be used for lodging or manufacturing, cooking or food preparation.

20.  Lessee shall comply with all safety, fire protection and evacuation regulations established by Lessor or any applicable governmental agency.

21.  Lessor reserves the right to waive any one of these rules or regulations, and/or as to any particular Lessee, and any such waiver shall not constitute a waiver of any other rule or regulation or any subsequent application thereof to such Lessee.

22.  Lessee assumes all risks from theft or vandalism and agrees to keep its Premises locked as may be required.

23.  Lessor reserves the right to make such other reasonable rules and regulations as it may from time to time deem necessary for the appropriate operation and safety of the Project and its occupants.  Lessee agrees to abide by these and such rules and

_____
INITIALS

Page 1 of 2
Last Edited: 7/12/2023 11:08 AM

_____
INITIALS

© 2017 AIR CRE.  All Rights Reserved.
OFGRR-2.00, Revised 01-03-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31

regulations.

## PARKING RULES

1.    Parking areas shall be used only for parking by vehicles no longer than full size, passenger automobiles herein called "Permitted Size Vehicles." Vehicles other than Permitted Size Vehicles are herein referred to as "Oversized Vehicles."

2.    Lessee shall not permit or allow any vehicles that belong to or are controlled by Lessee or Lessee's employees, suppliers, shippers, customers, or invitees to be loaded, unloaded, or parked in areas other than those designated by Lessor for such activities.

3.    Parking stickers or identification devices shall be the property of Lessor and be returned to Lessor by the holder thereof upon termination of the holder's parking privileges.  Lessee will pay such replacement charge as is reasonably established by Lessor for the loss of such devices.

4.    Lessor reserves the right to refuse the sale of monthly identification devices to any person or entity that willfully refuses to comply with the applicable rules, regulations, laws and/or agreements.

5.    Lessor reserves the right to relocate all or a part of parking spaces from floor to floor, within one floor, and/or to reasonably adjacent offsite location(s), and to reasonably allocate them between compact and standard size spaces, as long as the same complies with applicable laws, ordinances and regulations.

6.    Users of the parking area will obey all posted signs and park only in the areas designated for vehicle parking.

7.    Unless otherwise instructed, every person using the parking area is required to park and lock his own vehicle.  Lessor will not be responsible for any damage to vehicles, injury to persons or loss of property, all of which risks are assumed by the party using the parking area.

8.    Validation, if established, will be permissible only by such method or methods as Lessor and/or its licensee may establish at rates generally applicable to visitor parking.

9.    The maintenance, washing, waxing or cleaning of vehicles in the parking structure or Common Areas is prohibited.

10.  Lessee shall be responsible for seeing that all of its employees, agents and invitees comply with the applicable parking rules, regulations, laws and agreements.

11.   Lessor reserves the right to modify these rules and/or adopt such other reasonable and non-discriminatory rules and regulations as it may deem necessary for the proper operation of the parking area.

12.   Such parking use as is herein provided is intended merely as a license only and no bailment is intended or shall be created hereby.

**AIR CRE. 500 North Brand Blvd, Suite 900, Glendale, CA 91203, Tel 213-687-8777, Email contracts@aircre.com**
**NOTICE:  No part of these works may be reproduced in any form without permission in writing.**

INITIALS

Page 2 of 2
Last Edited: 7/12/2023 11:08 AM

INITIALS

© 2017 AIR CRE.  All Rights Reserved.

OFGRR-2.00, Revised 01-03-2017

Document ID: 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31



# Signature Certificate

Envelope Ref:8edf6c3a55331a7ea082a9e505c7c306688ba63b

| Author: | Mark Rabinovich | Creation Date: | 17 Jul 2023, 10:25:32, EDT | Completion Date: | 17 Jul 2023, 13:17:35, EDT |
|---|---|---|---|---|---|

## Document Details:

| | Name: | Amendment to Lease - 07-17-2023 Execution Copy-Yury Gampel-Stan Megerdichian-Mark Rabinovich-2023-07-17 |
|---|---|---|
| | Type: | |
| | Document Ref: | c719191d416c94b5d253ece8b93cbfe2b90a78337fe27872e75e074fd215be62 |
| | Document Total Pages: | 4 |
| | Name: | 26025 Mureau, Suite 210 - Nobility Management Lease - 7.12.23 final-Mark Rabinovich-Stan Megerdichian-2023-07-17 |
| | Type: | |
| | Document Ref: | 74bd32dcfe3880dd08c194571f0c83ec984603b9a074e1af569a8409a16b4a31 |
| | Document Total Pages: | 31 |

## Document Signed By:

| Name: | Mark Rabinovich |
|---|---|
| Email: | mrabinovich@nobilitymail.com |
| IP: | 199.204.19.146 |
| Location: | MESA, AZ (US) |
| Date: | 17 Jul 2023, 12:07:43, EDT |
| Consent: | eSignature Consent Accepted |
| Security Level: | Email |



Name:            Stan Megerdichian

Email:           gagmeger@gmail.com

IP:              198.72.173.127

Location:        LOS ANGELES, CA (US)

Date:            17 Jul 2023, 13:08:16, EDT

Consent:         eSignature Consent Accepted

Security Level:  Email

Name:            Yury Gampel

Email:           dryury@rapidlp.com

IP:              68.72.83.193

Location:        MEDLEY, FL (US)

Date:            17 Jul 2023, 13:17:35, EDT

Consent:         eSignature Consent Accepted

Security Level:  Email



**Document History:**

| | |
|---|---|
| Envelope Created | Mark Rabinovich created this envelope on 17 Jul 2023, 10:25:32, EDT |
| Signed by Mark Rabinovich | Mark Rabinovich signed this Envelope on 17 Jul 2023, 12:07:43, EDT |
| Invitation Sent | Invitation sent to Stan Megerdichian on 17 Jul 2023, 11:42:58, EDT |
| Invitation Sent | Invitation sent to Mark Rabinovich on 17 Jul 2023, 11:42:58, EDT |
| Invitation Sent | Invitation sent to Elena Rabinovich on 17 Jul 2023, 11:42:58, EDT |
| Invitation Sent | Invitation sent to Shannon Hanak on 17 Jul 2023, 11:42:58, EDT |
| Invitation Sent | Invitation sent to Ernest Tepman on 17 Jul 2023, 11:42:58, EDT |
| Invitation Sent | Invitation sent to Yury Gampel on 17 Jul 2023, 11:42:58, EDT |
| Invitation Accepted | Invitation accepted by Mark Rabinovich on 17 Jul 2023, 11:42:58, EDT |
| Invitation Accepted | Invitation accepted by Shannon Hanak on 17 Jul 2023, 11:47:18, EDT |
| Invitation Accepted | Invitation accepted by Ernest Tepman on 17 Jul 2023, 11:55:40, EDT |
| Signed by Mark Rabinovich | Mark Rabinovich signed this Envelope on 17 Jul 2023, 12:07:43, EDT |
| Invitation Accepted | Invitation accepted by Stan Megerdichian on 17 Jul 2023, 12:58:54, EDT |
| Signed by Stan Megerdichian | Stan Megerdichian signed this Envelope on 17 Jul 2023, 13:08:16, EDT |
| Invitation Accepted | Invitation accepted by Yury Gampel on 17 Jul 2023, 13:17:11, EDT |
| Signed by Yury Gampel | Yury Gampel signed this Envelope on 17 Jul 2023, 13:17:35, EDT |
| Executed | Document(s) successfully executed on 17 Jul 2023, 13:17:35, EDT |
| Signed Document(s) | Link emailed to gagmeger@gmail.com |
| Signed Document(s) | Link emailed to accounting@nobilitymail.com |
| Signed Document(s) | Link emailed to shanak@modernvascularmail.com |
| Signed Document(s) | Link emailed to etepman@modernvascular.com |
| Signed Document(s) | Link emailed to dryury@rapidlp.com |



# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is: 2818 La Cienega Avenue, Los Angeles, CA 90034

A true and correct copy of the foregoing document entitled **Debtor's Notice Of Motion And (I) Motion For Authority Approving Modification Of Lease Under § 363 And (Ii) Assuming Lease As Modified** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.     TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On **August 8, 2023**, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

- Russell Clementson     russell.clementson@usdoj.gov
- Cory Fein     cory@coryfeinlaw.com
- Craig S Ganz     ganzc@ballardspahr.com, BKTDocket_West@ballardspahr.com;hartt@ballardspahr.com
- David B Golubchik     dbg@lnbyg.com, stephanie@lnbyb.com
- Stella A Havkin     stella@havkinandshrago.com, shavkinesq@gmail.com
- Krikor J Meshefejian     kjm@lnbyg.com
- Nathan D Meyer     nmeyer@raklaw.com, ksanderlin@raklaw.com
- Michael S Myers     myersm@ballardspahr.com, BKTDocket_West@ballardspahr.com;PHXLitLAAs@ballardspahr.com
- Mary A Schmergel     mary.schmergel@usdoj.gov
- Mark M Sharf (TR)     mark@sharflaw.com, C188@ecfcbis.com;sharf1000@gmail.com;2180473420@filings.docketbird.com
- United States Trustee (SV)     ustpregion16.wh.ecf@usdoj.gov

**2.  SERVED BY UNITED STATES MAIL**: On **August 8, 2023**, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge <u>will be completed</u> no later than 24 hours after the document is filed.

Buchalter
Attn: Glen B Hotchkiss
15279 N. Scottsdale Road, Suite 400
Scottsdale, AZ 85254

☐ *Service information continued on attached page*

**3. SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on **August 8, 2023**, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge <u>will be completed</u> no later than 24 hours after the document is filed.

☐ *Service information continued on attached page*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| August 8, 2023 | Rebecka Merritt | /s/ Rebecka Merritt |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*                                                                **F 9013-3.1.PROOF.SERVICE**

Label Matrix for local noticing
0973-1
Case 1:23-bk-10657-MB
Central District of California
San Fernando Valley
Mon Aug  7 16:24:09 PDT 2023

Nebility Management, LLC
26025 Mureau Rd., Suite 110
Calabasas, CA 91302-3183

United States of America
Department of Justice
1100 L St NW
Washington, DC 20005-4035

San Fernando Valley Division
21041 Burbank Blvd,
Woodland Hills, CA 91367-6606

Alice Towwnsend
Marla Hormington/Lennie Bollinger
212 East Virgiiia St.
McKinney, TX 75069-4328

Anderson Banta Clarkson PLLC, IOLTA
48 N. MacDonald
Mesa AZ 85201-7329

Bosma Dairy North, LP
13805 Ave. 160, PO Box 1085
Tipton, CA 93272-1085

Calmur, LLC
4924 BALBOA BLVD, Ste 547
Encino, CA 91316-3402

Charles Raymond & Jeanie Raymond
Atticus Law, PLLC
7904 E. Chaparral Rd., #A110-418
Scottsdale, AZ 85250-7364

Cotton Center Corporate Office LLC
4650 E. Cotton Center Blvd. Suite 155
Phoenix, AZ 85040-4803

EM-PAAK Properties, LLC
4143 Rider Trail North
Earth City, MO 63045-1102

FRANCHISE TAX BOARD
BANKRUPTCY SECTION MS A340
PO BOX 2952
SACRAMENTO CA 95812-2952

Fort Worth Vascular
Specialists Corp
5750 Stratum Dr
Fort Worth, TX 76137-2757

Franchise Tax Board
Special Procedures - Insolvency
P.O. Box 2952
Sacramento, CA 95812-2952

Frank Garcia
Attn: 5tephen R Marshall
509 Roma Avenue
Albuqerque, NM 87102

Gampel Holdings, LP
19790 H. Dixie Hwy Suite 901
Miami, FL 33180

Greenberg Traurig, LLP
1144 15th Street #3300
Denver, CO 80202-2587

Houston Vascular
specialists Corp.
7103 South Peek Rd. #300
Richmond, TX 77407-3505

Indianapolis Vasculr
Specialists Cprp.
8704 N. Meridian St
Indianapolis, IN 46260-2331

(p)INTERNAL REVENUE SERVICE
CENTRALIZED INSOLVENCY OPERATIONS
PO BOX 7346
PHILADELPHIA PA 19101-7346

Iron Mountain
Po Box 601002
Pasadena, CA 91189-0002

Kansas City Vascular
Specialists Corp PA
5320 College Bl
Leawood, KS 66211-1621

Kentucky Vascular
Specialists, PLLC
2000 S. Hurstbourne Pkwy
Louisville, KY 40220-4207

Kristin K. Beilke
Murphy Desmond S.C
33 E. Main St., PO Box 2038
Madison, WI 53701-2038

Lexington Affiliates, LP
3109 N. St. Mary's St
San Antonio, TX 78212-3536

MFS Properties, Inc.
923 S. Bayview Street, Suite 100
Seattle, WA 98134-2093

Malibu Canyon Plaza LLC
C/O 1st Commercial Realty Group Inc
2009 Porterfield Way
Upland, CA 91786-2196

Mark E. Komer
Long, Komer & Associates, P.A.
P.O. Box 5098
Santa Fe, NM 87502-5098

Medtronic, Inc.
Wagner Falconer & Judd, Ltd.
100 South Fifth Street
Suite 800
Minneapolis, MN 55402-5357

Modern Vascular - Navajo, LLC
7800 Constitution Ave. NE
Albuquerque, NM 87110-7552

Modern Vascular Institute, LLC
2919 S Ellsworth Rd #115
Mesa, AZ 85212-2165

Modern Vascular Management - West
19790 W. Dixie Hwy. Suite 901
Miami, FL 33180-2298

Modern Vascular of Denver LLC
9461 Huron St
Denver, CO 80260-5426

Modern Vascular of Fairfax, LLC
2812 Old Lee Highway Building, 100-
Fairfax, VA 22031-4315

Modern Vascular of Ft. Worth, LLC
55 Physicians Lane
Southhaven, MS 38671-9569

Modern Vascular of Glendale, LLC
11851 N. 51st Ave #G110
Glendale, AZ 85304-2828

Modern Vascular of Mesa, LLC
535 E McKellips Rd STE 111
Mesa, AZ 85203-2525

Modern Vascular of Mission City
19790 W. Dixie Hwy #901
Miami, FL 33180-2298

Modern Vascular of San Antonio LLC
718 Lexington Avenue
San Antonio, TX 78212-4768

Modern Vascular of Southaven LLC
55 Physicians Lane
Southaven, MS 38671-9569

Modern Vascular of Sun City, LLC
14780 W. Mountain View Blvd.
Suite 120
Surprise, AZ 85374-7280

Modern Vascular of Tucson, LLC
2171 W Orange Grove Rd.
Tucson, AZ 85741-3118

OEC Medical Systems, Inc.
Michael B. Bach, Authorized Agent
25 Whitney Drive, Suite 106
Milford, OH 45150-8400

PSGMV, LLC
2402 N. 179th Street
Omaha, NE 68116-2266

PSGMV, LLC
T. Josh Judd
Andrews Myers, P.C.
1885 Saint James Place, 15th Floor
Houston, TX 77056-4175

(p)DE LAGE LANDEN FINANCIAL
ATTN LITIGATION & RECOVERY
1111 OLD EAGLE SCHOOL ROAD
WAYNE PA 19087-1453

Paramount Commercial Realty, LLC
401 Ryland St, STE 200A
Reno, NV 89502-1643

Phoenix NAP
Attn: Acounts Receivable
PO Box 51514
Los Angeles, CA 90051-5814

Pitney Bowes Global
Financial Services
PO Box 371887
Pittsburgh, PA 15250-7887

Pitney Bowes Purchase Power
PO Box 371874
Pittsburgh, PA 15250-7874

Rabia, LLC  Jilani Properties, LLC
12 Arundel Drive
Hayward, CA 94542-7902

Rabia, LLC and Jilani Properties, LLC
Murphy Desmond S.C.
33 E. Main St., Ste. 2038
Madison, WI 53703-3095

Reviewsnap
Dept LA 24612
Pasadena, CA 91185-0001

Rex Nederend Family Trs dtd 3/17/94
12718 Road 144
Tipton, CA 93272-9535

Rosalind Debonis
Attn: H. Christian Bode
7373 East Doubletree Ranch Rd.
Scottsdale, AZ 85258-2035

San Antonio Vascular
9819 Huebner Rd. Bldg. 4
San Antonio, TX 78240-3253

San Antonio Vascular Specialists Co
9819 Huebner Rd Bldg. 4
San Antonio, TX 78240-3253

Steven Kessler
Attn: Adrian O. Vega
4110 Cutler Ave. NE #100
Albuquerque, NM 87110-4080

Theodore Tafoya and Ann Tafoya
Attn: Mark E. Komer
P.O. Box 5098
Santa Fe, NM 87502-5098

Trizetto Provider Solutions
PO Box 734743
Chicago, IL 606734743

Turner Island AZ, LLC
1269 West I Street
Los Banos, CA 93635-3930

U.S. Trustee, San Fernando Valley
915 Wilshire Blvd.
Suite 1850
Los Angeles, CA 90017-3560

United States Attorney - Arizona
Attn: Brian Boynton
40 North Central Avenue, Suite 1800
Phoenix, AZ 85004-0932


United States Department of Justice
Attn: Mary A. Schmergel
Civil Div. 1100 L Street Room 70012
Washington, DC 20005-4035

United States Trustee (SV)
915 Wilshire Blvd, Suite 1850
Los Angeles, CA 90017-3560

Victoria Garcia
Attn: Cynthia A. Braun
2169 East Warner Road, Suite 104
Tempe, AZ 85284-3500


Vladimir Zeetser and Julia Zeetser
Attn: Nathan D. Meyer
12424 Wilshire Blvd. 12th Floor
Los Angeles, CA 90025-1052

Wagner Falconer & Judd, Ltd.
100 South Fifth Street
Suite 800
Minneapolis, MN 55402-5357

Wells Fargo Vendor Financial Services, LLC
1010 Thomas Edison Blvd SW
Cedar Rapids, IA 52404-8247


(p)WESTERN ALLIANCE BANK
1 EAST WASHINGTON STREET
STE 1400
PHOENIX AZ 85004-2559

William Pilkin
Attn: Andy Scholl
6739 Academy Suite 234
Albuquerque, NM 87109-3357

Yury Gampel
19790 W. Dixie Hwy Suite 901
Miami, FL 33180-2298


(p)ECLINICALWORKS LLC
2 TECHNOLOGY DRIVE
WESTBOROUGH MA 01581-1727

eClinicalWorks, LLC
PO Box 847950
Boston, MA 02284-7950

David B Golubchik
Levene, Neale, Bender, Yoo & Golubchik L
2818 La Cienega Avenue
Los Angeles, CA 90034-2618


Krikor J Meshefejian
Levene, Neale, Bender, Yoo & Golubchik L
2818 La Cienega Avenue
Los Angeles, CA 90034-2618

(p)MARK SHARF
6080 CENTER DRIVE SUITE 600
LOS ANGELES CA 90045-1540

Russell Clementson
915 Wilshire Blvd., Suite 1850
Los Angeles, CA 90017-3560


The preferred mailing address (p) above has been substituted for the following entity/entities as so specified
by said entity/entities in a Notice of Address filed pursuant to 11 U.S.C. 342(f) and Fed.R.Bank.P. 2002 (g)(4).


Internal Revenue Service
Insolvency I Stop 5022
300 N. Los Angeles St., #4062
Los Angeles, CA 90012-9903

Pacific Office Automation
PO Box 41602
Philadelphia, PA 19101

Western Alliance Bank
3033 West Ray Road
Chandler, AZ 85226


eClinicalWorks LLC
2 Technology Drive
Westborough, MA 01581

Mark M Sharf (TR)
6080 Center Drive #600
Los Angeles, CA 90045


The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Calmur, LLC

(u)LEVENE NEALE BENDER YOO & GOLUBCHIK L.L.P

(u)RMZ Holdings, LLC

(u)SCF RC Funding I, LLC

(u)SCF RC Funding I LLC
902 Carnegie Center Blvd., Ste 520
NJ 08450

(u)Cory Fein

**End of Label Matrix**
**Mailable recipients    77**
**Bypassed recipients     6**
**Total                  83**